# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AUTOBACS STRAUSS INC., a Delaware Corporation, | Case No. 09-10358 (CSS) |
| Debtor. | |

| | |
|---|---|
| AUTOBACS STRAUSS INC., and 1945 ROUTE 23 ASSOCIATES, INC., and R&S PARTS AND SERVICE, INC., by their Chief Liquidating Officer EXECUTIVE SOUNDING BOARD ASSOCIATES, INC., | Adv. Pro No. 09-52849 (CSS) |
| Plaintiffs, | |
| -against- | |
| AUTOBACS SEVEN CO., LTD. KENICHI TAKEDA, AKIHIRO YAMADA, HIROYOSHI KOJIMA, and YUKUO TAKENAKA, | |
| Defendants. | |

## MEMORANDUM OF DEFENDANTS AUTOBACS SEVEN CO., LTD., KENICHI TAKEDA, AKIHIRO YAMADA AND HIROYOSHI KOJIMA IN SUPPORT OF THEIR MOTION TO DISMISS

Dated: April 23, 2010
Wilmington, Delaware

**Landis Rath & Cobb LLP**
Richard S. Cobb (No. 3157)
James S. Green (No. 4406)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:     (302) 467-4400

**Kramer Levin Naftalis & Frankel LLP**
Jeffrey S. Trachtman
Michael J. Sternhell
Daniel M. Eggermann
1177 Avenue of the Americas
New York, New York 10036
Telephone:     (212) 715-7624

*Counsel for Autobacs Seven Co., Ltd.,
Kenichi Takeda, Akihiro Yamada and
Hiroyoshi Kojima*

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................... iv

Preliminary Statement ................................................................................................. 1

Statement of Facts ....................................................................................................... 7

A.     The Parties ........................................................................................................ 7

B.     AB7 Agrees To Provide $39 Million ($10 Million of It in Equity) To Fund the
       Purchase of the New Jersey Debtors' Assets ..................................................... 9

C.     AB7 Honors Its Contractual Commitments and Provides Substantially More
       Financial Support for AB Strauss Than the APA Requires ............................... 19

D.     AB7 Works with AB Strauss To Restore and Improve the Business ................. 21

E.     The Strauss Discount Auto Business Fails for the Third Time in the Face of the
       Worst Recession in Decades ............................................................................ 23

Argument ................................................................................................................... 25

I.     PLAINTIFFS DO NOT STATE A VALID CLAIM FOR BREACH OF
       THE APA ................................................................................................. 27

II.    PLAINTIFFS DO NOT STATE A VALID CLAIM FOR BREACH OF
       THE R&S PLAN ...................................................................................... 30

III.   PLAINTIFFS FAIL TO PLEAD A VALID CLAIM FOR TORTIOUS
       INTERFERENCE WITH CONTRACT .................................................... 35

IV.    PLAINTIFFS FAIL TO ALLEGE A VALID CLAIM FOR FRAUD IN
       THE INDUCEMENT ............................................................................... 37

       A.     The Particularized Statements Plaintiffs Attribute to Defendants
              Were All *True* ............................................................................... 39

       B.     Defendants' Statements Concerning Anticipated Efforts To
              Stabilize Strauss Discount Auto and Make the Business Profitable
              Are Not Actionable ......................................................................... 42

       C.     Plaintiffs Do Not Allege with Particularity That the AB7
              Defendants *Ever* Promised To Fund AB Strauss's Purchase of
              Strauss Discount Auto Solely with Equity ....................................... 44

       D.     Plaintiffs Fail To State a Fraud Claim Based on Defendants'
              Alleged Omissions ........................................................................... 46

KL3 2769268.15

# TABLE OF CONTENTS (cont'd)

Page

E. Plaintiffs Could Not Have Reasonably Relied on Any Alleged Oral Representations That the Purchase Price Would Be Paid Entirely in Equity ................................................................................................. 49

F. Plaintiffs Fail To Allege That Defendants Acted with Any Fraudulent Intent .......................................................................... 51

G. Defendants' Alleged Misrepresentations and Omissions Were Not the Proximate Cause of Plaintiffs' Injuries ................................. 53

V. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY ................................................................................... 55

A. AB Strauss's Directors Owed Fiduciary Duties *Solely* to Shareholders .................................................................................. 57

B. Plaintiffs' Duty of Care Allegations Are Barred by the AB Strauss Certificate of Incorporation ................................................. 58

C. Plaintiffs Have Not Pleaded Around the Business Judgment Rule ........... 59

VI. THE FACTS ALLEGED DO NOT SUPPORT A CLAIM TO PIERCE AB STRAUSS'S CORPORATE VEIL ................................................................ 65

A. The Complaint Does Not Allege That AB Strauss and AB7 Functioned as a Single Economic Entity ................................... 66

B. The Complaint Does Not Allege That AB Strauss's Corporate Form Was Used To Perpetrate a Fraud or Similar Injustice ..................... 71

VII. PLAINTIFFS FAIL TO PLEAD FACTS SUPPORTING RECHARACTERIZATION OF AB7'S LOANS AS EQUITY ........................... 72

VIII. THE COMPLAINT DOES NOT ALLEGE FACTS SUPPORTING EQUITABLE SUBORDINATION OF AB7'S CLAIMS .................................... 80

IX. PLAINTIFFS' AVOIDANCE CLAIMS FAIL AS A MATTER OF LAW ......... 82

A. The Complaint Fails To Allege a Viable Claim for Constructive Fraudulent Transfer ................................................................. 84

1. The Complaint Fails To Adequately Allege That the Debtor Received Less Than Reasonably Equivalent Value in Exchange for the Loan Obligations and the Payments ................. 84

KL3 2769268.15

# TABLE OF CONTENTS (cont'd)

Page

2. The Complaint Fails To Adequately Allege That One of the Required Financial Criteria Was Present When the Loan Obligations Were Incurred and the Payments Were Made ........... 85

B. The Complaint Fails To Allege a Plausible Claim for Actual Fraudulent Transfer ................................................................. 89

X. THE COMPLAINT FAILS TO ALLEGE A VALID CLAIM FOR MORE THAN A MINIMAL AVOIDABLE PREFERENCE ........................................... 91

XI. PLAINTIFFS' PRAYER FOR PUNITIVE DAMAGES SHOULD BE STRICKEN BECAUSE SUCH DAMAGES ARE UNAVAILABLE AS A MATTER OF LAW ON THE FACTS ALLEGED ............................................. 93

Conclusion ....................................................................................................................... 97

KL3 2769268.15

# TABLE OF AUTHORITIES

Page

## CASES

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994) ....................................................................................... 92

*In re ALH Holdings LLC*,
   No. 04-1339-SLR, 2009 WL 4980361 (D. Del. Dec. 22, 2009) ............................. 62

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ..................................................................................... 43

*Akzona Inc. v. E.I. Du Pont de Nemours & Co.*,
   607 F. Supp. 227 (D. Del. 1984) ............................................................................. 69

*Alexander v. CIGNA Corp.*,
   991 F. Supp. 427 (D.N.J.),
   *aff'd*, 172 F.3d 859 (3d Cir. 1998) ..................................................................... 42, 43

*Anadarko v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988) ....................................................................................... 57

*Angrisani v. Capital Access Network, Inc.*,
   175 F. App'x 554 (3d Cir. 2006) .............................................................................. 42

*Aronson v. Lewis*,
   473 A.2d 805 (1984),
   *overruled on other grounds sub nom.*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ....... 56, 61

*Asarco LLC v. Americas Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ................................................................................. 95

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .................................................................................... *passim*

*Atl. N. Airlines v. Schwimmer*,
   96 A.2d 652 (N.J. 1953) ..................................................................................... 30, 31

*Baldi v. Samuel Son & Co.*,
   548 F.3d 579 (7th Cir. 2008) ................................................................................... 86

*Banco Popular N. Am. v. Gandi*,
   876 A.2d 253 (2005) ................................................................................................. 38

*Bayer Corp. v. MasoTech, Inc. (In re Autostyle Plastics, Inc.)*,
   269 F.3d 726, 750-53 (6th Cir. 2001) ................................................... 75, 76, 77, 78

# TABLE OF AUTHORITIES (cont'd)

Page

*Bd. of Trs. v. Foodtown, Inc.*,
  296 F.3d 164 (3d Cir. 2002) ................................................................. 69

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 25

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
  563 F.2d 692 (5th Cir. 1977) ............................................................... 81

*Boring v. Google, Inc.*,
  No. 09-2350, 2010 WL 318281 (3d Cir. Jan. 28, 2010) ......................... 93

*Boyd v. Pearson*,
  346 F. App'x 814 (3d Cir. 2009) .......................................................... 26

*Braunstein v. Benjamin Berman, Inc.*,
  No. 89-5344, 1990 WL 192547 (D.N.J. Sept. 12, 1990) ........................ 50

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
  906 A.2d 27 (Del. 2006) ...................................................................... 62

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................... 52

*Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*,
  290 B.R. 229 (Bankr. D. Del. 2003) ............................................ *passim*

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*,
  864 A.2d 387 (N.J. 2005) ..................................................................... 29

*Buckley v. Trenton Saving Fund Soc'y*,
  544 A.2d 857 (N.J. 1988) ..................................................................... 94

*Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) .......................................................... 26, 42

*Burtch v. Dent (In re Circle Y of Yoakum, Tex.)*,
  354 B.R. 349 (Bankr. D. Del. 2006) ...................................................... 55

*CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*,
  No. 03 Civ. 7936(DAB), 2007 WL 2915181 (S.D.N.Y. Oct. 3, 2007) ..... 61

*Cedarbrook Plaza, Inc. v. Gottfried*,
  No. 97-1560, 1997 WL 330390 (E.D. Pa. June 6, 1997) ........................ 66

KL3 2769268.15

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993)................................................................61

*Chiarella v. United States*,
    445 U.S. 222 (1980) ...................................................................47

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998) .........................................................80

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006) ......................................................*passim*

*Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*,
    385 F. Supp. 2d 449 (D. Del. 2004) ................................................61

*Conway v. 287 Corporate Ctr. Assocs.*,
    901 A.2d 341 (N.J. 2006) .......................................................29, 30

*Cox v. Hess (In re Big Wheel Holding Co.)*,
    214 B.R. 945 (D. Del. 1997)........................................................80

*Crosse v. BCBSD, Inc.*,
    836 A.2d 492 (Del. 2003)...........................................................71

*Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*
    *(In re Crystal Palace Gambling Hall, Inc.)*,
    817 F.2d 1361 (9th Cir. 1987) ......................................................31

*Cumberland County Improvement Auth. v. GSP Recycling Co.*,
    818 A.2d 431 (N.J. Super. Ct. App. Div. 2003) ....................................31

*DiGiorgio Corp. v. Mendez & Co.*,
    230 F. Supp. 2d 552 (D.N.J. 2002)..................................................36

*Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.)*,
    No. 02-3609 A, 2003 WL 1889040 (Bankr. S.D.N.Y. Apr. 17, 2003) .................66

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*,
    380 B.R. 348 (Bankr. D. Del. 2008),
    *aff'd*, 400 B.R. 13 (D. Del. 2009) ................................................87, 89

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
    No. 3184-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008)........................67, 68

*Emerson Radio Corp. v. Orion Sales, Inc.*,
    253 F.3d 159 (3d Cir. 2001) ........................................................35

KL3 2769268.15

*FDIC v. Sea Pines Co.*,
  692 F.2d 973 (4th Cir. 1982) ...................................................................63

*Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*,
  421 B.R. 164 (Bankr. E.D. Pa. 2009) ..................................85, 89, 90, 92

*Fishbaum v. Liz Claiborne, Inc.*,
  No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999) ........................52

*Frederico v. Home Depot*,
  No. Civ. A. 05-5579 (JAP), 2006 WL 624901 (D.N.J. Mar. 10, 2006),
  *aff'd*, 507 F.3d 188 (3d Cir. 2007)........................................................45

*In re Hedged-Invs. Assocs.*,
  380 F.3d 1292 (10th Cir. 2004) .............................................................79

*Heller v. Kiernan*,
  No. Civ.A. 1484-K, 2002 WL 385545 (Del. Ch. Feb. 27, 2002),
  *aff'd*, 806 A.2d 164 (Del. 2002) ...........................................................56

*Henderson v. Morrone*,
  214 F. App'x 209 (3d Cir. 2007).............................................................28

*Hill v. Equitable Trust Co.*,
  562 F. Supp. 1324 (D. Del. 1983) ..........................................................94

*Hokanson v. Petty*,
  No. 3438-VCA, 2008 WL 5169633 (Del. Ch. Dec. 10, 2008)................59

*In re IKON Office Solutions, Inc. Sec. Litig.*,
  277 F.3d 658 (3d Cir. 2002) ..................................................................44

*Intermilo, Inc. v. I.P. Enters.*,
  19 F.3d 890 (3d Cir. 1994) .....................................................................95

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) .....................................................52

*Jardel Co. v. Hughes*,
  523 A.2d 518 (Del. 1987).......................................................................96

*Jewish Ctr. of Sussex County v. Whale*,
  432 A.2d 521 (N.J. 1981) ..................................................................38, 51

*Joyce ex rel. CTC Minerals, Inc. v. Cuccia*,
  No. Civ.A. 14953, 1997 WL 257448 (Del. Ch. May 14, 1997)..............61

KL3 2769268.15

*Kempf v. Target Corp.*,
   No. 06-CV-1935 (DMC), 2008 WL 305457 (D.N.J. Jan. 31, 2008).......................28

*Konover Constr. Corp. v. E. Coast Constr. Servs. Corp.*,
   420 F. Supp. 2d 366 (D.N.J. 2006)............................................................54

*Law Debenture Trust Co. of N.Y. v. Petrohawk Energy Corp.*,
   No. Civ.A. 2422-VCS, 2007 WL 2248150 (Del. Ch. Aug. 1, 2007) ....................80

*Liafail, Inc. v. Learning 2000, Inc.*,
   No. C.A.01-599 GMS, 2002 WL 31667861 (D. Del. Nov. 25, 2002) ...................45

*In re Lifschultz Fast Freight*,
   132 F.3d 339 (7th Cir. 1997) ..........................................................77, 78, 81

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 (3d Cir. 1993) .................................................................47, 48

*Litt v. Wycoff*,
   No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) .............................60

*Lo Bosco v. Kure Eng'g Ltd.*,
   891 F. Supp. 1020 (D.N.J. 1995).........................................................94, 96

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004) ...................................................................38

*Lyondell Chem. Co. v. Ryan*,
   970 A.2d 235 (Del. 2009)......................................................................62

*Maksin Mgmt. Corp. v. Roy A. Rapp, Inc.*,
   No. A-2817-06, 2008 WL 3165465 (N.J. Super. Ct. App. Div. Aug. 8, 2008).....................47

*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001).....................................................................59

*Mason v. Network of Wilmington, Inc.*,
   No. Civ.A. 19434-NC, 2005 WL 1653954 (Del. Ch. July 1, 2005)......................68

*McClain v. Faraone*,
   369 A.2d 1090 (Del. Super. Ct. 1977)......................................................96

*Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, Fr.*,
   No. Civ.A. 19760-NC, 2004 WL 415251 (Del. Ch. Mar. 4, 2004)......................71

KL3 2769268.15

*Midland Interiors, Inc. v. Burleigh,*
No. 18544, 2006 WL 3783476 (Del. Ch. Dec. 19, 2006).......................................65

*Miller v. Dow (In re Lexington Oil & Gas Ltd.),*
423 B.R. 353 (Bankr. E.D. Okla. 2010) ................................................95

*Milner v. TPAC LLC (In re Ticketplanet.com),*
313 B.R. 46 (Bankr. S.D.N.Y. 2004) ................................................71

*Mobil Oil Corp. v. Linear Films, Inc.,*
718 F. Supp. 260 (D. Del. 1989) ................................................72

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
971 F.2d 1056 (3d Cir. 1992) ................................................37, 85, 87

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
930 A.2d 92 (Del. 2006).......................................58

*N.J. Econ. Dev. Auth. v. Pavonia Restaurant, Inc.,*
725 A.2d 1133 (N.J. Super. Ct. App. Div. 1998) ................................................47

*Nelson v. Emerson,*
No. 2937-VCS, 2008 WL 1961150 (Del. Ch. May 6, 2008) ................................................65

*Nester v. O'Donnell,*
693 A.2d 1214 (N.J. Super. Ct. App. Div. 1997) .......................................31

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.*
*(In re BH S&B Holdings LLC),*
420 B.R. 112 (Bankr. S.D.N.Y. 2009) .......................................... *passim*

*Official Comm. of Unsecured Creditors v. Beckoff (In re RSL COM PRIMECALL, Inc.),*
No. 01-11457 (ALG), 2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003) ..........63, 65, 71

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston*
*(In re Exide Techs., Inc.),*
299 B.R. 732 (Bankr. D. Del. 2003)........................................... *passim*

*Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P.*
*(In re Fedders N. Am., Inc.),*
405 B.R. 527 (Bankr. D. Del. 2009)............................................73, 74, 80, 83, 90

*Official Comm. of Unsecured Creditors v. Seven D. Wholesale*
*(In re Contempri Homes, Inc.),*
269 B.R. 124 (Bankr. M.D. Pa. 2001) ................................................92

KL3 2769268.15

# TABLE OF AUTHORITIES (cont'd)

Page

*Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC*
    (*In re Radnor Holdings Corp.*),
    353 B.R. 820 (Bankr. D. Del. 2006)..................................................................73, 74, 75

*OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*,
    325 B.R. 696 (Bankr. D. Del. 2005)..................................................................84, 89

*One-O-One Enters. v. Caruso*,
    848 F.2d 1283 (D.C. Cir. 1988)..................................................................50

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002)..................................................................61

*Pardo v. Gonzaba (In re APF Co.)*,
    308 B.R. 183 (Bankr. D. Del. 2004)..................................................................85

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002),
    *aff'd sub nom.*, *In re USN Commc'n, Inc.*, 60 F. App'x 401 (3d Cir. 2003) .............85, 86, 87

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ..................................................................25

*Pierce v. Ortho Pharm. Corp.*,
    417 A.2d 505 (N.J. 1980) ..................................................................94

*Premier Pork L.L.C. v. Westin, Inc.*,
    No. 07-1661, 2008 WL 724352 (D.N.J. Mar. 17, 2008) ..................................................................38

*Printing Mart-Morristown v. Sharp Elec. Corp.*,
    563 A.2d 31 (N.J. 1989) ..................................................................36

*Raslavich v. Elkins (In re Old World Cone Co.)*,
    119 B.R. 473 (Bankr. E.D. Pa. 1990) ..................................................................92

*Reeves v. Am. Airlines, Inc.*,
    408 A.2d 283 (Del. 1979)..................................................................96

*Rolo v. City Investing Co. Liquidating Trust*,
    155 F.3d 644 (3d Cir. 1998) ..................................................................38, 45

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*,
    321 B.R. 128 (Bankr. D. Del. 2005)..................................................................66

*Ross v. Celtron Int'l, Inc.*,
    494 F. Supp. 2d 288 (D.N.J. 2007)..................................................................36

*Sandler v. Lawn-a-Mat Chem. & Equip. Corp.*,
   358 A.2d 805 (N.J. Super. Ct. App. Div. 1976) .................................................... 94

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009) .............................. 46, 53

*In re Scott Acq. Corp.*,
   344 B.R. 283 (Bankr. D. Del. 2006) ........................................................................ 59

*In re Shenango Group Inc.*,
   501 F.3d 338 (3d Cir. 2007) .................................................................................... 31

*Silverstein v. Percudani*,
   207 F. App'x. 238, 240 (3d Cir. 2006) .................................................................... 45

*Silvestre v. Bell Atl. Corp.*,
   973 F. Supp. 475 (D.N.J. 1997),
   *aff'd*, 156 F.3d 1225 (3d Cir. 1998) ...................................................................... 35, 36

*Sinclair Oil Corp. v. Levien*,
   280 A.2d 717 (Del. 1971) ...................................................................................... 60

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
   416 F.3d 229 (3d Cir. 2005) .................................................................................... 59

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
   911 A.2d 362 (Del. 2006) ...................................................................................... 56, 62

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
   906 A.2d 168 (Del. Ch. 2006),
   *aff'd*, 931 A.2d 438 (Del. 2007) .......................................................................... 57, 59, 60, 62

*Trevino v. Merscorp, Inc.*,
   583 F. Supp. 2d 521 (D. Del. 2008) ...................................................................... 67, 71

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
   No. 09-1198, 2010 WL 1253157 (Bankr. S.D.N.Y. Mar. 31, 2010) ...................................... 95

*Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
   332 F.3d 188 (3d Cir. 2003) .................................................................................... 67

*In re Tyson Foods, Inc. Sec. Litig.*,
   No. 01-425-SLR, 2004 WL 1396269 (D. Del. June 17, 2004),
   *aff'd*, 155 F. App'x 53 (3d Cir. 2005) .................................................................. 52, 53

KL3 2769268.15

*United States v. Bestfoods,*
  524 U.S. 51 (1998) ...........................................................................................70

*Unocal Corp. v. Mesa Petroleum Co.,*
  493 A.2d 946 (Del. 1985)...................................................................................56

*Upjohn Co. v. Syntro Corp.,*
  No. 89-107-JJF, 1990 WL 79232 (D. Del. Mar. 9, 1990) ................................70

*VFB LLC v. Campbell Soup Co.,*
  482 F.3d 624 (3d Cir. 2007) ..............................................................................57

*VT Investors v. R & D Funding Corp.,*
  733 F. Supp. 823 (D.N.J. 1990)..........................................................................43

*In re Walt Disney Co. Deriv. Litig.,*
  907 A.2d 693 (Del. Ch. 2005),
  *aff'd, Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.),* 906 A.2d 27 (Del. 2006)........56

*In re Wheelabrator Techs., Inc. S'holder Litig.,*
  No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992)........................................59

*Winner Acceptance Corp. v. Return on Capital Corp.,*
  No. 3088-VCP, 2008 WL 5352063 (Del. Ch. Dec. 23, 2008) ............................67

*Winoka Vill., Inc. v. Tate,*
  84 A.2d 626 (N.J. Super. Ct. App. Div. 1951) ....................................................50

*In re Worlds of Wonder Sec. Litig.,*
  814 F. Supp. 850 (N.D. Cal. 1993),
  *aff'd in part, rev'd in part on other grounds,* 35 F.3d 1407 (9th Cir. 1994) .........................34

## STATUTES

11 U.S.C. § 101(32)(A) .........................................................................................85

11 U.S.C. § 547.........................................................................................91, 92, 93

11 U.S.C. § 548.........................................................................83, 84, 85, 88, 89

11 U.S.C. § 550.........................................................................................................83

11 U.S.C. § 1129(a)(4) ...........................................................................................49

Fed. R. Civ. P. 8(a) .........................................................................................25, 45

Page

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1, 38

Del. Code Ann. tit. 6, § 1307 ............................................................................... 95

Del. Code Ann. tit 8, § 102 .................................................................................. 58

Del. Code Ann. tit. 8, § 124 ................................................................................. 79

N.J. Stat. Ann. § 2A:15-5.12 ................................................................................ 95

N.J. Stat. Ann. § 25:2-29 ..................................................................................... 95

## MISCELLANEOUS

*Black's Law Dictionary* (9th ed. 2009) ............................................................. 34, 38

*Dictionary of Finance & Investment Terms* (7th ed. 2006) .................................. 34

Joseph E. Stiglitz, *Freefall: America, Free Markets, and the Sinking of the World Economy* (2010) .................................................................................................. 23

10 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 4886.60 ....................................................................................... 36

Defendants Autobacs Seven Co., Ltd. ("AB7"), Kenichi Takeda, Akihiro Yamada, and Hiroyoshi Kojima (together, the "AB7 Defendants") respectfully submit this memorandum in support of their motion (the "Motion"), pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) (incorporated in Fed. R. Bankr. P. 7012 and 7009), to dismiss the Complaint and Objection to Claim (the "Complaint" or "Compl.") filed in this Adversary Proceeding by plaintiffs Autobacs Strauss Inc. ("AB Strauss" or the "Debtor") and R&S Parts and Service Inc. and 1945 Route 23 Associates, Inc. (together, the "New Jersey Debtors").

## Preliminary Statement

This lawsuit is an attempt to extract further value from the party that gave the most — and lost the most — in the latest failed effort to revive the perennially struggling Strauss Discount Auto business.

In a carefully negotiated Asset Purchase Agreement (the "APA"), Debtor AB Strauss committed to purchase the assets of the New Jersey Debtors for a price of up to $45 million — no more than $29 million at closing to fund an enumerated list of effective date obligations and expenses (including a first installment payment to the New Jersey Debtors' unsecured creditors (the "Class 4 Creditors")) and approximately $16 million in *future* payments to be made for the benefit of the Class 4 Creditors. AB7, which had established AB Strauss as the entity to acquire and run the Strauss Discount Auto business, agreed to provide cash to fund the roughly $29 million in closing payments, plus $10 million in equity to be used by AB Strauss as additional working capital. The APA strictly limited AB7's total funding obligation to $39 million; the *future* $16 million of installment payments (which AB7 had declined even to guarantee) remained the responsibility only of *AB Strauss*. Indeed, creditors were specifically told that AB7 was *not* writing a "blank check." The APA did not require any portion of AB7's

investment other than the $10 million to be in the form of equity and contained no language barring AB7 from making unsecured loans to AB Strauss.

AB7 performed all of its obligations under the APA — and then some. In a nearly two-year effort to turn around the struggling business, AB7 sunk approximately *$75 million* of its own net cash into the company — $32.3 million in equity and most of the remainder in low-interest, unsecured loans. AB7's voluntary funding of nearly twice what it promised to invest afforded AB Strauss the best chance of surviving a cataclysmic recession and permitted it to continue making installment payments for the benefit of the Class 4 Creditors, who ultimately received approximately 60% of their claims. In contrast, AB7 lost its entire equity investment and, as AB Strauss's largest unsecured creditor, stands to recover only a small fraction of its roughly $43 million unsecured claim.

But plaintiffs want more. They now ask AB7 retroactively to guarantee *100%* of the Class 4 Creditors' claims; to assume liability for all of AB Strauss's other unsecured claims; to give up entirely its unsecured claim based on tens of millions of dollars in legitimate, documented, voluntarily advanced loans; and on top of that to pay hundreds of millions in *damages* to create a vast windfall for AB Strauss's current owner, Glenn Langberg — the executive who (i) piloted the Strauss stores into the previous bankruptcy; (ii) extracted a $3 million personal cash payment in connection with the AB7 transaction (at a time he now claims the company was insolvent); (iii) participated without visible protest in the events now claimed to have defrauded and injured the New Jersey Debtors (at a time when he owed them fiduciary duties); and then (iv) grabbed the Debtor's equity for $7,500 to take control of the reorganization process and this litigation.

KL3 2769268.15

The fundamental theory underlying this Complaint — that AB7 defrauded the New Jersey Debtors by concealing a scheme to conduct a secret "leveraged buyout" and to recklessly "expand" the Strauss business — is a litigator's concoction, *contradicted* by the facts alleged in the Complaint. While the Complaint alleges that the Debtor was prohibited from incurring any insider debt, this supposed bar appears nowhere in the APA, the New Jersey Debtors' plan of reorganization, or any other relevant document. Indeed, the U.S. Bankruptcy Court for the District of New Jersey (the "New Jersey Bankruptcy Court") was told only that AB7 would contribute *$10 million* in equity and that AB Strauss had no present intention of taking on any *secured* debt. Nor does the Complaint allege facts supporting any reckless "expansion" of the Strauss business. The Complaint does not allege that a single new store was opened. To the contrary, it alleges merely that AB Strauss increased inventory and personnel at existing stores. But the vast majority of these expenditures represented simply replenishing bankruptcy-depleted store shelves. And AB7's intention to revitalize the business by further expanding and diversifying inventory was no secret; it was prominently advertised to vendors, with the enthusiastic embrace of the New Jersey Debtors' management. In any event, the Complaint fails to allege facts showing that any material amount of AB Strauss's losses, much less the ultimate failure of its business, stems from the minor examples of allegedly misguided new product purchases that plaintiffs recite — even leaving aside that the conduct, as pleaded, clearly falls within the business judgment rule.

Stripped of inflammatory rhetoric, the facts actually pleaded establish only a mundane business failure. If this was a secret "leveraged buyout," it was the first in history funded 100% with the acquiring party's own cash (nearly half as equity) and no encumbering of the target's assets. If this is a veil-piercing case, it is the first in which millions of dollars was

siphoned *into* the challenged entity.  If it is an equitable subordination case, it is the first in which the defendant voluntarily advanced millions of dollars in cash to fund payments to the very creditors now crying foul.

The blunderbuss Complaint contains 15 causes of action.  For the Court's convenience, we attach as Annex A a chart listing each claim in number order, along with a short-hand description of defendants' grounds for dismissal of each count.  But we begin our discussion of these claims here at the logical threshold: What did AB7 actually promise and undertake to do?

We first demonstrate that plaintiffs fail to allege a valid claim for breach of the APA (Point I, below).  The carefully negotiated terms of the APA required AB7 to invest no more than $39 million, only $10 million of which was required to be invested as equity.  Period.  An integration clause bars any attempt to alter those fundamental terms.  AB7 satisfied its negotiated obligations, and no claim for breach of the APA can be sustained.

Plaintiffs' parallel claim for breach of the New Jersey Debtors' plan of reorganization (the "R&S Plan") fails for the same reason (Point II).  Plaintiffs point to certain language in the order confirming the R&S Plan (the "R&S Confirmation Order" or "Confirmation Order") that in their view expanded AB7's funding obligation from $39 million to $55 million and increased the required equity investment from $10 million to the entire $55 million.  But plaintiffs do not allege any subsequent negotiations or agreements that would have caused the New Jersey Bankruptcy Court to materially change the parties' clear APA obligations.  Read as a coherent whole alongside the APA (which it was intended to incorporate), the R&S Confirmation Order similarly required AB7 to invest no more than $39 million, $10

- 4 -

million of which had to be invested as equity.  Because AB7 satisfied these obligations, the claim for breach of the R&S Plan similarly fails.

Plaintiffs' contract claims do not improve when repackaged as the New Jersey Debtors' fanciful claim for fraudulent inducement (Point III).  The specific affirmative statements allegedly made to the New Jersey Bankruptcy Court and creditors — that AB7 would provide the Debtor with $39 million (including $10 million in equity) and that AB Strauss would have no *secured* debt — were absolutely true, and generalized assurances that AB7 would "stand behind" the company or seek to "stabilize" it are not specific enough to be actionable (although they too were true).  Plaintiffs' allegation that creditors of the New Jersey Debtors were privately assured that AB Strauss would have *no debt of any kind* (which would be quite unusual for a chain of retail stores) is not pleaded with particularity and is contradicted by the terms of the APA.  Plaintiffs' attempt to infer deceit from various supposed omissions fails in the absence of any duty to disclose and is fundamentally illogical:  there are no facts alleged suggesting that *any* specific party *ever* attached significance to the supposed absence of unsecured debt or that creditors would have rejected the AB7 transaction (which was the only viable option available) if they had understood that part of the acquisition would be funded through loans.  The immateriality of this "non-disclosure" is confirmed by the absence of any allegation that Mr. Langberg, who remained an officer and director (and thus a fiduciary for the New Jersey Debtors) when he allegedly learned of the "fraud" in June 2007, *ever* took steps to correct or reveal it — or that the New Jersey Debtors, if they were so informed, viewed the disclosure as significant.

The Complaint further fails to allege facts supporting fraudulent intent, since AB7, *after* supposedly effectuating its fraud, voluntarily infused nearly *twice* the sum it had

- 5 -

committed to provide. What exactly was the point of AB7's fraudulent "scheme" — to fool the New Jersey Debtors into taking AB7's money? Finally, the Complaint fails to allege any harm to the New Jersey Debtors stemming from the alleged fraud, because strict adherence to AB7's funding obligations as conceptualized by plaintiffs would have left AB Strauss with *less* liquidity, *less* ability to make installment payments to the Class 4 Creditors, and *less* chance of having averted another bankruptcy.

Plaintiffs advance the same basic allegations under a series of increasingly incongruous legal rubrics. They claim that defendants tortiously interfered with the New Jersey Debtors' rights under the APA and the R&S Plan, even though parties to a contract and their officers and directors cannot, as a matter of law, be held liable under this tort (Point IV). They charge the Director Defendants with breach of fiduciary duty, even though, as directors of a solvent subsidiary corporation, they owed duties *only* to shareholders — and, in any event, the conduct alleged in the Complaint falls squarely within Delaware's strict business judgment rule (Point V). And most astonishingly, they allege veil-piercing, even though AB Strauss and AB7 clearly functioned as separate companies and the Complaint fails to allege that AB Strauss was a sham entity set up to defraud creditors (Point VI).

Plaintiffs also allege a series of bankruptcy-based theories to try to accomplish what they cannot through their state law allegations. First, plaintiffs contend that AB7's unsecured loans should be "recharacterized" as equity, even though the Complaint itself confirms that AB7 carefully distinguished between its equity infusions and unsecured loans, and the loans bear all the hallmarks of true debt (including formal documentation, fixed interest rates, repayment schedules, and the like) (Point VII). Plaintiffs also seek to equitably subordinate AB7's unsecured claim, but that theory fails as well because the underlying facts alleged fail to

- 6 -

demonstrate that AB7 engaged in inequitable conduct resulting in an unfair advantage over other creditors. To the contrary, AB7 disadvantaged *itself* by extending unsecured credit to AB Strauss to permit it to meet its obligations, including its obligations to the New Jersey Debtors (Point VIII).

Plaintiffs further assert a series of facially invalid avoidance theories: (1) a claim for constructive fraudulent transfer that fails because the Complaint does not adequately allege insolvency and because AB Strauss received reasonably equivalent value for the alleged transfers in the form of cash and satisfaction of prior indebtedness; (2) a claim for *actual* fraudulent transfer that fails because of the absence of any plausible allegation of fraud or concealment in the making of the loans; and (3) a preference claim that fails because, with respect to most of the amount alleged, subsequent new value was provided following the transfers (Points IX, X).

Finally, plaintiffs' prayer for punitive damages must be stricken because it attaches to causes of action that do not permit such damages as a matter of law (*e.g.*, breach of contract under New Jersey law, fraudulent transfer) or that require a level of outrageous and morally culpable conduct that the Complaint simply does not allege (*e.g.*, fraud, breach of fiduciary duty) (Point XI).

## Statement of Facts[1]

### A. The Parties

Defendant AB7 is a corporation organized and existing under the laws of Japan with its principal place of business in Tokyo. The company operates more than 600 automotive retail and service locations worldwide, primarily in Japan. Compl. ¶ 19. Until June 12, 2009,

---

[1] For purposes of this Motion only, defendants assume the truth of the facts alleged in the Complaint (except to the extent contradicted by other allegations or underlying documents).

AB7 operated in the United States through its wholly owned direct subsidiary Autobacs U.S.A., Inc. ("AB USA") and, between March 8, 2007 and June 12, 2009, through its indirect subsidiary AB Strauss. *Id.* ¶ 20. Defendant Kenichi Takeda is a citizen of Japan; he is a former director of AB7 and, from April 1, 2006 to April 30, 2007, served as co-chief operating officer. Thereafter, he served as the senior executive officer of merchandising strategy for AB7 from June 26, 2008 to December 1, 2008. Mr. Takeda was also the chairman of AB Strauss from March 9, 2007 to June 25, 2009. *Id.* ¶ 21. Defendant Akihiro Yamada is a citizen of Japan and an employee of AB7. He served as the chief executive officer and a director of AB Strauss from March 9, 2007 to June 25, 2009. Mr. Yamada also served as AB Strauss's president from March 9, 2007 to February 3, 2009. *Id.* ¶ 22. Defendant Hiroyoshi Kojima is a citizen of Japan and an employee of AB7 and was also the chief financial officer and a director of AB Strauss from March 9, 2007 to June 25, 2009. *Id.* ¶ 23. Defendant Yukuo Takenaka is a citizen of the United States, a resident of California, and the president and chief executive officer of Takenaka Partners LLC ("Takenaka Partners"), a specialty investment bank and consulting firm that has, from time to time, provided strategic advisory services to AB7. Mr. Takenaka also served as an outside director of AB Strauss and AB USA from March 9, 2007 to March 4, 2009. *Id.* ¶ 24. The individual defendants are collectively referred to herein as the "Director Defendants."

Plaintiff AB Strauss is a Delaware corporation with its principal place of business in South River, New Jersey. Doing business as Strauss Discount Auto, AB Strauss sells after-market automotive parts and accessories and operates automotive service centers throughout New Jersey, New York, and Pennsylvania. *Id.* ¶¶ 16, 26-27. Prior to May 2, 2007, Strauss Discount Auto was owned and operated by the New Jersey Debtors. On August 10, 2006, the New Jersey Debtors, which had been struggling financially for some time, sought relief under 11

KL3 2769268.15

U.S.C. §§ 101 *et seq.* in the New Jersey Bankruptcy Court. *Id.* ¶ 27. This was the second

bankruptcy proceeding for the Strauss Discount Auto business in less than ten years.[2] As

detailed below, AB7 caused the formation of AB Strauss on March 8, 2007 for the purpose of

acquiring the Strauss Discount Auto business from the New Jersey Debtors pursuant to a

confirmed plan of reorganization in their bankruptcy proceedings. *Id.* ¶ 16.

**B.     AB7 Agrees To Provide $39 Million ($10 Million of It in Equity)
To Fund the Purchase of the New Jersey Debtors' Assets**

In 2006, AB7, which was interested in expanding its presence and operations in

the U.S. market, engaged a strategic advisor, Takenaka Partners, to negotiate AB7's proposed

acquisition of the Strauss Discount Auto business assets from the New Jersey Debtors. *Id.* ¶¶ 28-

29. AB7 also retained Pillsbury Winthrop Shaw Pittman LLP to provide legal advice in

connection with the transaction. *Id.* ¶ 30. The law firm Lowenstein Sandler represented the New

Jersey Debtors during the parties' negotiations, which commenced in August 2006 and continued

for the next seven months, culminating in the execution of the APA, dated March 29, 2007,

pursuant to which, AB Strauss — a newly formed, wholly owned subsidiary of AB7's existing

California subsidiary AB USA — would purchase substantially all of the assets of the New

Jersey Debtors. *Id.* ¶ 47; Ex. B, APA § 2.1.

Section 3.2 of the APA provided that AB Strauss would pay a total purchase price

of approximately (and no more than) $45 million, which would cover all administrative claims,

secured DIP financing claims, cure amounts, and other expenses under the R&S Plan as well as

---

[2]      *See* Declaration of Jeffrey S. Trachtman dated April 23, 2010 ("Trachtman Decl."), Ex. A
(Disclosure Statement for First Amended Joint Plan of Reorganization of R&S Parts and Service at 7, *In
re 1945 Route 23 Assocs.*, No. 06-17474 (NLW) (Bankr. D.N.J. Mar. 30, 2007) (R&S Parts and Service
assets acquired in 2000 through predecessor's bankruptcy case)). The Trachtman Decl. attaches certain
documents cited in or integral to the Complaint. For brevity, such exhibits are cited simply as "Ex. __."

approximately $19.34 million in claims held by the New Jersey Debtors' unsecured creditors (*i.e.*, the Class 4 Creditors). Compl. ¶ 48; Ex. B § 3.2. AB Strauss would also assume certain post-petition liabilities of the New Jersey Debtors, without a cap. Ex. B § 2.2.

Section 3.3 of the APA divided the purchase price into (i) an "initial cash portion" of approximately (and no more than) $29 million, which would cover the payments and expenses described in Paragraph 3.2, including a first installment payment to the Class 4 Creditors and (ii) the "Deferred Amounts," covering the approximately $16 million due to the Class 4 Creditors in *future* payments (the "Deferred Payments"). *Id.* § 3.3. Section 3.3 provided that the amounts required to be paid as the "initial cash portion" of the purchase price (*i.e.*, the enumerated payments of approximately $29 million) "*together with* a $10,000,000 equity investment in [AB Strauss] by [AB7], shall not exceed $39,000,000." *Id.* § 3.3 (emphasis added).

AB7 was also made a party to the APA. *Id.* at 1, 34. However, in contrast to the duties imposed on AB Strauss, AB7's obligations under the agreement were quite limited and were set forth in their entirety in a single paragraph under Article IV, titled "FORMATION AND FUNDING OF NEWCO" (*i.e.*, AB Strauss):

> [AB7] indirectly owns and, at least until all Deferred Amounts required to be paid by [AB Strauss] hereunder shall have been paid in full, will indirectly own 100% of the equity interests of [AB Strauss]. [AB7] is causing [AB Strauss] to enter into this Agreement, and [AB7] specifically agrees, for the benefit of [the New Jersey Debtors] and [their] creditors, to provide [AB Strauss] with the funds up to the total amount set forth on Schedule 4, provided however, that the aggregate amount provided by [AB7] to [AB Strauss] pursuant to this ARTICLE IV *shall not exceed $39,000,000.*

*Id.*, art. IV (emphasis added). The referenced Schedule 4 further clarified AB7's funding obligations by setting forth an itemized list of the estimated amounts to be due at closing from AB Strauss that would satisfy each component of the initial cash portion of the purchase price, which AB7 would provide to AB Strauss in advance of closing. These amounts, together with

KL3 2769268.15

AB7's $10 million "Equity Investment," provided for an estimated "Total Payment as per Article IV of the APA" of $38,919,235. *Id.*; Ex. C. Section 5.19 of the APA specified that "Schedule 4 accurately sets forth in all Material respects the amounts to be settled for cash at the Closing with the Initial Dividend (*along with* the $10,000,000 equity investment that [AB7] agrees to make in [AB Strauss])." Ex. B § 5.19 (emphasis added).

Thus, the APA's unambiguous language provided that AB7's total payment obligation under the APA was capped at $39 million, only $10 million of which was required to be equity rather than debt. Compl. ¶¶ 49-50. The amount of the purchase price beyond the initial cash portion of $29 million — the approximately $16 million in Deferred Payments to the Class 4 Creditors — was solely the responsibility of AB Strauss, not AB7, which, as plaintiffs acknowledge, had expressly declined during the parties' negotiations even to *guarantee* the Deferred Payments, much less pay them directly. Compl. ¶ 42; Ex. B § 3.3(c). Lest there be any doubt, the APA further clarified that while the transaction's "Maximum Purchase Price . . . *including* any amounts required to pay any Deferred Amounts, shall not exceed $45,000,000" (Ex. B § 8.1(e) (emphasis added)), "the amount of cash required to pay cash amounts *at Closing* for the liabilities *and* to make the capital contribution to [AB Strauss] set forth in <u>Schedule 4</u> shall not exceed $39,000,000" (*id.* § 8.1(f) (emphasis added)).[3]

While the APA set forth various representations and warranties of AB Strauss and the New Jersey Debtors (*id.* §§ 5.1-6.6), it did not include *any* representations or warranties from AB7. Other than the requirement that AB7 make a $10 million equity investment in AB Strauss,

---

[3]     These indisputably clear terms render remarkable the Complaint's blithe assertion that "AB7's stated plan" was to provide the entire $45 million purchase price, *plus* the $10 million equity investment, *plus* itself assume all of the New Jersey Debtors' other liabilities "without a cap." Compl. ¶ 35. This is but one of the Complaint's many inaccuracies and distortions.

KL3 2769268.15

the APA imposed no further obligations on AB7 to capitalize AB Strauss in any particular way, or any restrictions on AB7's ability to loan money to AB Strauss or fund the acquisition with intercompany debt.

To ensure that the parties' representations and understandings would be limited to those they explicitly agreed to include in the contract, the APA included an integration clause that provided in relevant part:

> This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.

*Id.* § 11.6. Notwithstanding their agreement to this integration clause and the clear terms of the APA, the New Jersey Debtors now contend that they relied on alleged promises by Mr. Takenaka and Joseph Kim, a Takenaka Partners vice president, sometime during the negotiation process that AB7 would make its investment in AB Strauss solely through equity infusions, without making any unsecured loans. Compl. ¶ 42. However, the Complaint does not allege with particularity what statements were made on what date to what individuals. Nor does it explain why this promise, if it were important, did not appear in the APA or any other contemporaneous document.

On March 26, 2007, just days before the parties signed the APA, the New Jersey Debtors convened a meeting with their trade creditors to announce that AB7 would be purchasing the Strauss Discount Auto business; to introduce Messrs. Takeda and Yamada as the new chairman and chief executive officer, respectively, of AB Strauss; and to inform them of the new buyer's plan to dramatically remake the Strauss Discount Auto business and, thereby, "'indelibly change automotive retailing in America.'" *Id.* ¶ 46 (quoting Mr. Yamada).

KL3 2769268.15

Joseph Catalano, at that time a director and president of the New Jersey Debtors, had outlined the debtors' goals for the meeting in an email to AB7 on March 9, 2007. Mr. Catalano wrote that he wished "to get the vendor community excited about the prospects of the new relationship with [AB7]" by representing that AB7 was "interested in *geometric growth* within the US market." As Mr. Catalano explained, "[w]hen the vendors hear about significant growth, they get excited. . . . I want to leave our vendor community with a *charged up feeling*, knowing, in the coming months *the transformation of a new Strauss/Autobacs model will unfold* and that *significant growth* is on the horizon." Ex. D (emphasis added).

Consistent with Mr. Catalano's wishes, AB7 and the New Jersey Debtors gave a PowerPoint presentation at the March 26, 2007 vendor meeting that discussed the history of AB7 and its anticipated strategy for its U.S. operations. Among other things, AB7 communicated its intention to "Transfer [AB7's] Merchandising Know-How" to AB Strauss, "strengthen wider product variety," "increase Retail Sales by 50% in 2009," and "[g]ear-up to expand our stores immediately" and "dynamically after [AB7's] Win-Win format [is] completed in 2008." Ex. E at 22. The presentation further identified as primary business drivers (i) "Expansion of Merchandising Categories will be Offered to the Consumer" and (ii) "Broader and Deeper Assortments within current Categories Will Make our Offering Second to None." *Id.* at 42.

The presentation also explained that the three-year business strategy for AB Strauss would include efforts to (i) "Aggressively Build the Tire and Service Business to Drive Comparable Sales Increases and (ii) "Re-Mix, Enhance and Promote a Vibrant Merchandise Assortment for the Retail 'DIY' Segment." *Id.* at 46. Finally, while Mr. Yamada, speaking on behalf of AB7, allegedly stated that the company's "partnership" with AB Strauss would include financial support, there is no allegation in the Complaint (nor can there be) that AB7 represented

that it would guarantee AB Strauss's payment obligations to the New Jersey Debtors or any other outside creditors. Compl. ¶ 46.[4]

On March 30, 2007, the day after the parties executed the APA, the New Jersey Debtors filed a disclosure statement with the New Jersey Bankruptcy Court for the proposed R&S Plan (the "R&S Disclosure Statement"). Among other things, the R&S Disclosure Statement noted that the New Jersey Debtors had been unable to market their assets successfully to any of their U.S. competitors. Despite some limited expressions of interest, none was willing to offer consideration for the Strauss Discount Auto business that would provide unsecured creditors with anything more than a "small distribution" on account of their claims. Compl. ¶ 54; Ex. A at 36. The New Jersey Debtors further represented that they opted to enter into the APA because AB7's offer to effectuate a purchase of the Strauss Discount Auto assets through its subsidiary was "financially superior to any other offer received." Compl. ¶ 54; Ex. A at 37. Furthermore, it noted that one of the advantages of the proposed transaction was that "[AB Strauss] will be capitalized with at least $10 million of cash and will have no (or *de minimis*) *secured* debt." Ex. A at 39 (emphasis added). The New Jersey Debtors attached to their disclosure statement a three-year projection of AB Strauss's net income and EBITDA for the first three years following AB Strauss's acquisition of the Strauss Discount Auto business assets. Compl. ¶ 57; Ex. F (emphasis added). The projection did *not* include a balance sheet and thus did not address one way or the other whether AB Strauss would have unsecured debt.

---

[4]   The Complaint also admits that AB7 made a similar presentation to creditors on October 30, 2007, touting "AB7's intention to significantly expand Autobacs Strauss stores in the United States." Compl. ¶ 163. Plaintiffs do not allege that this statement came as a surprise or constituted the revelation of a previously hidden expansion scheme.

KL3 2769268.15

The R&S Disclosure Statement also purported to describe certain of the APA's terms, including, in a section titled "Purchase Price," that AB Strauss would deliver the cash portion of the purchase price at closing in an amount equal to the sum of the same administrative claims, secured DIP financing claims, cure amounts, and other expenses described in Paragraph 3.2 of the APA and "an amount sufficient to provide funds for the *initial* dividend" due to Class 4 Creditors. Ex. A at 38 (emphasis added). The R&S Disclosure Statement indicated that prior to closing, AB7 would make a "capital contribution to [AB Strauss] in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital," and thereafter "[*AB Strauss*] will assume [the New Jersey Debtors'] obligation to make the [Deferred Payments]." *Id.* (emphasis added). The R&S Disclosure Statement did not define the term "capital contribution" or prohibit working capital loans. *Id.* Contrary to the conclusion alleged in the Complaint (at ¶ 56), nothing in the Disclosure Statement "represent[ed] that the cash purchase price would be funded in return for equity, not debt."

The R&S Disclosure Statement did not, nor could it, modify the parties' rights and obligations under the APA by increasing AB7's total cash obligation or imposing a new duty on the part of AB7 to fund the entire transaction with an equity investment in AB Strauss. To the contrary, it listed among the "Conditions Precedent to Confirmation of the [R&S Plan]" that (i) "[the New Jersey Debtors] and [AB Strauss] agree to the terms of the [APA]" and (ii) the New Jersey Bankruptcy Court enter an order that "shall approve *in all respects* all of the provisions, terms and conditions of [the R&S Plan and the APA]." Ex. A at 46 (emphasis added). Moreover, the Complaint does not allege that, in the single day that elapsed between execution of the APA and the filing of the R&S Disclosure Statement, (i) the parties discussed modifying the APA, (ii) the New Jersey Debtors offered additional consideration in return for AB7's

- 15 -

agreement to fund the entire purchase price with equity, or (iii) AB7 agreed to reconsider its prior refusal to guarantee the Deferred Payments and instead pay them all up front. Notably, neither AB7 nor AB Strauss was a signatory to the Disclosure Statement.

The New Jersey Bankruptcy Court held a hearing on March 30, 2007 to consider approval of the R&S Disclosure Statement. Ex. G. Counsel to the New Jersey Debtors informed the court that they had reached an agreement to sell the Strauss Discount Auto assets to a newly formed subsidiary of AB7; that the maximum purchase price of those assets would be $45 million; and that "in addition to the $45 million is going to be a $10 million capital infusion by [AB7] to [AB Strauss]." *Id.* at 20:24-21:5. Among other things, counsel to the Creditors Committee represented to the court that "the purchasers [*i.e.*, AB7 and AB Strauss] are making a payment" but "they're not writing a blank check." *Id.* at 14:20-21. The New Jersey Bankruptcy Court approved the R&S Disclosure Statement on March 30, 2007. Compl. ¶ 60.

On April 25, 2007, the New Jersey Bankruptcy Court held a hearing to consider confirmation of the R&S Plan (the "R&S Confirmation Hearing"). *Id.* Counsel to the New Jersey Debtors made a detailed presentation to the court, summarizing various elements of the R&S Plan. Ex. H at 8:10-12:4. Counsel to the New Jersey Debtors also proffered testimony of Mr. Langberg on behalf of the New Jersey Debtors, and of Mr. Takenaka on behalf of AB7, in support of confirmation of the R&S Plan. *Id.* at 12:8-24:22. Among other things, Mr. Langberg testified through his proffer that AB Strauss upon confirmation of the R&S Plan would be "well capitalized" insofar as it "would have the ten million dollar equity infusion" and a "cleaner, stronger balance sheet because it would have no *secured* debt to start with." Compl. ¶ 62; Ex. H at 17:7-11 (emphasis added). With respect to the Deferred Payments, Mr. Langberg further testified that "[t]here would be sufficient funds to satisfy claims when they are allowed because

of the payments to be made by [*AB Strauss*] over the three-year period." Ex. H at 19:7-9 (emphasis added). When the court asked what AB Strauss intended to do with the $10 million equity infusion from AB7, counsel to the New Jersey Debtors informed the court that "[i]t's going to be used to buy inventory and fix up the stores." *Id.* at 49:3-4.

Among other things, Mr. Takenaka testified through his proffer, as follows:

[AB7's] business plan for [AB Strauss] is to stabilize the business during the next several months of for upwards of 12 months and provide working capital and apply the company's human resources and its existing expertise and know how to make the business more efficient and more profitable.

[AB7] and [AB Strauss] have no current intention to incur secured debt which [sic] otherwise encumber the assets and impact the availability of its financial resources to pay operating expenses including lease payments in the future. [AB7] is committed to the debtors' business and will do what it takes to make the business operate profitably. [AB7] would not be doing this transaction if it did not think it could be successful.

Compl. ¶ 63; Ex. H at 22:21-23:8. Mr. Takenaka also testified through his proffer that AB7 would second several of its senior executives to serve as directors and officers of AB Strauss. Specifically, Mr. Takeda would become chairman of the board of directors of AB Strauss and Mr. Yamada would become a director, president, and chief executive officer of the company. Ex. H at 23:9-16. There was no cross-examination of Mr. Takenaka in connection with his proffer.

Other than Mr. Langberg's proffered testimony concerning AB7's commitment to make a $10 million equity investment in AB Strauss, there was *no* testimony, nor were there questions or comments from the court or counsel to the Committee or individual creditors, concerning the form of AB7's investment. Neither the court nor any party addressed whether AB7 would advance the other $29 million, constituting the cash portion of the purchase price due at closing, as debt or equity. To the contrary, AB7's equity obligation was referred to only as

KL3 2769268.15

"*the* ten million dollar equity infusion." *See, e.g.*, Ex. H at 17:9 (emphasis added). Nor, with the exception of Mr. Langberg's and Mr. Takenaka's proffered testimony concerning the absence of *secured* debt, was there any testimony or discussion concerning AB Strauss's future indebtedness or whether AB7 would or could extend intercompany loans to AB Strauss for future working capital needs.

The New Jersey Bankruptcy Court entered the R&S Confirmation Order on April 27, 2007, thereby approving the sale of the Strauss Discount Auto assets to AB Strauss. Compl. ¶ 67; Ex. I. The Confirmation Order "approved in all respects" the APA. Ex. I ¶ 7. Consistent with the APA, the R&S Confirmation Order required AB Strauss to deliver to the New Jersey Debtors on or prior to May 8, 2007 the "cash portion of the Purchase Price," which, *together with* the Deferred Payments to be made in the future to unsecured creditors (*i.e.*, the $29 million "cash portion" plus the $16 million in *future* installment payments) was not to exceed $45 million. Compl. ¶ 68; Ex. I ¶ 20. The Confirmation Order required AB7 to make a "capital contribution" — a term that remained undefined — to AB Strauss in an amount sufficient to enable AB Strauss to deliver the "cash portion of the purchase price plus $10 million of working capital," *i.e.*, the $39 million specified in the APA, and *"[i]n addition,"* directed *AB Strauss* to provide cash in the future to make the remaining installment payments to the Class 4 Creditors, *i.e.*, the remaining $16 million of the $45 million purchase price. *See id.* ¶ 68 (emphasis added). Thus, consistent with the APA, the R&S Confirmation Order did not obligate AB7 to fund AB Strauss's future payments of the remaining $16 million in Deferred Payments. The Confirmation Order did not specify the form of AB7's "capital contribution." The Confirmation Order further noted that "[t]he APA was negotiated, proposed, and entered into . . . without collusion, in good faith, and from arm's-length bargaining positions." Ex. I ¶ 11.

KL3 2769268.15

On April 26, 2007, AB7 transferred to AB Strauss $43 million in initial capital in the form of a $20 million equity investment and a $23 million long-term loan. Compl. ¶ 79. The Strauss Discount Auto purchase closed on May 2, 2007, at which time AB Strauss paid $27,878,470.60 to the New Jersey Debtors (slightly less than what was estimated on Schedule 4 to the APA), which left AB Strauss with more than the anticipated $10 million in cash as initial working capital. *Id.* ¶ 71. On the same day, Messrs. Langberg and Catalano were appointed as directors of AB Strauss and named as the company's chief strategy officer and chief operating officer, respectively. *Id.* ¶ 72.

## C. AB7 Honors Its Contractual Commitments and Provides Substantially More Financial Support for AB Strauss Than the APA Requires

Although the APA and R&S Confirmation Order obligated it to provide only $39 million to AB Strauss, during the first nineteen months following AB Strauss's purchase of the Strauss Discount Auto chain, AB7 infused approximately $83.15 million of its own cash into AB Strauss to ensure that AB Strauss would have sufficient working capital to operate and meet its obligations to outside creditors. Those cash payments consisted of (i) the initial $20 million equity investment (*id.* ¶ 79); (ii) an additional equity investment of $12.3 million in April 2008 (*id.* ¶ 134); (iii) the initial $23 million long-term loan (*id.* ¶ 79); (iv) subsequent additional new money working-capital loans totaling $27,850,000 between October 2007 and November 2008 (*id.* ¶ 111); and (v) subsequent working capital loans to refinance maturing working capital loans.[5] For the Court's convenience, the following chart sets forth a summary of AB7's loans to AB Strauss and the purpose of each loan (*i.e.*, new money vs. refinancing):

_____

[5] With AB7's additional $12.3 million equity investment in April 2008, AB7's total equity investment in AB Strauss reached $32.3 million. Thus, even if there were any merit to plaintiffs' theory (footnote continued)

| Exhibit | Date | Principal | New Money | Amount Refinanced |
|---|---|---|---|---|
| J | 4/26/2007 | $23,000,000 | $23,000,000 | $0 |
| K | 10/11/2007 | $2,500,000 | $2,500,000 | $0 |
| L | 11/14/2007 | $2,000,000 | $2,000,000 | $0 |
| M | 12/19/2007 | $2,100,000 | $2,100,000 | $0 |
| N | 1/9/2008 | $4,000,000 | $4,000,000 | $0 |
| O | 1/10/2008 | $4,500,000 | $0 | $4,500,000 |
| P | 3/3/2008 | $4,000,000 | $4,000,000 | $0 |
| Q | 5/2/2008 | $5,000,000 | $5,000,000 | $0 |
| R | 6/20/2008 | $2,600,000 | $2,600,000 | $0 |
| S | 7/9/2008 | $4,000,000 | $0 | $4,000,000 |
| T | 7/28/2008 | $3,650,000 | $3,650,000 | $0 |
| U | 11/6/2008 | $10,650,000 | $2,000,000 | $8,650,000 |
| V | 12/6/2008 | $10,650,000 | $0 | $10,650,000 |
| | TOTAL: | **$78,650,000** | **$50,850,000** | **$27,800,000** |

AB7 advanced each of the loans on terms that were highly favorable to AB Strauss, with interest rates below the U.S. Prime Rate and in most cases near or below the prevailing 3-month LIBOR. Compl. ¶ 111; Ex. W.

Of the $50.85 million in new money unsecured loans, AB Strauss had repaid only $10.6 million in principal by the Petition Date. Compl. ¶ 129. After receipt of that payment on April 22, 2008, AB7 proceeded to lend AB Strauss an additional $13.25 million in new money working capital loans. Compl. ¶ 111, Exs. Q, R, T, U. Notably, the interest rates charged on those loans were lower than the interest rates charged on the repaid loans. Compl. ¶ 111.

---

that AB7 was obligated to fund the entire amount due under Article IV of the APA with equity, only $6.7 million in additional equity would be required beyond what AB7 has already provided.

KL3 2769268.15

Moreover, the $10.6 million was repaid only after AB7 had voluntarily infused an additional $12.3 million in *equity* earlier in April 2008 — an exchange that helped AB Strauss by strengthening its balance sheet.

In total, by the end of 2008, AB7 had invested nearly $75 million net, in cash, from its own funds — far more than the $39 million it had committed to provide pursuant to the APA. And while AB7 had expressly declined to guarantee AB Strauss's Deferred Payment obligations to the New Jersey Debtors, AB7's repeated cash infusions nevertheless permitted AB Strauss to remain current on those obligations for nearly two years following confirmation of the R&S Plan. As a result, the New Jersey Debtors were able to repay approximately $11 million of the $19 million (nearly 60%) owed to the Class 4 Creditors. Compl. ¶¶ 114, 116, 315.

## D.  AB7 Works with AB Strauss To Restore and Improve the Business

In addition to its considerable financial support, AB7 also invested substantial human capital in AB Strauss by seconding three of its senior executives — Messrs. Takeda, Yamada, and Kojima — to serve as directors of AB Strauss and its chairman, president and chief executive officer, and chief financial officer, respectively. Compl. ¶¶ 141-43. After assuming these positions, Messrs. Takeda, Yamada, and Kojima set about to implement the business plans and strategy that AB7 and the New Jersey Debtors had described to Strauss Discount Auto's vendors and the New Jersey Bankruptcy Court prior to confirmation of the R&S Plan.

Specifically, AB Strauss used the initial $10 million equity infusion and additional working capital loans it received from AB7 to replenish inventory in the Strauss Discount Auto stores. The Complaint characterizes these efforts as a "high risk expansion program" (Compl. ¶ 100), but it does not allege that any new stores were opened or enlarged — the natural meaning of an "expansion" program for a chain of stores. Plaintiffs allege only that

- 21 -

after the asset sale closed, Messrs. Takeda, Yamada, and Kojima directed AB Strauss's employees to increase per-store inventory by up to 50% (*id.* ¶ 179), an instruction they now deem "reckless" (*id.* ¶ 176). But the actual facts alleged confirm that the vast majority of this "increase" was simply directed to *replenishing* store shelves depleted by the New Jersey Debtors' prior business failure and bankruptcy. As of December 31, 2005, eight months prior to the New Jersey Debtors' Chapter 11 filing, Strauss Discount Auto had per store inventory of approximately $300,000.[6] By the time the R&S Plan was confirmed, per store inventory had dropped to $220,000. *Id.* ¶ 180. A year after the closing, inventory had increased to just $333,000, representing only about a 10 percent increase over prepetition levels. *Id.* Notably, even at $333,000 per store, AB Strauss's per store inventory fell far below that of its competitors, as AB Strauss and the New Jersey Debtors acknowledged at the March 26, 2007 vendor presentation. Ex. E at 36 (competitor per store inventory ranging from $483,000 to $1,089,000). Thus, the Complaint simply does not allege that any massive expansion program was ever actually *implemented*, much less that it caused AB Strauss to fail.[7]

Consistent with AB7's representations to Strauss Discount Auto's vendors at the March 26, 2007 presentation, AB Strauss also introduced new merchandise and product lines, in some cases from suppliers with which AB7 had strategic relationships. Compl. ¶¶ 190-94. The

---

[6]     Strauss Discount Auto had $29,703,418 in gross inventory as of that date. Ex. FF. Based on the 94 stores open as of the August 10, 2006 New Jersey petition date, *see* Ex. X, Declaration of Glenn R. Langberg in Support of First Day Applications and Motions, filed August 11, 2006, at ¶ 12, per store inventory would be approximately $316,000. However, that would slightly overstate historical inventory, because we are informed and believe that approximately 99 stores were open as of December 31, 2005, resulting in a per-store inventory of approximately $300,000.

[7]     Plaintiffs also assert that AB7 imposed on AB Strauss a "high risk expansion" of "payroll" (Compl. ¶ 104), but again the facts alleged do not support the rhetoric. The Complaint actually alleges only that AB Strauss's payroll expense for calendar year 2007 increased 5.4% over the prior year. *Id.* ¶ 200. This is hardly a "hiring spree" (*id.*), but rather an expected part of revitalizing a retail and service business following bankruptcy.

KL3 2769268.15

Complaint contains detailed discussions of several of these new product initiatives, recounting strategic disagreements, purported mistakes, and the failure of certain products to sell well. *See id.* ¶¶ 186-88. However, the Complaint does not allege that these issues account for a material portion of AB Strauss's inventory expenditures, and indeed most of them are self-evidently trivial in the context of AB Strauss's eventual $30 million in losses: *e.g.*, $15,000 spent on allegedly unnecessary working horn displays (*id.* ¶ 192-93); $22,542 net loss on one-piece floor mats, although nearly 90% of those ordered were sold (*id.* ¶ 191); $6,300 lost on products from a vendor selected by Mr. Yamada (*id.* ¶ 196). Leaving aside whether these complaints are legally cognizable in light of the business judgment rule, an issue addressed below in Point V, the Complaint again does not allege facts linking the minor proportion of AB Strauss's expenditures devoted to new products (as opposed to restocking) to the ultimate failure of the Debtor's business.

### E. The Strauss Discount Auto Business Fails for the Third Time in the Face of the Worst Recession in Decades

AB Strauss's efforts to revive Strauss Discount Auto ultimately failed. While the Complaint seeks to link that failure to the existence of unsecured debt on the balance sheet or supposedly reckless "expansion," the actual facts alleged do not coherently and plausibly connect AB7's alleged wrongdoing and the business's ultimate decline. The Complaint ignores the factors that obviously played the greatest role: historically high gasoline prices and the financial crisis that began gathering steam in 2007, engulfing all sectors of the U.S. economy and, eventually, most of the world — resulting in the worst global recession since the Great Depression. *See generally* Joseph E. Stiglitz, *Freefall: America, Free Markets, and the Sinking of the World Economy* (2010).

KL3 2769268.15

By February 2009, AB Strauss had experienced seven consecutive quarters of steadily mounting losses totaling over $30 million and was unable to fund its operations or satisfy its outstanding debt obligations to AB7. Compl. ¶¶ 105, 223. AB7 was not obligated to continue financing these losses indefinitely. While the Complaint suggests that AB7 merely "pulled the plug" on AB Strauss for its own reasons (*id.* ¶ 206), it otherwise admits that other financing alternatives were considered and rejected before AB7 determined to notice defaults on the outstanding loans (*id.* ¶ 204-05).

On February 4, 2009 (the "Petition Date"), AB Strauss filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. *Id.* ¶ 10. The Complaint suggests that this was a harmful event for AB Strauss (*id.* ¶ 225) (bankruptcy filing was "ultimate ignominy"), but it appears that the filing was the only way to halt AB Strauss's tailspin by early 2009, when the recession was hitting its depths. The Debtor has since represented (in connection with its proposed plan of reorganization) that bankruptcy has allowed it to shed unfavorable leases and restructure its business into a viable operation. *See* Ex. Y, Disclosure Statement with Respect to Amended Joint Plan of Reorganization Proposed by Autobacs Strauss Inc. and the Official Committee of Unsecured Creditors (Case No. 09-10358, D.I. 1047) at 22-23.

On May 1, 2009, AB7 filed a proof of claim against the AB Strauss estate in the amount of $43,994,044.12. Compl. ¶ 219. The major components of this claim were $42,575,218.47 in unpaid principal and interest on the unsecured loans and $1,400,184.72 based upon AB7's guarantee of AB Strauss's obligations under a $1.4 million continuing letter of credit agreement with the Bank of Tokyo-Mitsubishi UFJ, Ltd. *Id.* The Complaint asserts that

KL3 2769268.15

this proof of claim is itself yet another fraudulent act (*id.* ¶ 88), but like so much in the Complaint, this statement is based on litigation rhetoric rather than facts.

On June 12, 2009, GRL Capital Advisors, LLC, an entity controlled by Mr. Langberg, purchased 100% of the equity interests of AB Strauss, in connection with the separate California bankruptcy proceedings of AB USA. Mr. Langberg was formerly the indirect majority shareholder and chief executive officer of the New Jersey Debtors and served as a director of AB Strauss and its chief strategy officer until its Chapter 11 filing. He is currently AB Strauss's chief executive officer. *Id.* ¶¶ 7, 20, 28. AB Strauss continues to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. *Id.* ¶ 17. On December 11, 2009, AB Strauss and the New Jersey Debtors filed the Complaint.[8]

## Argument

Fed. R. Civ. P. 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." However, to survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8(a)(2) "requires a 'showing' rather than a blanket assertion of an entitlement to relief"). Moreover, a plaintiff must plead "sufficient factual matter," accepted as true, to "state a claim to relief that is

---

[8]        Less than one week later, plaintiffs filed *another* complaint, based on substantially identical factual allegations, in the United States District Court for the District of New Jersey (the "New Jersey Complaint"). At least 174 of the 188 paragraphs of facts in the New Jersey Complaint were lifted essentially verbatim from the Complaint in this action. The New Jersey complaint focuses on the same fraud allegations (couched there as common law fraud and RICO claims) and adds one distinct claim concerning a trademark dispute between AB Strauss and AB7. AB7 moved to transfer the New Jersey action to this Court. On March 23, 2010, the District Court denied the motion without prejudice and referred the matter to the Bankruptcy Court for the District of New Jersey to decide jurisdiction and venue issues in the first instance. *See Autobacs Strauss Inc. v. Autobacs Seven Co.*, D.N.J., Case No. 09-6365, D.I. 26. Defendants in the New Jersey action filed a renewed transfer motion on April 19, 2010.

KL3 2769268.15

*plausible on its face." Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (emphasis added) (quoting *Twombly*, 550 U.S. at 555, 557). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.*; *Boyd v. Pearson*, 346 F. App'x 814, 815 (3d Cir. 2009).

This plausibility determination is not made in a "vacuum." Rather, "it is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 132 (Bankr. S.D.N.Y. 2009) (quoting *Iqbal*, 129 S. Ct. at 1950). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief'" as required by Rule 8(a)(2). *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556-57) (internal citation omitted)).

On a motion to dismiss, a court should consider documents that are either "integral to or explicitly relied upon in the complaint." *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). To the extent such documents contradict the allegations of the complaint, the allegations should not be accepted as true. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 740-41 (Bankr. D. Del. 2003) (reviewing loan documents in dismissing claim for recharacterization).

Plaintiffs' claims fail to satisfy these basic pleading standards. Each claim fails, as a matter of law, for want of "sufficient factual matter" that could support recovery under the relevant cause of action. *Iqbal*, 129 S. Ct. at 1949. Moreover, viewed holistically, plaintiffs'

KL3 2769268.15

entire pleading narrative — namely that defendants engaged in an elaborate fraud to conceal their intention to fund the acquisition of Strauss Discount Auto with a combination of equity and working capital loans, and to use those funds to recklessly expand inventory and staffing — is implausible on its face. Plaintiffs never attempt to explain, or allege facts that would allow this Court to infer, why defendants would have troubled themselves with this scheme, which resulted in AB7 *losing* over $75 million, while outside creditors and the principals of the New Jersey Debtors *benefited* from the conduct alleged by receiving most (and in some cases all) of the consideration due to them under the APA and the R&S Plan, rather than facing liquidation of the Strauss Discount Auto assets. *See In re BH S&B Holdings*, 420 B.R. at 160 (dismissing creditor claims of veil-piercing, breach of fiduciary duty, and equitable subordination or recharacterization; "One thing that stands out here is the absence of any allegation that, during the debtors' short-lived and rapid path to bankruptcy, any of the defendants did anything to recover the money they invested or loaned to the debtors. In other words, the defendants too lost a lot of money as this venture failed."). This lack of plausibility permeates every one of plaintiffs' claims.

## I. PLAINTIFFS DO NOT STATE A VALID CLAIM FOR BREACH OF THE APA

AB7's actual promises and undertakings in connection with the AB Strauss transaction are set forth clearly and unambiguously in the APA: AB7 agreed to provide cash to fund a specific, enumerated list of confirmation-related payments totaling approximately (and no more than) $29 million (including the initial installment due to Class 4 Creditors), plus a $10 million equity infusion — with an express total funding cap of $39 million. Nothing in the APA required AB7 to provide the $29 million as equity rather than debt; obligated it to fund the additional $16 million in Deferred Payments to Class 4 Creditors (which were expressly the

obligation of *AB Strauss*); or barred it from lending money to AB Strauss for future working capital as needed. *See* above at 9-12. Plaintiffs' allegation that AB7 was actually obligated to invest *$55 million*, and all of it as equity, is flatly contradicted by the plain language of the agreement. AB7 unquestionably satisfied the actual contractual undertakings it agreed to in the APA. As a result, not only must the claim for breach of the APA be dismissed, but the reality of what AB7 *actually agreed and promised to do* knocks the props out from under every other fanciful claim in the Complaint.

In the absence of any ambiguity, courts applying New Jersey law (which governs here) will enforce a contract according to its plain language and will not impose duties or obligations that the parties did not elect to express in their final, integrated agreement. *See Kempf v. Target Corp.*, No. 06-CV-1935 (DMC), 2008 WL 305457, at *4 (D.N.J. Jan. 31, 2008) ("[W]here the parties have said, by very plain words, what they meant, the court has no duty to perform other than to carry their meaning into effect." (quoting *Korb v. Spray Beach Hotel Co.*, 93 A.2d 578, 580 (N.J. Super. Ct. App. Div. 1955)).

Through its cross-reference to Schedule 4, Article IV of the APA set forth in no uncertain terms that AB7 would capitalize AB Strauss with no more than $39 million — only $10 million of which was required to be invested in the form of equity. Ex. B, art. IV; Ex. C. Indeed, the APA's special treatment of the $10 million equity investment, coupled with its silence as to how AB7 would fund the remainder of the purchase price, reflects a deliberate choice expressing the parties' intent: to require that $10 million be paid as equity and to permit the rest to be contributed as equity, through loans, or by some combination thereof. *See Henderson v. Morrone*, 214 F. App'x 209, 213 (3d Cir. 2007) ("The doctrine of *expressio unius*

KL3 2769268.15

*est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." (citation omitted)).

The parties to the APA — all sophisticated business entities — conducted their negotiations at arm's length, over a period of eight months, through highly experienced counsel and strategic advisors. Had they intended the APA to require AB7 to fund the entire purchase price with equity, they could have and would have included a clear and unambiguous statement to that effect in Article IV of the agreement. They did not, and the Court should not permit plaintiffs to fashion that contractual right after the fact out of whole cloth through litigation. *See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005) (courts "should not tinker with a finely drawn and precise contract entered into by experienced business people that regulates their financial affairs").

Unable to find any support in the APA itself for their assertion that the parties' agreement required AB7 to fund AB Strauss solely with equity, plaintiffs rely on a statement (purportedly made in late 2006 or early 2007 by Mr. Takenaka and/or Mr. Kim) the alleged substance of which was that the purchase of Strauss Discount Auto would be a full equity deal. Compl. ¶ 42. As discussed in greater detail below (at 44-46), plaintiffs fail to allege with particularity to whom, by whom, when, where, or in what form that statement was made; they fail to allege even *what Mr. Takenaka and/or Mr. Kim supposedly said*. Moreover, even if the heightened pleading requirements applicable to plaintiffs' fraud claim were satisfied, the allegation of such an extra-contractual promise would be barred by New Jersey's parol evidence rule. Even under New Jersey's "expansive" view of that rule, *see Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006), a party may not rely on extrinsic evidence to alter the terms of a contract. Extrinsic evidence may be admitted for the limited purpose of interpreting a

writing to aid a court in determining the meaning of a contract, but it cannot be used to *change* the writing. *See Atl. N. Airlines v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953) ("So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant."). Because the parol evidence rule is not merely an evidentiary rule, but instead is a matter of substantive law, allegations of oral representations that contravene a writing should be disregarded for purposes of a motion to dismiss. *Conway*, 901 A.2d at 346.

Here, where plaintiffs endeavor to use an alleged statement, extrinsic to the APA, to challenge the express terms of the APA and Schedule 4, the parol evidence rule precludes the statement's admission or consideration. The Court need not go beyond the four corners of the APA to understand its meaning.[9]

## II. PLAINTIFFS DO NOT STATE A VALID CLAIM FOR BREACH OF THE R&S PLAN

Plaintiffs' claim for breach of the R&S Plan fails because the Plan simply incorporates and enforces the same bargain negotiated in the APA, obligating AB7 to provide no more than $39 million in cash, only $10 million of which was required to be in the form of an equity investment. The New Jersey Bankruptcy Court approved the APA "in all respects" when it confirmed the R&S Plan. Ex. I ¶ 7. There is no indication that the parties negotiated any change in the deal or that the court intended to impose one. Plaintiffs' argument to the contrary is based solely on minor changes in the language expressing the parties' obligations — in

---

[9] Even if the Court were to consider circumstances outside the contract, such extrinsic evidence would *support* defendants' reading of the APA. For example, at the R&S Confirmation Hearing the court and counsel paid particular attention to the fact that AB Strauss would be capitalized with $10 million in equity and have no *secured* debt and did not mention or suggest any restriction on AB7's ability to provide *unsecured* intercompany loans. If, as plaintiffs suggest, the APA was somehow amended to increase AB7's obligations from $39 million to $55 million and to require that every dime of that obligation be provided to AB Strauss up front in the form of equity, it is implausible that neither the parties nor the court would have even *mentioned* the issue in connection with confirming the R&S Plan. *See Iqbal*, 129 S. Ct. at 1949 (plaintiffs must "state a claim to relief that is plausible on its face").

KL3 2769268.15

particular, a parenthetical cross-reference to the $16 million in Deferred Payments intended to clarify the cap on *AB Strauss*'s obligations, not to expand AB7's. Plaintiffs' theory fails as a matter of both basic contract construction and common sense.

A confirmed plan of reorganization is construed and enforced similarly to a private contract, applying the same general principles of contract interpretation. *See In re Shenango Group Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles."). Three hornbook principles of contract interpretation are of particular importance here.

First, a contract must be read as a whole so that all of its provisions are given the common sense meaning intended by the parties. *See Cumberland County Improvement Auth. v. GSP Recycling Co.*, 818 A.2d 431, 438 (N.J. Super. Ct. App. Div. 2003) (contract "must be read as a whole, in 'accord with justice and common sense'" (quoting *Krosnowski v. Krosnowski*, 126 A.2d 182, 188 (N.J. 1956))). Second, a contract should be construed together with other documents executed by the same parties, for the same purpose, and in the course of the same transaction. *See Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997); *see also Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc. (In re Crystal Palace Gambling Hall, Inc.)*, 817 F.2d 1361, 1365 n.3 (9th Cir. 1987) (interpreting various writings, including an asset purchase agreement, plan of reorganization, and confirmation order to resolve apparent conflict between documents). Third, as discussed above, a party may not rely on extrinsic evidence to alter the terms of a contract. *See Schwimmer*, 96 A.2d at 656-57.

The starting point for analysis of the APA is its unambiguous language strictly limiting AB7's cash obligation to $39 million, representing the closing payments enumerated in Schedule 4 plus a $10 million equity investment to be used as working capital. Plaintiffs argue

that this clear, negotiated deal was changed — not by any subsequent negotiation or adjusted bargain, but merely by unexplained changes in the language finally expressing the funding obligations in the R&S Confirmation Order. Plaintiffs argue for two material changes: *First*, that AB7 was obligated to pay at closing not the $39 million stated in the APA as its total obligation, but *$55 million*, including the $16 million in *future* Deferred Payments that AB Strauss would eventually be obligated to make to the New Jersey Debtors. Compl. ¶ 70. *Second*, that the R&S Plan required AB7 to fund the purchase of the New Jersey Debtors' assets *entirely* with equity, notwithstanding that the APA limited AB7's equity commitment to $10 million. *Id.* Plaintiffs' arguments fail at the threshold plausibility hurdle because the Complaint contains no coherent explanation of why the Confirmation Order would fundamentally change the parties' bargain with no explanation of any subsequent negotiations, agreements, or exchange of consideration. Absent such explanation, the Confirmation Order implementing the R&S Plan should be presumed to embody the essential terms of the APA without material alteration.

   In addition, plaintiffs' construction of the R&S Confirmation Order, which relies on a single parenthetical as the supposed textual basis to expand AB7's obligation to $55 million, makes absolutely no sense. They point to language in the R&S Confirmation Order stating that AB7 "will make a capital contribution to Autobacs/Strauss in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital." Ex. I ¶ 20. The "foregoing" language states that "in no event will the aggregate amount of the cash portion of the Purchase Price paid by [AB Strauss] under the [APA] *(including the installment payments referred to in the next paragraph)* exceed $45 million." *Id.* Plaintiffs' argument assumes that the highlighted parenthetical was intended to make the $16 million in future installment payments part of the "cash portion of the Purchase Price" that AB7 was to fund. But the

KL3 2769268.15

reference was self-evidently included for a different purpose: to cap *AB Strauss*'s total purchase price obligation to the New Jersey Debtors at $45 million — the roughly $29 million due at closing (to be provided by AB7 as part of its $39 million maximum funding obligation), plus the $16 million in *future* payments that would be *solely* the obligation of AB Strauss. This reading is confirmed by the language immediately following the reference to AB7's obligations, which states that "*[i]n addition*, [AB Strauss] shall provide funds to the [New Jersey Debtors] in such amounts and at such times as are necessary to permit the [New Jersey Debtors] to make the installment payments" to Class 4 Creditors. *Id.*

Such a construction is the only one that is consistent with the APA and thus satisfies the principle that the two documents should be read together to harmonize their provisions and effectuate the underlying intent of the parties. It is also consistent with the parties' prior negotiations: AB7 had expressly declined even to *guarantee* the future installment payments. It makes no sense to think that it agreed instead, without further negotiation or consideration, to simply pay them all up front. If that had been the parties' deal, *there would have been no reason to defer the payments*. Instead, the Class 4 Creditors could and would simply have received their 100% payout at closing.

Perhaps most significantly, under plaintiffs' theory, AB7 would have been required to pay the $55 million *on or prior to the effective date of the R&S Plan* (which was the same date as the closing on the sale transaction). Compl. ¶¶ 68, 71. Yet the Schedule 4 cash closing statement reflected only an anticipated transfer of $38,919,235 — not $55 million as would be necessary under the plaintiffs' theory. Ex. C. It is nonsensical to suggest that the New Jersey Debtors would wait nearly three years to pursue AB7 for the balance if, as plaintiffs allege, AB7 in fact funded only 70% of its required commitment at closing. Moreover, if $55

- 33 -

million in funding had been expected at closing, counsel to the New Jersey Debtors would have represented to the New Jersey Bankruptcy Court at the confirmation hearing that AB Strauss would have a *$26 million* equity infusion, rather than just $10 million, beyond the amounts used to pay claims and expenses at closing. *Id.* ¶ 62. The *only* plausible inference is that all parties understood that AB7's financial obligation was capped at $39 million.

With respect to the form of AB7's obligations, plaintiffs' principal argument is that by using the phrase "capital contribution" to describe AB7's funding obligation, the New Jersey Bankruptcy Court intended to alter the APA and require the entire amount to be paid in as equity. Plaintiffs suggest that "capital" and "debt" are mutually exclusive modes of financing, such that AB7's contribution of working capital to AB Strauss could not be made in the form of favorable, low-interest loans. However, Black's Law Dictionary defines "capital contribution" merely as "[f]unds made available by a shareholder, usu. without an increase in stock holdings." *Black's Law Dictionary* 237 (9th ed. 2009). Moreover, the related term "working capital" plainly embraces loans such as those extended by AB7 to AB Strauss. *See, e.g., Dictionary of Finance & Investment Terms* 797 (7th ed. 2006) (defining sources of "working capital" as including "bank and other short-term borrowings, trade credit, and term debt"); *see also In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 860 (N.D. Cal. 1993) (noting that corporation may obtain working capital "from expanded bank borrowings or through additional debt or equity financings"), *aff'd in part, rev'd in part on other grounds*, 35 F.3d 1407 (9th Cir. 1994).

Any uncertainty about the intended meaning of the term "capital contribution" as used in the R&S Confirmation Order is resolved by consulting the APA and the surrounding circumstances. Limiting AB7's obligation to contribute *equity* to the $10 million specified in the APA harmonizes the two documents and avoids rewriting a party's obligation for no reason and

- 34 -

with no consideration. As noted above (at 17-18), the parties at the Confirmation Hearing focused only on the $10 million equity infusion and never even addressed the question whether AB7's other $29 million in funding had to be provided in any particular form. The New Jersey Bankruptcy Court further was told only that there was no current intention to encumber AB Strauss's assets with *secured* debt, strongly implying that issuing *unsecured* debt was a possibility. There is nothing in the confirmation record or the Complaint to suggest that the court had any reason to alter the terms negotiated and embodied in the APA, and thus the word "capital contribution" should be read to permit the infusion of any cash apart from the $10 million equity obligation either as equity or debt. Accordingly, AB7's financing of AB Strauss with a mix of equity and low-income loans did not violate either the express terms or the spirit of the R&S Plan, and plaintiffs' alternative contract claim should be dismissed as well.

## III.    PLAINTIFFS FAIL TO PLEAD A VALID CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

The New Jersey Debtors also purport (in Count Twelve) to state a claim against defendants for tortious interference with the New Jersey Debtors' rights under the APA and the R&S Plan to receive the remaining balance of the Deferred Payments. This count fails under well-established New Jersey law precluding a claim for interference with a contract to which the defendant is party, because contract rather than tort law provides the remedies in such cases. *See, e.g., Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 173 (3d Cir. 2001) ("[A] cause of action for tortious interference with [a] contract cannot be directed against a defendant who is a party to the contract."); *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 486 (D.N.J. 1997) ("A tortious interference with contract claim can be waged only against a third-party who is not a party to the contractual or economic relationship at issue."), *aff'd*, 156 F.3d 1225 (3d Cir. 1998). AB7 was a party to the APA and an obligor under the R&S Plan. Compl. ¶ 312. Thus, as a

- 35 -

matter of law, it cannot have tortiously interfered with the New Jersey Debtors' rights under those documents.[10]

Furthermore, as employees of AB7 when the alleged conduct at issue occurred and directors of AB Strauss, which was a party to the APA and assumed obligations under the R&S Plan, Messrs. Takeda, Yamada, and Kojima share AB7's protection from liability for tortious interference, as does Mr. Takenaka, who was an outside director of AB Strauss. *See Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 305-06 (D.N.J. 2007). "An employee working for [a] corporation with which the plaintiff allegedly had a contract cannot serve as the third party necessary for the tripartite relationship" required for a tortious interference claim. *Silvestre*, 973 F. Supp. at 486. Therefore, no defendant in this action can be liable under a tortious interference theory.

Plaintiffs' tortious interference claim fails as well because the Complaint does not allege that defendants acted with malicious intent to interfere with plaintiffs' rights under the APA and R&S Plan. *See Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989); *see also DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) ("[A] plaintiff must demonstrate that the defendant acted with either an intent to interfere with plaintiff's contract right or acted with knowledge that his actions would interfere with the contract right."). Plaintiffs' conclusory allegation of malice (Compl. ¶ 314) is supported by no facts suggesting that defendants actually *intended* to cause a breach of AB Strauss's payment

---

[10]  Even if the contract were viewed primarily as one between AB Strauss and the New Jersey Debtors, a parent's economic interest privileges it to interfere in its subsidiary's contractual relations with third parties. "Since a parent corporation and its wholly-owned subsidiary have a complete unity of interest, the entities are incapable of tortious interference with the business relations of each other." 10 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 4886.60 (perm. ed., rev. vol. 2001).

obligations to the Class 4 Creditors. Indeed, the allegation is contradicted by the admission that AB7 advanced funds to AB Strauss for the specific purpose of *meeting* those obligations. *Id.* ¶¶ 114, 116, 315. Ironically, plaintiffs contend that the act of advancing these funds — which turned out to be the only way AB Strauss could perform its APA obligations — constituted tortious interference with that very contract. *Id.* ¶ 313. The internal inconsistency of plaintiffs' allegations requires dismissal of their claim as a matter of both law and logic.

## IV. PLAINTIFFS FAIL TO ALLEGE A VALID CLAIM FOR FRAUD IN THE INDUCEMENT

The failure of plaintiffs' contract claims dooms as well the New Jersey Debtors' claim (in Count Thirteen) that they were fraudulently induced into supporting the AB7 transaction. AB7 delivered fully on its promises — then far exceeded them by providing voluntary funding to keep AB Strauss afloat for nearly two years in an economic hurricane, thus *benefiting* rather than harming the Class 4 Creditors. Moreover, the Complaint contains no facts showing that, at the time the deal was negotiated and approved, *any* party focused on or cared about either the form of AB7's investment (beyond the specified $10 million in equity) or whether AB Strauss's business plan was aggressive or conservative. Creditors were specifically told that AB Strauss was renouncing only *secured* debt and that its new Japanese Chairman and CEO intended to transform the business by expanding and diversifying store inventory. That is why, when the so-called "fraud" was revealed in June 2007 (Compl. ¶ 81), no party ever claimed to have been defrauded — much less brought the "fraud" to the attention of the supposedly hoodwinked New Jersey Bankruptcy Court. There was no "fraud" until the Debtor's lawyers dreamed it up.[11]

---

[11] Needless to say, it is the actual *facts* alleged, not plaintiffs' labels, that matter here. Thus, for example, what AB7 allegedly lied about was its intention to capitalize AB Strauss entirely with its own
(footnote continued)

- 37 -

A valid claim for fraudulent inducement must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (1997)); *see also Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (N.J. 1981). Such a claim must also satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Among other things, plaintiffs "must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004). Rule 9(b) requires "notice of the 'precise misconduct' with which defendants are charged" to give defendants an opportunity to respond meaningfully to the complaint "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (citation omitted). Plaintiffs' allegations fail to meet even the basic standard of Rule 12(b)(6), let alone the heightened pleading requirements of Rule 9(b).[12]

---

cash contributions of $32.3 million in equity and more than $40 million in low-interest unsecured loans, rather than merely $39 million (or $55 million) in equity. AB7 did not, even on the facts alleged in the Complaint, conceal a secret "leveraged buyout" (Compl. ¶ 3) — a term that implies funding an acquisition mainly with third-party debt secured by the target's assets. *See Black's Law Dictionary* 228 (9th ed. 2009); *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1059 n.2 (3d Cir. 1992).

[12] At the outset, the fraud claim must be dismissed as against Messrs. Takeda, Yamada, and Kojima, who are nowhere in the Complaint even alleged to have made any fraudulent statements. *See, e.g., Premier Pork L.L.C. v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *10 (D.N.J. Mar. 17, 2008) (dismissing fraud claims against defendants not alleged to have made misrepresentations because "a plaintiff must plead fraud with particularity with respect to each defendant" (citation and internal quotation marks omitted)).

KL3 2769268.15

## A. The Particularized Statements Plaintiffs Attribute to Defendants Were All *True*

As an initial matter, all statements attributed to defendants with the particularity required by Rule 9(b) were *true*. Plaintiffs allege that:

- Mr. Takenaka testified through his proffer at the R&S Confirmation Hearing that AB7 and AB Strauss had "no current intention to incur secured debt" or to "otherwise encumber the assets and impact the availability of [AB Strauss's] financial resources to pay operating expenses." Compl. ¶ 63.

- Mr. Langberg, allegedly relying on defendants' representations, testified through his proffer at the R&S Confirmation Hearing that "[AB Strauss] upon confirmation [would] be well capitalized. . . . [AB Strauss] would have the ten million dollar equity infusion [and] a cleaner, stronger balance sheet because it would have no secured debt to start with." *Id.* ¶ 62.

- Messrs. Kim and Takenaka "represented to Langberg, Catalano, Paul Dawson . . . and William Drozdowski . . . that a new corporation would be formed that would be sufficiently capitalized with working capital and would also assume the liabilities of R&S Parts and Service and satisfy all the claims in the R&S Bankruptcy Case." *Id.* ¶ 32.

- "In or about March 2007, Kim represented to Langberg and Catalano that . . . AB7 had 'lots of cash and a strong balance sheet' and that AB7 had the capability of paying the entire purchase price 'up front.' Kim further represented that AB7 would financially back [AB Strauss], that AB7 was putting its formidable wealth behind [AB Strauss], and that 'the money would be there' for Strauss." *Id.* ¶ 37.

- "In or about January 2007, Kim stated to Catalano, and in March 2007 Yamada stated to the vendor community that following upon confirmation, [AB Strauss] would be well funded." *Id.* ¶ 92(c).

- Mr. Kim drafted a "Three Year Projection that was attached to the R&S Disclosure Statement [that] disclosed no interest being paid or accrued" by AB Strauss. *Id.* ¶ 86(d).

- "Takenaka testified at the hearing . . . that there were no additional agreements or understandings over and above what had already been disclosed to the Court." *Id.* ¶ 99.

Even assuming that these statements were in fact made, all of them were true.

AB7 intended to and did back AB Strauss with millions of dollars in funding and intended to and

did avoid imposing any secured debt on the new company. Prior to closing the Strauss asset purchase, AB7 provided AB Strauss with a $20 million equity infusion — *twice* as much as the APA and the R&S Plan and Confirmation Order required — and contributed $23 million of additional cash in the form of a low-interest, long-term, unsecured loan. This $43 million initial investment was $4 million *more* than the maximum due under Article IV of the APA. Ex. B, art. IV. AB7's continued support of AB Strauss over the next two years included an additional equity investment of $12.3 million less than a year after confirmation of the R&S Plan — bringing AB7's total equity investment to $32.3 million — as well as the extension of additional unsecured working capital loans on terms highly favorable to AB Strauss. *See* above at 19-21.[13]

Particularly since AB7 had explicitly "declined to provide" a guarantee of AB Strauss's future obligations (Compl. ¶ 42) and the New Jersey Debtors knew AB7 was *not* "writing a blank check" (Ex. G at 14:18-21), none of the specific statements attributable to defendants about AB7's funding intentions were in any way false or misleading.

Contrary to plaintiffs' assertion (Compl. ¶ 58), the three-year projection allegedly prepared by Mr. Kim did not constitute a representation that AB Strauss would have *no* debt of any kind. The document in question was a statement of projected income and EBITDA, not a balance sheet, and therefore included only anticipated revenue and expenses, rather than assets and liabilities. Ex. F.[14]

---

[13]     Thus, even if, as plaintiffs' incorrectly contend, the APA or the R&S Confirmation Order had required AB7 to fund its $39 cash obligation with equity alone, AB7 would have been obligated only to treat another $6.7 million of the $75 million cash it provided as equity capital. Had AB7 really been acting fraudulently, it presumably would have funded *all* of the acquisition with debt, as in an actual "leveraged buyout."

[14]     Mr. Takenaka's general statement to the New Jersey Bankruptcy Court that he and AB7 were not aware of "any other arrangement or agreement involving [AB7] and [AB Strauss]" was not rendered inaccurate (much less fraudulent) simply because AB7 had *internally* authorized eventual loans to AB Strauss, as plaintiffs allege. Compl. ¶ 64. The funding approval was merely a ministerial detail of a fully (footnote continued)

Plaintiffs also fail to allege facts showing that AB7 misrepresented either its plans to expand Strauss Discount Auto's inventory and product lines or its intention to put its own Japanese executives in charge of AB Strauss. Once again, the fraud must relate to actual *facts* misrepresented, rather than plaintiffs' hyperbolic spin on those facts. The Complaint does not actually allege facts supporting a so-called "reckless high risk program of rapid expansion." Compl. ¶ 6. Plaintiffs do not allege that AB Strauss opened a single new store — merely that it restocked depleted store shelves (increasing inventory over pre-bankruptcy levels by only around 10%) and increased staff by 5.4% as it tried to revitalize the business. *See* above at 21-22.[15]

In any event, AB7 was entirely transparent about its plan to revitalize the Strauss business with a bold new strategy, telling vendors at the March 2007 meeting that the new Japanese executives intended to transfer AB7's merchandising expertise, increase and diversify inventory, and "indelibly change automotive retailing in America." Compl. ¶ 46; *see* above at 12. Indeed, the New Jersey Debtors' own counsel represented to the New Jersey Bankruptcy Court that AB7's $10 million equity investment in AB Strauss would be used "to buy inventory and fix up the stores." Ex. H at 49:3-4.

The New Jersey Debtors' allegations that certain statements *in their own disclosure statement* were misleading, and that AB7 generally approved the draft, does not support a fraud claim absent an allegation that the specific statements at issue were drafted or

---

disclosed transaction, not a separate "agreement" requiring disclosure. The AB7 board's February 26, 2007 internal authorization does not evidence an "agreement" with AB Strauss, which was not even created until March 8, 2007. Compl. ¶ 33.

[15]    The relatively modest nature of the "expansion" actually implemented at AB Strauss, coupled with the tens of millions of dollars in extra working capital that AB7 voluntarily supplied, further defeats the assertion that Mr. Takenaka's representations about the adequacy of the promised funding were false and misleading. Compl. ¶ 92(b). This conclusion is not affected by plaintiffs' conclusory assertion that AB Strauss was "insolvent from its inception (*id.*), which is simply not true (*see* below at 85-86).

approved by a particular defendant. *See Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir.1997) (defendant liable for statements of others only if expressly adopted or endorsed). In any event, the Complaint does not adequately allege that any affirmative statement in the R&S Disclosure Statement was false. The Disclosure Statement's silence about loans and its reference to AB7's overall "capital contribution" do not add up to a "represent[ation] that the cash purchase price would be funded in return for equity, not debt." Compl. ¶ 56. As explained above (at 9-12), the APA, signed the day before the R&S Disclosure Statement was issued, required only a $10 million equity infusion. Plaintiffs' argument that the use of the phrase "capital contribution" was meant to materially expand AB7's obligations fails as a matter of contract interpretation — and it certainly cannot be used to bootstrap a fraud claim.[16]

### B. Defendants' Statements Concerning Anticipated Efforts To Stabilize Strauss Discount Auto and Make the Business Profitable Are Not Actionable

Even if plaintiffs' fraud theory were not directly contradicted by the record and plaintiffs' own pleading, many of the supposedly "fraudulent" statements alleged are too general or inchoate to be actionable. "Statements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations even though they turn out to be false." *Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 556 (3d Cir. 2006); *see also Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998). "[I]n order to constitute a fact, a

---

[16]     Nor is there anything false in the R&S Disclosure Statement's description of the expected AB Strauss governance structure. Compl. ¶ 92(d). Messrs. Langberg and Catalano were, in fact, made directors and given senior executive positions with AB Strauss, and AB7's intention to install Messrs. Takeda and Yamada above them as chairman and CEO, respectively, was disclosed. *See* above at 12, 17. There is no allegation that *any* party understood the Disclosure Statement to represent that the U.S. executives who had presided over the business's recent failure would continue to control AB Strauss, or that any party even believed that would be desirable, much less relied upon it as a material representation.

KL3 2769268.15

statement's content must be susceptible of 'exact knowledge' at the time it is made." *CIGNA*,

991 F. Supp. at 435 (quoting *Vaughn v. Gen. Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986)).

In *CIGNA*, the court granted summary judgment to defendants on plaintiffs' fraudulent

inducement claim because the purported statements attributed to defendants were, as they are

here, "replete with predictions of future events — such as 'relationship would be long lasting,'"

and defendants "were committed to the future success" of their relationship with plaintiffs. Such

forward-looking statements do not support a fraud claim "just because they subsequently turn out

not to be true." *Id.* at 436.

Plaintiffs allege that defendants represented that "AB7 would financially back

[AB Strauss], that AB7 was putting its formidable wealth behind [AB Strauss], and that 'the

money would be there' for Strauss." Compl. ¶ 37. Such statements and others like it sprinkled

throughout the Complaint "are not assurances of fact and thus do not constitute

misrepresentations," *CIGNA*, 991 F. Supp. at 435 (citing *Diaz v. Johnson Matthey, Inc.*, 869 F.

Supp. 1155, 1165 (D.N.J. 1994)), particularly since AB7 also expressly declined to guarantee

AB Strauss's Deferred Payment obligations. Similarly, defendants' statements to the New Jersey

Bankruptcy Court that "[AB7's] business plan for [AB Strauss]" post-confirmation was "to

stabilize the business . . . and provide working capital and apply the company's human resources

and its existing expertise and know how to make the business more efficient and more

profitable" are prototypical examples of "puffery" that cannot support a fraud claim. *See, e.g., In

re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("vague and general statements"

of corporate optimism are non-actionable "puffery"); *VT Investors v. R & D Funding Corp.*, 733

F. Supp. 823, 838 (D.N.J. 1990) (statements that company in which plaintiffs invested would

soon generate positive cash flow were non-actionable "puffery").

- 43 -

Moreover, AB7 indisputably *did* make efforts to restore the Strauss Discount Auto business by providing financing necessary to replenish depleted inventory and boost the sales force — consistent with its representations to the New Jersey Debtors' creditors and the New Jersey Bankruptcy Court. Disagreements over *how* to accomplish that goal, and the ultimate failure of those efforts, do not transform general statements of business optimism into fraud. To hold otherwise would sanction a classic attempt to plead "fraud by hindsight." *In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 673 (3d Cir. 2002) (for statement to be actionable as fraud, it must have been false when made, not merely with benefit of hindsight).

### C. Plaintiffs Do Not Allege with Particularity That the AB7 Defendants *Ever* Promised To Fund AB Strauss's Purchase of Strauss Discount Auto Solely with Equity

In addition to the entirely truthful or otherwise non-actionable statements discussed above, plaintiffs also assert broadly that AB7 falsely represented "to the New Jersey Bankruptcy Court and the creditors, principals, and professionals of the R&S Bankruptcy Case" that AB Strauss "would be free from insider debt." Compl. ¶ 2. But they never allege *facts* with anything approaching the particularity required by Rule 9(b) to support this naked assertion. In place of the necessary particularized allegations, plaintiffs allege the following:

> During negotiations on the proposed R&S Plan, in or about January 2007 AB7 and Takenaka Partners, through Kim and Takenaka, represented to the principals of R&S Parts and Service, who, acting as the conduit for AB7's information, stated to counsel to the R&S Creditors Committee that the Strauss Discount Auto Purchase would be a full equity deal with the purchase price being funded by capital contributions rather than debt.

*Id.* ¶ 86(a). Plaintiffs' wholly unsupported account of this elaborate game of "telephone" fails to provide defendants with notice of (i) who at AB7 allegedly gave these instructions to Messrs. Takenaka and Kim (or when they were given), (ii) what the alleged content of these instructions were, (iii) exactly what Messrs. Takenaka and Kim allegedly said to the unidentified "principals

- 44 -

of R&S Parts and Service," (iv) when and how these unidentified principals supposedly transmitted this information to the R&S Creditors Committee's unnamed counsel, or (v) which, *if any*, individual creditors — on whose behalf the New Jersey Debtors bring their fraud claim — ultimately received this representation and, in reliance thereon, voted in favor of the R&S Plan.

Such "naked assertions devoid of further factual enhancement" fail to satisfy even the more liberal pleading standard of Rule 8 (*see Iqbal*, 129 S. Ct. at 1949), let alone the heightened pleading standard of Rule 9(b), the purpose of which "is to provide notice of the 'precise misconduct' with which defendants are charged . . . and to prevent false or unsubstantiated charges." *Rolo*, 155 F.3d at 658 (citation omitted). A plaintiff alleging fraud must "plead the date, place or time of the fraud, and allege with specificity who made the relevant misrepresentation." *Silverstein v. Percudani*, 207 F. App'x. 238, 240 (3d Cir. 2006) (affirming dismissal of RICO claims where plaintiff "allege[d] he met with [the] 'Percudani Defendants,' but [did] not specify which of the Percudani Defendants he met with, on what dates, and what specific misrepresentations were made"); *see also Frederico v. Home Depot*, No. Civ. A. 05-5579 (JAP), 2006 WL 624901, at *2 (D.N.J. Mar. 10, 2006) ("the plaintiff must allege who made the purported misrepresentations and what specific misrepresentations were made"), *aff'd*, 507 F.3d 188 (3d Cir. 2007); *Liafail, Inc. v. Learning 2000, Inc.*, No. C.A.01-599 GMS, 2002 WL 31667861, at *4 (D. Del. Nov. 25, 2002) (Rule 9(b) requires plaintiff alleging fraudulent inducement "to identify, with the required specificity, when, by whom, to whom, and under what circumstances, the alleged false statements were made which induced [plaintiff] to enter into the APA").

Plaintiffs here fail to provide this required detail. Rather, they have left it to this Court and defendants to speculate what precisely Messrs. Takenaka and Kim supposedly said —

KL3 2769268.15

and at what point in or around January 2007 they said it, either to Mr. Langberg, Mr. Catalano, or both — to convey AB7's commitment to fund AB Strauss's purchase of the Strauss assets with equity alone. Plaintiffs similarly assert only in the most sweeping terms that defendants' "false and misleading representations" caused "the creditors" of the New Jersey Debtors to support and vote for confirmation of the R&S Plan (Compl. ¶ 317) — without identifying, anywhere in their 108-page complaint, a *single* creditor that supposedly did so. Thus, plaintiffs do not even attempt to plead the "reliance" element of their fraud claim, leaving aside whether any such reliance could otherwise be reasonable on the facts alleged. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *33 (D.N.J. July 10, 2009) ("Plaintiffs do not plead a single instance in which they, themselves, or any of their prescribing doctors received a misrepresentation of fact from Defendants and relied upon that misrepresentation in deciding to prescribe one of the Subject Drugs to Plaintiffs.").

A pleading that fails to provide "facts that support the reasonable inference that Defendants' conduct entitles Plaintiffs to relief," but instead invites a court "*to leap* to that conclusion," cannot be sustained. *Id.* at *27 (emphasis added). As the Supreme Court has instructed, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

### D. Plaintiffs Fail To State a Fraud Claim Based on Defendants' Alleged Omissions

Plaintiffs attempt to bolster their fraud pleading by alleging that defendants failed to disclose that AB7 would fund a portion of the Strauss Discount Auto asset purchase with loans to AB Strauss. Compl. ¶ 318. This "omissions" theory fares no better than plaintiffs' faulty allegations of affirmative misstatements.

- 46 -

The Supreme Court has long held that where "an allegation of fraud is based on nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). "[W]here a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). These courts have repeatedly found that "a party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'" *N.J. Econ. Dev. Auth. v. Pavonia Restaurant, Inc.*, 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998) (citation omitted); *Maksin Mgmt. Corp. v. Roy A. Rapp, Inc.*, No. A-2817-06, 2008 WL 3165465 at *8 (N.J. Super. Ct. App. Div. Aug. 8, 2008) ("An ordinary business transaction . . . will rarely give rise to a duty to disclose since the parties are essentially 'adversarial.'") (quoting *Pavonia Restaurant*, 724 A.2d at 1139).

Plaintiffs have not alleged, nor could they, that defendants had a fiduciary or otherwise "special" relationship with the New Jersey Debtors or their creditors during the negotiations that led to execution of the APA and the R&S Plan approval process. Indeed, the Confirmation Order noted that "[t]he APA was negotiated, proposed, and entered into . . . without collusion, in good faith, and from *arm's-length bargaining positions*." Ex. I ¶ 11 (emphasis added). Absent a "special" relationship, defendants' alleged failure to disclose that AB7 might fund a portion of the purchase price with loans to AB Strauss is actionable only if nondisclosure of that fact would have made misleading an "earlier partial or ambiguous

statement of facts." *Lightning Lube*, 4 F.3d at 1185 (citing Restatement (Second) of Torts § 551).

The Complaint does not meet this standard. The heavily negotiated APA did not include *any* representations by AB7 — let alone a representation that AB7 would fund the entire acquisition with an equity investment in AB Strauss. Ex. B. Mr. Takenaka represented to the New Jersey Bankruptcy Court only that AB7 had no current intention to burden AB Strauss with *secured* debt — a representation that was not misleading even absent further disclosure that AB7 might extend *unsecured* loans to AB Strauss. Indeed, it would have been highly unusual for a retail chain not to incur unsecured debt, or for a parent corporation not to extend credit to a struggling subsidiary.

Even accepting plaintiffs' theory that AB7 "represented" that it would fund its investment of $39 million (or $55 million, as plaintiffs allege) as equity, the Complaint does not allege facts showing that the failure to disclose an intention to provide instead *$75 million* in working capital ($32.3 million in equity and the rest in low-interest unsecured loans) rendered AB7's statements materially misleading. Indeed, the undisclosed intention was *more favorable* for the New Jersey Debtors because it involved AB7 providing *more* capital, including advancing loans that specifically permitted AB Strauss to pay more to the Class 4 Creditors than would have been possible if AB7 had provided only the funding required by the APA. The Complaint does not allege, nor could it rationally, that creditors would have opted for liquidation of the Strauss assets rather than support the R&S Plan if they had known prior to confirmation that AB7 would capitalize AB Strauss in the manner that it ultimately did.

It is telling that, during the disclosure statement hearing before the New Jersey Bankruptcy Court, not a single creditor sought information concerning whether AB7 would fund

- 48 -

the purchase price with equity or loans or a combination of both, or questioned the adequacy of the R&S Disclosure Statement in that regard. Ex. G. During the R&S Confirmation Hearing, the New Jersey Debtors' counsel proffered testimony from Mr. Langberg that summarized various components of the R&S Plan that were beneficial to creditors, including that AB Strauss would be "well capitalized" insofar as it "would have the ten million dollar equity infusion" and a "cleaner, stronger balance sheet because it would have no *secured* debt to start with" (Compl. ¶ 62; Ex. H at 17:7-11 (emphasis added)), and that "[t]here would be sufficient funds to satisfy [Class 4 Creditors' claims] because of the payments to be made by *[AB Strauss]* over the three-year period." Ex. H at 19:7-9 (emphasis added). Neither the court nor any of the various counsel representing creditors at the hearing questioned whether AB Strauss would have *unsecured* debt or whether AB7 would fund the purchase price with loans to AB Strauss; it is implausible that an issue of material concern to creditors would not have prompted a *single* question or been discussed at the hearing. The alleged "nondisclosures" were immaterial as a matter of law.[17]

### E. Plaintiffs Could Not Have Reasonably Relied on Any Alleged Oral Representations That the Purchase Price Would Be Paid Entirely in Equity

The fraudulent inducement claim fails for the additional reason that the New Jersey Debtors could not reasonably have relied on Mr. Takenaka's alleged oral promise of an "all equity deal" in light of the specific terms of the APA, including its explicit integration

---

[17]    Plaintiffs' "omissions" argument includes the puzzling claim (Compl. ¶ 87) that AB7 violated 11 U.S.C. § 1129(a)(4), which simply requires Bankruptcy Court approval of the reasonableness of payments "for services or for costs and expenses" in or in connection with the case or the plan. This provision does not even speak of "disclosure," and the Complaint does not explain how it could apply to future interest payments on unsecured working capital loans made in the ordinary course of operations by an acquirer of the debtor's assets.

KL3 2769268.15

clause.[18] The APA, which was meticulously negotiated at arm's length by sophisticated parties represented by experienced counsel, required only $10 million of AB7's funding obligation to be paid in equity; it was silent as to the form of the remaining $29 million. *See* above at pp. 9-12. Accordingly, with the exception of the $10 million equity investment, the APA granted AB7 the freedom to choose how to fund AB Strauss, and the integration clause required that any agreement to the contrary be expressed in writing.

Under decades of New Jersey law, a plaintiff cannot establish reasonable reliance on an oral representation directly superseded by an integrated contract that deals with the same subject matter. *See, e.g.*, *Winoka Vill., Inc. v. Tate*, 84 A.2d 626, 628 (N.J. Super. Ct. App. Div. 1951) (Brennan, J.) ("alleged oral misrepresentations, being contradictory of the undertakings expressly dealt with [in] writing[], are not effectual"); *accord Braunstein v. Benjamin Berman, Inc.*, No. 89-5344, 1990 WL 192547, at *8-*9 (D.N.J. Sept. 12, 1990) (plaintiff could not have reasonably relied on any statements not contained in integrated agreement). Other courts have similarly held that an integration clause precludes reliance on inconsistent extra-contractual representations. *See, e.g.*, *One-O-One Enters. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) ("Were we to permit plaintiffs' use of the defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the paper on which they are written." (internal quotation marks omitted)).

---

[18]     In pertinent part, Article 11.6 of the APA states:

> This Agreement . . . supersede[s] all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Seller . . . .

KL3 2769268.15

The New Jersey Debtors and their sophisticated advisors knew that AB7's obligations were being defined exclusively by the APA. If they attached any importance to prior representations or assurances, they should and would have negotiated to build them into that definitive agreement.

F.    **Plaintiffs Fail To Allege That Defendants Acted with Any Fraudulent Intent**

The fraud claim fails for yet another reason: plaintiffs do not allege facts showing that defendants made the alleged false statements or omissions with *scienter*, "that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom." *Jewish Ctr. of Sussex County*, 432 A.2d at 524.

Plaintiffs repeatedly assert that AB7's failure to disclose its intention to provide working capital loans to AB Strauss was "part of an overall scheme to carry out a leveraged buyout to acquire the assets of R&S Parts and Service and to carry out a broad expansion of the Debtor's business without adequate working capital." Compl. ¶¶ 291, 301. Putting aside that the Complaint does not allege facts supporting either the LBO or "broad expansion" allegations (*see* above at 3, 21-22), plaintiffs separately fail to allege any credible, conceivable motive for AB7 to defraud the New Jersey Debtors in the manner alleged. What possible advantage could AB7 hope to gain by "defrauding" the New Jersey Debtors into accepting $39 million of AB7's own cash to pay their secured creditors in full, cover all the other expenses of their bankruptcy, and pay a first dividend to its Class 4 Creditors? What was the expected pay-off for AB7 (other than a sincere hope that the company would succeed) in then choosing to pump tens of millions of dollars *more* of its *own cash* into AB Strauss over two years to keep the company afloat and

KL3 2769268.15

making scheduled payments to the Class 4 Creditors, who were paid the majority of their claims while AB7 lost its entire equity investment? Some fraud![19]

At most, the "fraud" plaintiffs allege is based on a retrospective disagreement about the language in the R&S Confirmation Order describing AB7's funding obligations and AB7's failure to have acted in conformity with what *plaintiffs* now say is the better reading of that document. But even if there were merit to plaintiffs' argument that the R&S Confirmation Order modified AB7's obligations under the APA (which there is not, *see* above at 31-35), the Complaint does not allege facts establishing that *AB7 understood at the time* that it was obligated to fund its investment *solely* as equity and had a motive to mislead the New Jersey Debtors. AB7 acted consistently with the APA's unambiguous terms, which had been "approved in all respects" by the New Jersey Bankruptcy Court. Even if AB7's reasonable understanding of its contractual obligations were wrong, that would not establish its fraudulent intent.

In fact, courts have held that a party's reasonable, albeit mistaken, interpretation of a contract cannot give rise to an inference of scienter. The decision in *In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR, 2004 WL 1396269 (D. Del. June 17, 2004), *aff'd*, 155 F. App'x 53 (3d Cir. 2005), is instructive. The *Tyson* action arose from a merger agreement between Tyson Foods, Inc. and IBP, Inc. *Id.* at *2. Tyson sent a publicly disclosed letter to IBP stating that Tyson was terminating the merger agreement because, *inter alia*, certain of the information IBP

---

[19] Numerous courts have recognized that a defendant's decision to invest its own funds into a business undermines any inference that defendant acted with fraudulent intent. *See, e.g.*, *Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (noting that inference of scienter may be undermined when an insider makes substantial stock acquisitions during period of alleged fraud); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006) ("The fact that a defendant acquires stock during a class period further negates any idea that Defendants had a motive to commit fraud."); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (fact that defendants' holdings in corporation increased during period of alleged fraud was "wholly inconsistent with fraudulent intent").

KL3 2769268.15

had provided to Tyson during the due diligence process was materially false. *Id.* at *5. The Delaware Court of Chancery subsequently held, in litigation between Tyson and IBP, that the merger agreement did not permit Tyson to terminate based on the alleged inaccuracies and that IBP was entitled to specific performance of the merger agreement. *Id.* at *6. Following that ruling, plaintiff sued Tyson on behalf of a purported class of former IBP stockholders who sold their stock after Tyson's purported termination, claiming that the statements in Tyson's letter were fraudulently misleading. *Id.* at *1, *7. The district court dismissed the complaint, finding that "while the Chancery Court disagreed with Tyson Foods' interpretation of the relevant agreements, it specifically indicated that Tyson Foods' interpretation was reasonable." Thus, Tyson's mistaken but reasonable statements concerning its contractual rights were insufficient to demonstrate fraudulent intent. *Id.* at *10.

Here, because the APA obligated AB7 to invest only $10 million in equity into AB Strauss, AB7's alleged failure to disclose that it would fund a portion of its remaining $29 million obligation with loans rather than equity reflects — at most — an incorrect but not unreasonable reading of AB7's contractual obligations.[20]

G.    **Defendants' Alleged Misrepresentations and Omissions Were Not the Proximate Cause of Plaintiffs' Injuries**

Finally, plaintiffs fail to plead facts establishing a causal connection between defendants' alleged fraud and the New Jersey Debtors' alleged injuries. "Under New Jersey law,

---

[20]    Plaintiffs allege that "AB7's knowledge of its fraudulent actions" is established by the agreement of AB7 and AB Strauss that no interest should be paid on the unsecured loans during the period when AB Strauss's obligations to the Class 4 Creditors remained outstanding. Compl. ¶ 102. But as the quoted emails themselves reflect, this decision was made in an abundance of caution to avoid the "risk of litigation" in the event a party argued that interest payments would violate the ban on dividends during this period. *Id.* This conservative approach hardly suggests, much less establishes, that AB7 intended to *defraud* anyone by providing loans to AB Strauss.

- 53 -

it is well established that any injury allegedly sustained by a plaintiff must have been proximately caused by a defendant's conduct." *In re Schering-Plough Corp.*, 2009 WL 2043604, at *33 (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 438 (3d Cir. 2007); *Konover Constr. Corp. v. E. Coast Constr. Servs. Corp.*, 420 F. Supp. 2d 366, 370 (D.N.J. 2006). Plaintiffs allege that "[a]s a direct and proximate result of the Defendants' materially false and deceptive representations and omissions," the New Jersey Debtors "incurred damages in the amount of $8,140,496.67 as the amount due and owing by [AB Strauss] under the [APA] and the confirmed R&S Plan." Compl. ¶ 322. They attempt to tie these damages to the alleged fraud with a conclusory assertion that "[h]ad AB7 funded the Strauss Discount Auto Purchase through capital contributions . . . rather than loans, and had AB7 refrained from imposing on [AB Strauss] the reckless and irresponsible program of expansion . . . , no bankruptcy filing would have been required." *Id.* ¶ 225.

But plaintiffs do not even attempt to allege, much less do so coherently, how shifting $6.7 million from the debt to equity column in AB7's books would have prevented AB Strauss from requiring bankruptcy protection. The more plausible, if not the only plausible inference is that the business failed, not because of the amount of low-interest debt it carried, but because of the devastating recession and other external factors, such as historically high gas prices.

Indeed, even after AB7 provided AB Strauss with approximately $73.5 million net in combined equity and low-interest loans, in February 2009 AB Strauss's cash position was $9.6 million, while it owed $24 million to creditors *other than AB7*. *Id.* ¶ 107. This $14.4 million shortfall would have been geometrically larger had AB7 not repeatedly provided its subsidiary with working capital loans. Thus, AB Strauss would have been *more*, not less,

- 54 -

starved for cash if AB7 had funded the entire Strauss Discount Auto purchase price with equity and withheld debt financing, and the company would *still* have required bankruptcy protection.

Likewise, plaintiffs fail to demonstrate a causal connection between AB7's representations concerning its future business plans to increase and diversify inventory and the ultimate failure to resurrect the perennially struggling business. As demonstrated above (at 12-14), far from hiding its new business strategy, AB7 trumpeted it to vendors with the support of Strauss's management prior to confirmation of the R&S Plan. And while the Complaint dwells on disagreements about certain new merchandise and programs, its does not allege that any material portion of AB Strauss's expenditures (or losses) can be attributed to *new* rather than merely restocked product lines. *See* above at 21-23. Thus, the Complaint does not allege facts giving rise to a reasonable inference that the business failed *because of* undisclosed aspects of AB7's business plan rather than simply as a consequence of pre-existing structural problems in the business model and/or the effects of the severe recession.

Moreover, the New Jersey Debtors specifically admitted that any alternative transaction would have netted unsecured creditors only "a small distribution" on account of their claims. Ex. A at 36. Having recovered 60% of the Class 4 Creditor claims, the New Jersey Debtors have already received far more than they would have realized had the transaction with AB7 not been consummated. The New Jersey Debtors were simply not harmed by any alleged "fraud," and plaintiffs' fraudulent inducement claim should be dismissed with prejudice.

## V. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

In Count Two, plaintiffs repackage the same facts yet again as a claim for breach of fiduciary duty. To state such a claim under Delaware law, which governs plaintiffs' fiduciary duty count, *see Burtch v. Dent (In re Circle Y of Yoakum, Tex.)*, 354 B.R. 349, 359 (Bankr. D.

- 55 -

Del. 2006), a plaintiff must show (i) the existence of a fiduciary duty and (ii) a breach of that duty. *Heller v. Kiernan*, No. Civ.A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002). Directors and officers owe to their corporations *only* the fiduciary duties of care and loyalty. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 746 n.400 (Del. Ch. 2005) ("[O]utside the recognized fiduciary duties of care and loyalty . . . there are no other fiduciary duties."), *aff'd*, *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27 (Del. 2006); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) (duty of "good faith" merely sub-category of two main duties).

Plaintiffs' fiduciary duty claim fails at the outset because (1) AB Strauss was not insolvent, and its directors therefore owed *no* duty of any kind to creditors, and (2) AB Strauss's certificate of incorporation expressly *exculpated* the directors for breach of the duty of care — the principal duty allegedly breached here. But even if these bars could be circumvented, the Complaint does not allege facts surmounting Delaware's business judgment rule, which establishes a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Courts in Delaware will "not substitute [their] judgment for that of the board if the latter's decision can be 'attributed to *any* rational business purpose.'" *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)) (emphasis added). Plaintiffs' allegations fail to overcome this high bar. The purported fiduciary duty claim here is a classic hindsight attack on good-faith strategic business decisions, informed by nothing more than the unfortunate failure of defendants' chosen strategy to deliver its intended results.

- 56 -

**A.    AB Strauss's Directors Owed
        Fiduciary Duties *Solely* to Shareholders**

As an initial matter, Count Two of the Complaint should be dismissed because, contrary to plaintiffs' suggestion, AB Strauss's directors owed no duties to the company's creditors. At its inception, AB Strauss was solvent; the R&S business assets purchased as a going concern plus cash on hand significantly outweighed AB Strauss's liabilities. *See* below at 85-86. As directors of a solvent, wholly owned subsidiary corporation, the Director Defendants were obligated to serve *only* the interests of AB Strauss's sole shareholder. *See Anadarko v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created."), *aff'd*, 931 A.2d 438 (Del. 2007); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) ("[I]t makes no sense to impose a duty on the director of a solvent, wholly-owned subsidiary to be loyal to the subsidiary *as against the parent company*." (emphasis in original)). Even if a wholly owned subsidiary's board "took actions that made [the subsidiary] less valuable as an entity" the board will not be liable provided that it acted at the direction of the parent company or for its benefit. *See Trenwick*, 906 A.2d at 201-02 ("[T]he Trenwick America directors were free to manage Trenwick America for the best interests of Trenwick, and to follow loyally the direction of Trenwick's board as to what Trenwick's best interests were.").

- 57 -

Thus, the New Jersey Debtors, and the Debtor purporting to act on behalf of other creditors, simply lack any right that could be enforced through a breach of fiduciary duty claim. Plaintiffs' fiduciary duty claim fails on this ground alone.[21]

### B. Plaintiffs' Duty of Care Allegations Are Barred by the AB Strauss Certificate of Incorporation

Even if plaintiffs could establish that AB Strauss was insolvent from inception, their fiduciary duty claim, insofar as it is premised on alleged violations of the duty of care, is specifically barred by AB Strauss's certificate of incorporation, which includes the following clause exculpating the company's directors from liability for precisely such conduct:

> NINTH: A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided, however, that the foregoing shall not eliminate or limit the liability of the director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

Ex. Z at 3. Delaware law expressly permits exculpatory clauses in a certificate of incorporation. *See* Del. Code Ann. tit 8, § 102(b)(7) (authorizing "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director," while enumerating required exceptions tracked in AB Strauss's exculpation provision).

---

[21]     The Complaint also asserts that AB Strauss's directors owed a fiduciary duty to the company's creditors because, in plaintiffs' view, AB Strauss was "in the zone of insolvency" from its inception. Compl. ¶ 240. But the Delaware Supreme Court has *rejected* this legal theory. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2006) ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does *not* change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners." (emphasis added)).

KL3 2769268.15

Exculpatory clauses like the one in AB Strauss's certificate of incorporation require dismissal of duty of care claims as a matter of law. *See, e.g., Malpiede v. Townson*, 780 A.2d 1075, 1092-93 (Del. 2001) (affirming dismissal of plaintiffs' due care claim based on exculpatory provision in certificate of incorporation); *Hokanson v. Petty*, No. 3438-VCA, 2008 WL 5169633, at *5 (Del. Ch. Dec. 10, 2008) (dismissing breach of duty of care claims because of exculpatory provision in certificate of incorporation).[22]

### C. Plaintiffs Have Not Pleaded Around the Business Judgment Rule

Plaintiffs' fiduciary duty claim would still fail even in the absence of an exculpatory clause (and, again, even assuming AB Strauss's insolvency) because the Complaint fails to plead around Delaware's business judgment rule, a task that the Third Circuit has described as "near-Herculean." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). Directors do not lose the protections of the business judgment rule simply because their firm becomes insolvent. *Trenwick*, 906 A.2d at 195 n.75 (insolvency does not affect "directors' ability to rely upon the business judgment rule"). Nor does a firm's insolvency preclude its directors from embarking on a risky business strategy to increase profits. "Even when the firm is insolvent, directors are free to pursue value maximizing strategies." *Id.* at 175; *see also In re Scott Acq. Corp.*, 344 B.R. 283, 285-86 (Bankr. D. Del. 2006) ("[T]he fact of insolvency does not change the primary object of the directors' duties, which is the firm itself.").

Plaintiffs' core allegations are legally insufficient to show a breach of the duty of care. Having failed to plead facts establishing that AB7's unsecured loans to AB Strauss

---

[22] The Court may take judicial notice of the exculpatory provision at the motion to dismiss stage. *See, e.g., In re BH S&B Holdings*, 420 B.R. 112, 145 (Bankr. S.D.N.Y. 2009); *In re Wheelabrator Techs., Inc. S'holder Litig.*, No. 11495, 1992 WL 212595, at *11 (Del. Ch. Sept. 1, 1992).

KL3 2769268.15

breached the APA or constituted fraud, plaintiffs cannot transform the loans into a breach of fiduciary duty merely by declaring them "illegal and illegitimate" and complaining that the Director Defendants "rubber stamp[ed]" them. Compl. ¶¶ 177-78. To the contrary, the loans provided necessary working capital and facilitated payments to the very creditors now complaining about them.

The similarly conclusory allegation of an "irresponsible and high risk rapid expansion program" (*id.* ¶¶ 179-88, 200-02) — which entailed primarily replenishing bankruptcy-depleted store shelves — also fares no better repackaged as an alleged breach of fiduciary duty. Plaintiffs cannot seriously contend that defendants' strategy was disconnected from "any rational business purpose." *Sinclair Oil*, 280 A.2d at 720 (emphasis added). In fact, plaintiffs concede a business purpose for the inventory expansion: to "obtain market share with increased sales" in the hope of later increasing profitability. Compl. ¶ 181. The failure of that strategy to resurrect the Strauss business does not mean that pursuing it was a breach of fiduciary duty:

> [B]usiness failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit. If the mere fact that a strategy turned out poorly is in itself sufficient to create an inference that the directors who approved it breached their fiduciary duties, the business judgment rule will have been denuded of much of its utility.

*Trenwick*, 906 A.2d at 193; *see also Litt v. Wycoff*, No. 19083-NC, 2003 WL 1794724, at *10 (Del. Ch. Mar. 28, 2003) (business decision not evaluated based on outcome).

The Complaint's more specific allegations regarding AB Strauss's purchases of LED replacement lights, new types of floor mats, horn and lights displays, and other new product lines — in some cases from AB7 or suppliers with which AB7 had strategic relationships and at prices that certain AB Strauss employees felt could be lower (Compl. ¶¶ 190-99) — do not add

- 60 -

up to a breach of the duty of care. Even if these examples were not so obviously *de minimis* (*see* above at 23), merchandizing choices of this sort are precisely the kind of management decisions that the business judgment rule was intended to protect from judicial review. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360-61 (Del. 1993).[23]  Plaintiffs contend that these purchases were made without sufficient prior market research. Compl. ¶ 168. But it is undisputed that AB7 (a multi-billion dollar, experienced, and highly sophisticated retailer with $2 billion in annual sales) developed its overall merchandizing strategy for AB Strauss and disclosed those plans to Strauss's creditors, with the enthusiastic endorsement of Mr. Catalano, prior to confirmation of the R&S Plan. Ex. D. Plaintiffs' fiduciary duty claim is nothing more than a hindsight challenge to a once-lauded business strategy that happened to fail.[24]

Nor can these allegations be spun as a breach of the Director Defendants' duty of loyalty. The Complaint nowhere alleges that the Director Defendants were personally self-interested or received any special, material benefit from any challenged transaction, such as would support a traditional claim for breach of the duty of loyalty. *See, e.g., CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936(DAB), 2007 WL 2915181, at *3 (S.D.N.Y. Oct. 3, 2007); *Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004); *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002); *Joyce ex rel. CTC Minerals, Inc. v. Cuccia*, No. Civ.A. 14953, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997). Simply being employed by both the parent corporation and the subsidiary does

---

[23]    These allegations regarding the conduct of AB Strauss's day to day business do not appear to apply to Mr. Takenaka, who was not an employee but merely an outside director.

[24]    Even if not automatically exculpated, allegations of mere negligence, such as Mr. Yamada's alleged failure to notify others at AB Strauss that he had received notice of the need to renew a state registration for selling service contracts (Compl. ¶ 210), obviously do not rise to the level of a breach of fiduciary duty. *See Aronson*, 473 A.2d at 812 (noting that "under the business judgment rule director liability is predicated on concepts of gross negligence").

not automatically make directors "interested" in transactions involving the parent. *See, e.g., In re ALH Holdings LLC*, No. 04-1339-SLR, 2009 WL 4980361, at *18 (D. Del. Dec. 22, 2009) (finding that parent's employment of majority of subsidiary LLC's board "does not, in [and] of itself, overcome the presumption of the business judgment rule"); *Trenwick*, 906 A.2d at 201 (rejecting claims of disloyalty and conflict of interest based on fact that subsidiary's board was also employed by parent).

Plaintiffs recite generally that the challenged conduct breached the duty of "good faith" (Compl. ¶¶ 241-42), but bad faith rising to the level of a breach of the duty of loyalty cannot be predicated on what are essentially claims of negligence, even if couched as "gross" negligence. *See In re Walt Disney*, 906 A.2d at 64-65. Nor is it appropriate, with the benefit of hindsight, to "equate [a perceived] bad outcome with bad faith." *Stone*, 911 A.2d at 373. Rather, bad faith can exist only where directors acted with wrongful intent and "knew that they were not discharging their fiduciary obligations." *Id.* at 370; *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240, 243 (Del. 2009) (holding that "bad faith encompasses not only an intent to harm but also intentional dereliction of duty" and that "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties"); *In re BH S&B Holdings*, 420 B.R. at 147 (bad faith "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity" (internal citation and quotation marks omitted)). The Complaint contains no allegations against the Director Defendants remotely approaching this standard of intentional, dishonest wrongdoing.

The Complaint expressly invokes the duty of loyalty only in connection with the allegation that the Defendant Directors caused AB Strauss to "purchas[e] inventory on

- 62 -

unfavorable terms from AB7 or companies which had a relationship with AB7." Compl. ¶ 243.

But this attempt to second-guess routine purchasing decisions does not constitute the type of

extreme conduct, such as victimizing an insolvent subsidiary for the benefit of its shareholders,

that has been held to support a pleading for breach of the duty of loyalty. *See, e.g.*, *FDIC v. Sea

Pines Co.*, 692 F.2d 973, 977 (4th Cir. 1982) (common directors violate duty of loyalty by

mortgaging subsidiary's only unencumbered asset to secure parent's debt); *Official Comm. of

Unsecured Creditors v. Beckoff (In re RSL COM PRIMECALL, Inc.)*, No. 01-11457 (ALG),

2003 WL 22989669, at *12 (Bankr. S.D.N.Y. Dec. 11, 2003) (directors breached fiduciary duty

by causing insolvent subsidiary to guarantee $1.7 billion of parent's debt).

   *In re RSL* is particularly instructive. While sustaining a breach of duty claim

based on guaranteeing the parent's debt, the court in that case specifically *dismissed* at the

pleading stage a claim quite similar to the core allegation here: that common directors breached

their duty of loyalty by approving a transaction through which the controlling shareholder,

Ronald Lauder, loaned $100 million to the subsidiary in return for warrants. Observing that the

warrants turned out to be worthless, that Lauder "lost most of his investment," and that (like AB7

here) Lauder was likely to receive "at best a very small recovery" in the bankruptcy, the court

dismissed the breach of fiduciary duty claim. *Id.* at *10 & n.12 ("[I]t cannot be ignored that at a

time when [the subsidiaries] were arguably insolvent and nearing collapse, Lauder put money

into PLC on an unsecured basis, instead of taking it out."). Here, similarly, the Director

Defendants' approval of AB7's unsecured, low-interest loans to AB Strauss benefited creditors

by permitting the company to keep operating and making scheduled Class 4 payments. They did

not breach any duty. And even if the transactions were required to satisfy the "entire fairness"

standard, as plaintiffs allege (Compl. ¶ 278), that standard has been met because the Complaint does not allege that the loans were made on inappropriate or onerous terms.[25]

Finally, plaintiffs fail to allege facts that plausibly demonstrate that the Director Defendants' decision to seek bankruptcy protection was the result of bad faith. Plaintiffs concede that after AB7 made a business judgment not to extend further credit to AB Strauss, Messrs. Takeda, Yamada, and Kojima conferred to discuss the possibility of obtaining financing from CIT Group. Separately, Messrs. Langberg and Catalano purportedly approached Kimco for the same purpose. *Id.* ¶ 204-05. Far from demonstrating bad faith, plaintiffs' allegations indicate that AB Strauss's senior management considered seeking alternative financing arrangements. However, both CIT and Kimco would have required AB Strauss to pledge its inventory as collateral, thus increasing the company's *secured* indebtedness. *Id.* It hardly evidences bad faith that management ultimately chose not to seek outside financing that would have encumbered the company's assets. *See In re BH S&B Holdings*, 420 B.R. at 150 (finding that more plausible explanation for decision not to incur additional debt was that management "did not see fit, within their business judgment, to put any more money into expenditures in order to

---

[25]     Plaintiffs attempt to seize on the one large payment *out* of AB Strauss (its $10.6 million prepayment of certain outstanding loans from AB7) as evidence of a breach of fiduciary duty. Compl. ¶ 241(d). But AB Strauss self-evidently *benefited* from the transaction — it followed an equity infusion of $12.3 million (a swap that strengthened AB Strauss's balance sheet), and the pre-paid amount was then loaned back at even more favorable interest rates when AB Strauss needed further liquidity. *Id.* ¶¶ 111, 136.

The Complaint seeks to spin these positive events as nefarious misdeeds, suggesting that the additional equity was infused only to avoid a "going concern" qualification in AB Strauss's 2007 audit. *Id.* ¶¶ 134-36. But other than the coincidence that the audit report was issued in April, plaintiffs allege no facts actually supporting this theory. There is no allegation of any communication with the auditors or any other indication that *anybody* at AB7 or AB Strauss thought there was a "going concern" issue, which the Complaint posits as a "problem" (*id.* ¶ 136) based only on a hypothetical liquidation insolvency analysis that it never alleges was actually conducted, suggested, or discussed (*id.* ¶ 135).

KL3 2769268.15

maintain [the company] as a going concern, which could more plausibly have been the most reasonable conclusion anyone could reach under the circumstances").

Moreover, the business judgment rule fully protects the decision to file for bankruptcy protection itself. *See In re RSL*, 2003 WL 22989669, at *8 (directors afforded "significant discretion as to whether an insolvent company can 'work out' its problems or should file a bankruptcy petition"); *Nelson v. Emerson*, No. 2937-VCS, 2008 WL 1961150, at *8 (Del. Ch. May 6, 2008) ("It is settled Delaware law that 'even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm.' Filing a Chapter 11 bankruptcy petition is a federally-sanctioned strategy for maximizing the value of an insolvent company.") (quoting *Trenwick*, 906 A.2d at 204). In fact, the Debtor has represented in connection with its recently filed proposed plan of reorganization that bankruptcy has *benefited* AB Strauss by permitting it to restructure and adopt a more profitable business model. *See* above at 24.

## VI. THE FACTS ALLEGED DO NOT SUPPORT A CLAIM TO PIERCE AB STRAUSS'S CORPORATE VEIL

Embracing a "kitchen sink" approach, plaintiffs also offer (in Count One) an exceedingly strange claim to pierce the corporate veil of an entity into which the parent company poured millions of dollars. Veil-piercing is a rarely granted, extraordinary remedy. *See, e.g.,* *Midland Interiors, Inc. v. Burleigh*, No. 18544, 2006 WL 3783476, at *3 (Del. Ch. Dec. 19, 2006) ("[P]ersuading a Delaware court to pierce the corporate veil is a difficult task. Absent compelling cause, a court will not disregard the corporate form or otherwise disturb the legal attributes, such as limited liability, of a corporation."). Delaware uses a stringent, two-part test to determine whether a corporate veil should be pierced. First, the plaintiff must establish that the parent and subsidiary corporation functioned as a single economic entity. *Brown v. GE*

- 65 -

*Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 235 (Bankr. D. Del. 2003). Second, the

plaintiff must demonstrate that an overall element of injustice or unfairness is present. *Id.* The

bar for establishing the requisite degree of unfairness is high — akin to "fraud or something like

it" — and the fraud must arise directly out of the use of the corporate form. *Id.* at 236. Here, the

facts fail to establish either element.[26]

### A. The Complaint Does Not Allege That AB Strauss and AB7 Functioned as a Single Economic Entity

Plaintiffs' veil piercing claim fails because the Complaint does not come close to

establishing — indeed, it does not even seriously allege — that AB Strauss and AB7 functioned

as a single economic entity. Rather, the Complaint describes a prototypical relationship between

a corporate parent and its wholly owned subsidiary.

---

[26]     Even if the Complaint made out a valid veil-piercing claim, only the Debtor (and not the New Jersey Debtors) would have standing to bring it. Under Delaware law, where an alter ego claim is premised on generalized harm to the debtor, the claim is the property of the debtor's estate and cannot be brought by an individual creditor. *See, e.g., Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 136 (Bankr. D. Del. 2005) (trustee has exclusive standing to bring general claim common to all creditors); *Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.)*, No. 02-3609 A, 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003) ("[T]he trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature."). Here, the New Jersey Debtors have not alleged that *they* were misled into believing that AB Strauss was the alter ego of AB7. To the contrary, the Complaint is replete with allegations demonstrating that the New Jersey Debtors (and their creditors' committee) understood that AB Strauss and AB7 were in fact separate and distinct legal entities. *See, e.g.,* Compl. ¶ 42 (alleging that R&S Creditors' Committee requested (but did not obtain) guarantee from AB7 and that R&S Plan prohibited AB Strauss from paying dividends to AB7); ¶¶ 49-50, 68 (recognizing that APA and R&S Confirmation Order imposed separate and distinct obligations on AB Strauss and AB7). Nor have the New Jersey Debtors alleged that they suffered any particularized harm resulting from AB7's alleged "domination" of AB Strauss distinct from any supposed harm to AB Strauss or its creditors generally. The Complaint alleges that "[a]s a direct result of AB7's domination and control over [AB Strauss], *the Company* incurred massive debt obligations to AB7 . . . and incurred huge increases in inventory and other expenses, all of which in combination caused *the Company* to sustain material losses." Compl. ¶ 234 (emphasis added). The New Jersey Debtors veil-piercing claim must be dismissed on this ground alone. *See Cedarbrook Plaza, Inc. v. Gottfried*, No. 97-1560, 1997 WL 330390, at *11 (E.D. Pa. June 6, 1997) (dismissing creditor's alter ego claim where alleged harm was general to the corporation).

KL3 2769268.15

Courts in Delaware consider the following factors to gauge the separateness of the two corporate entities:

1. Whether the company was adequately capitalized for the undertaking;

2. whether the company was solvent;

3. whether there has been a commingling of assets;

4. whether one entity held itself out as liable for the debts of another;

5. whether the companies used the same offices and employees;

6. whether corporate formalities were observed;

7. whether the controlling shareholder siphoned company funds; and

8. whether, in general, the company simply functioned as a façade for the controlling shareholder.

*See Winner Acceptance Corp. v. Return on Capital Corp.*, No. 3088-VCP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008). The analysis focuses not on a single factor, but rather the totality of the circumstances. *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008). *None* of these factors favors disregarding AB Strauss's corporate form and taking the extraordinary step of holding AB7 liable for all of its subsidiary's obligations.

The first factor focuses on capitalization of the business at its inception (*i.e.*, the initial capitalization). *See, e.g.*, *In re Foxmeyer*, 290 B.R. at 244; *see also Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003). Indeed, "the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) (quotation omitted). Here, far from

establishing that AB Strauss was undercapitalized at its inception, the Complaint demonstrates that AB7 provided AB Strauss with far *more* initial cash than was called for under the APA or R&S Plan. AB7's investment of $43 million of its own funds strongly suggests that AB Strauss was not established to defraud creditors or avoid liability associated with its particular business.

Separately, while AB Strauss may currently be insolvent, "[i]nsolvency, in and of itself, does not justify piercing the corporate veil." *EBG Holdings*, 2008 WL 4057745, at *13. The Delaware Court of Chancery has cautioned:

> Clearly, mere insolvency is not enough to allow piercing of the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless. Thus the insolvency inquiry must have a different purpose. Instead, insolvency is one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors. If so, and especially if particular shareholders benefited from and controlled that conduct, then justice would require the piercing of the corporate veil in order to hold the benefiting shareholders responsible.

*Mason v. Network of Wilmington, Inc.*, No. Civ.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005); *see also In re Foxmeyer*, 290 B.R. at 244 (noting that insolvency is relevant only if caused by acts of parent). Nothing in the record suggests that AB7 caused AB Strauss to become insolvent in an effort to protect its assets from creditors. Indeed, just the opposite is true. AB7 infused approximately $75 million net of its own cash into AB Strauss to ensure that the company would have sufficient working capital to operate and meet its obligations to outside creditors. Compl. ¶¶ 79, 111, 134.

Plaintiffs also have not alleged any comingling of assets, nor could they. And there is no credible allegation that AB7 was held out as generally liable for AB Strauss's debts. Though the Complaint alleges that certain of AB Strauss's trade creditors received copies of AB7's financial statements, plaintiffs do not allege that those statements were represented to be

- 68 -

*AB Strauss's* financials. *Id.* ¶¶ 158-60.[27] Plaintiffs allege that AB7 represented it would "stand

behind" AB Strauss (*id.* ¶ 161), but AB7 expressly *declined* to guarantee AB Strauss's future

payments to creditors (Compl. ¶ 42) and, as counsel to the New Jersey Debtors' own creditors'

committee told the New Jersey Bankruptcy Court in connection with approval of the R&S Plan,

AB7 was "making a payment"; it was *not* "writing a blank check." Ex. G at 14:20-21.[28]

        Plaintiffs' efforts to plead domination and control of AB Strauss by AB7 based on

overlapping personnel are equally unavailing. The Complaint does not allege that AB7 and AB

Strauss were run out of the same offices — indeed, AB7 is based in Tokyo, thousands of miles

away from AB Strauss's New Jersey headquarters (Compl. ¶¶ 16, 19) — or that AB7's

executives, acting in that capacity, controlled AB Strauss's daily operations. It merely alleges

that three of AB7's employees and one of its outside advisors served as directors and/or officers

of AB Strauss — which had two directors unaffiliated with AB7 and approximately 1,450

employees as of the petition date (Ex. AA ¶ 12) — and that these directors and officers helped

AB Strauss implement a corporate strategy designed by its parent corporation. Compl. ¶¶ 140-

57, 166-74. "It is well-established that wholly-owned subsidiaries may share officers, directors

and employees with their parent, without requiring the court to infer that the subsidiary is a mere

instrumentality for the parent and without requiring the court to conclude that those officers and

directors were not functioning properly." *In re BH S&B Holdings*, 420 B.R. at 138. Indeed,

---

[27]    In any event, the Debtor lacks standing to pursue alter ego claims based on particularized harm to particular creditors. *See Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 170-71 (3d Cir. 2002) (alter ego claim based on particularized harm to particularized creditor is not property of the estate).

[28]    There is also no merit to plaintiffs' argument that AB Strauss's use of the "Autobacs Group" logo implied that it and AB7 were one in the same. Compl. ¶ 165. Courts in Delaware have recognized that a parent's referring to a separate corporate subsidiary as a "division" is insufficient to justify piercing the corporate veil. *See, e.g., Akzona Inc. v. E.I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984).

KL3 2769268.15

courts have recognized that an overlap of officers and directors among a parent and its subsidiaries is common and entirely legitimate. *See, e.g., Upjohn Co. v. Syntro Corp.*, No. 89-107-JJF, 1990 WL 79232, at \*5 (D. Del. Mar. 9, 1990); *see also United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998) ("Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary . . . it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility."). Moreover, "[c]ourts refuse to pierce the veil just because parent corporations retain decision-making authority over subsidiaries." *In re BH S&B Holdings*, 420 B.R. at 138.

Similarly, the minimal disregard of corporate formalities alleged in the Complaint does not come close to establishing that AB Strauss functioned as an alter ego of AB7. Compl. ¶ 157. When considering whether a corporation has complied with corporate formalities, courts typically consider whether corporate records are kept and whether officers and directors functioned properly. *See, e.g., In re Foxmeyer*, 290 B.R. at 235. The Complaint does not allege that AB Strauss's board failed to maintain minutes of its meetings or other corporate records, or that the company's directors and officers failed to discharge their duties. Rather, plaintiffs allege that the board of directors did not formally approve the loans AB Strauss received from AB7. Compl. ¶ 121. But AB Strauss's bylaws did not, as plaintiffs incorrectly assert, require that these loans receive board approval. The bylaws merely provide that the board "*may* authorize any officer or officers . . . to enter into or execute . . . any and all deeds, bonds, mortgages, contracts and other obligations or instruments." Ex. BB, art. VII, § 6. Moreover, the Complaint refers to accounting rules supposedly requiring such approval (Compl. ¶ 157), but does not allege that such rules were ever formally adopted by AB Strauss's board.

- 70 -

As for the crucial last two factors, the Complaint does not allege that AB7 "siphoned company funds." To the contrary, AB7 put $75 million net of its own cash *into* the company. And all the factors discussed above show that AB Strauss was no mere "façade" but a legitimate, separate corporation recognized as such by all relevant parties.

### B. The Complaint Does Not Allege That AB Strauss's Corporate Form Was Used To Perpetrate a Fraud or Similar Injustice

The veil-piercing claim fails independently for want of any alleged fraud or comparable injustice. *In re Foxmeyer*, 290 B.R. at 236. Such fraud or injustice must "be found in the defendants' use of the corporate form" and thus must consist of something more than the basic fraud or contract claim alleged in the complaint. *Id.*; *see also Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, Fr.*, No. Civ.A. 19760-NC, 2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004). The plaintiff must plead facts supporting an inference that the challenged corporation was "a sham entity designed to defraud . . . creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *see also In re RSL*, 2003 WL 22989669, at *15 ("[P]laintiff must plead facts showing that the corporation is a sham and exists for *no other purpose* than as a vehicle for fraud." (emphasis added)) (citing *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)); *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d at 531. As one court applying Delaware law explained:

> There must be an abuse of the corporate form to effect a fraud or an injustice — some sort of elaborate shell game. To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability.

*Milner v. TPAC LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004).

It is not enough to show that a parent and its subsidiary are closely connected and that observation of corporate formalities has been "less than steadfast," because that, without

KL3 2769268.15

more, does not establish fraud or injustice. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266-67 (D. Del. 1989) (refusing to pierce veil, despite significant evidence of domination, control, and disregard of corporate separateness, where there was no fraud or injustice inflicted through defendant's use of corporate form).

Here, even if there were merit to plaintiffs' fraudulent inducement claim, which there is not (*see* above at 37-55), that would not be enough to pierce the veil. To avoid dismissal of this separate claim, plaintiffs must allege an additional, independent fraud or injustice resulting directly from AB Strauss's abuse of the corporate form itself. But the Complaint fails to allege *any* fraud or injustice resulting from the corporate separateness (or lack thereof) of AB Strauss and AB7, much less that AB Strauss was a sham company created to deceive creditors. In fact, plaintiffs concede that AB Strauss was formed for the legitimate business purpose of acquiring the assets of Strauss Discount Auto pursuant to the APA and the R&S Plan. Compl. ¶ 33. Moreover, AB7 put money *in* — a lot of money, much of which was used to satisfy obligations to AB Strauss's outside creditors. It did not use AB Strauss to facilitate a shell game to divert creditors' money to AB7. AB7 also did not use AB Strauss to transfer the risk of business failure to the company's creditors. To the contrary, AB7 put its own money on the line and came out the biggest loser when the Strauss Discount Auto business failed yet again. Plaintiffs allege no fraud or injustice connected to AB7's use of the corporate form.

## VII. PLAINTIFFS FAIL TO PLEAD FACTS SUPPORTING RECHARACTERIZATION OF AB7'S LOANS AS EQUITY

In Count Eight, plaintiffs seek to eliminate most of AB7's bankruptcy claim by recharacterizing as "equity" more than $40 million in carefully documented, legitimate intercompany loans that provided AB Strauss with crucial liquidity over and above AB7's contractually required $10 million equity infusion. Compl. ¶¶ 219, 281-94. The Complaint

KL3 2769268.15

presents this claim as if it were a remedy for AB7's supposed "leveraged buyout" scheme, rehashing pejorative fraud and breach of fiduciary duty arguments that are fully rebutted above. *Id.* ¶¶ 290-92. But recharacterization "has nothing to do with inequitable conduct." *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009). Rather, it is a bankruptcy doctrine that permits a court to determine that a purported loan was in fact *intended* to be an investment of equity from the outset. *See, e.g., Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838-40 (Bankr. D. Del. 2006). The term "recharacterization" is actually something of a misnomer, because the analysis focuses on the parties' intent at the time of the transaction to determine the "proper characterization [of the advance] in the first instance." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454-56 (3d Cir. 2006).

Courts have generally examined a number of factors to determine whether a debt is truly a loan or should instead be recharacterized as equity, including:

> (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any, for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.

*In re Exide*, 299 B.R. at 740 (citing *Bayer Corp. v. MasoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 750-53 (6th Cir. 2001)). No single factor is controlling, and the Third Circuit has rejected any "mechanistic" approach to analyzing a recharacterization claim, favoring

instead a common sense evaluation of the facts surrounding a transaction. *See In re SubMicron*, 432 F.3d at 455-56; *see also In re Radnor*, 353 B.R. at 838.

While a recharacterization analysis is often fact-intensive, courts have not hesitated to dismiss such claims under Rule 12(b)(6) where, based on the facts alleged and the documents incorporated by reference (including loan documentation), a complaint fails to plausibly plead that a loan was intended to be an equity infusion. *See, e.g.*, *In re Exide*, 299 B.R. at 742 (dismissing recharacterization claim based on review of loan documents); *In re Fedders*, 405 B.R. at 554 (dismissing recharacterization claim for failure to sufficiently plead intent); *In re BH S&B Holdings*, 420 B.R. at 157-60 (dismissing recharacterization claim based on review of loan documents).

In this case, the Complaint itself confirms that AB7 knew the difference between an equity infusion and a loan and carefully documented each transaction to indicate its intent. The specific pattern of financing underscores that when AB7 documented an advance as a loan, it intended it to be a loan. On April 26, 2007, AB7 provided AB Strauss with $43 million, structuring $20 million as an equity infusion and $23 million as a loan. Compl. ¶ 79. Then, on five separate occasions between October 11, 2007 and March 3, 2008, AB7 provided AB Strauss with new cash in the aggregate amount of $14.6 million — each advance structured as a loan. *See* above at 19-20; Compl. ¶ 111. Thereafter, on April 9, 2008, AB7 provided AB Strauss with $12.3 million in new cash, this time documented as an equity infusion. Compl. ¶ 134. After that, on four separate occasions from May 2, 2008 through November 6, 2008, AB7 provided the Debtor with new cash in an aggregate amount of $13.25 million —— again, structuring each advance as a loan. *See* above at 19-20; Compl. ¶ 111. Had AB7 intended all of these infusions to be equity, as the plaintiffs allege, AB7 would not have differentiated among them. But AB7's

careful distinction between debt and equity demonstrates that when AB7 called an advance a loan, it intended a loan. Indeed, AB Strauss's current chief executive officer acknowledged, under penalty of perjury, that the advances made by AB7 under the various loan agreements represented unsecured debt. Ex. AA ¶¶ 19-21. An analysis of the *Autostyle* factors only confirms this conclusion.

<ol>
<li>

### Instruments, If Any, Evidencing Indebtedness

The presence of instruments evidencing indebtedness weighs in favor of finding that funds were intended to be loans. *See In re Exide*, 299 B.R. at 741; *In re AutoStyle*, 269 F.3d at 750. Here, the agreement governing each loan is an "instrument evidencing indebtedness." Each underlying agreement is entitled "Loan Agreement," and each Loan Agreement contains a recital and an Article 2 entitled "Loan" that clearly indicate that the "Lender" will make a loan to the "Borrower" under each particular agreement. *See* Exs. J - V. Additionally, the Complaint incorporates by reference AB Strauss's April 17, 2008 Loan Prepayment Application, which recounts that AB Strauss had received from AB7 $41.65 million in long-term and short-term loans. *Id.* ¶ 78. This is further evidence that the loans were contemporaneously treated as *debt*. *See In re Radnor*, 353 B.R. at 830, 839 (internal memoranda referring to loans as "debt" supported treatment as debt).
</li>
<li>

### Presence or Absence of a Fixed Maturity Date

The presence of fixed maturity dates and repayment obligations in the loans similarly weighs in favor of characterization as debt. *See In re Exide*, 299 B.R. at 741; *In re AutoStyle*, 269 F.3d at 750. Each Loan Agreement here explicitly provides for a repayment date or, in the case of the initial $23 million loan, a repayment schedule. *See* Ex. J, art. 1 (setting forth repayment schedule); Compl. ¶ 111 (acknowledging repayment dates). This factor, too, cuts in favor of respecting the loans as true loans.
</li>
</ol>

KL3 2769268.15

3. Presence of a Fixed Rate of Interest and Interest Payments

The presence of fixed rates of interest and interest payments in the loan agreements is yet another indicator of a debt transaction. *See In re Exide*, 299 B.R. at 741; *In re AutoStyle*, 269 F.3d at 750-51. The Complaint admits that each of the loans was interest-bearing (Compl. ¶ 79) and details the applicable interest rates assigned to each working capital loan (*id.* ¶ 111). The Complaint further acknowledges that AB Strauss in fact paid more than $350,000 in interest. *See id.* ¶ 132. This factor weighs in favor of respecting the loans as true loans.

4. Source of Repayment

The loan agreements here do not tie repayment to the success of AB Strauss's business. To the contrary, each loan establishes independent terms for the payment of principal and interest and the exercise of rights and remedies upon a default. *See, e.g.*, Ex. J, art. 8 (obligation to repay loan survives default, bankruptcy, and insolvency). It is only where "the expectation of repayment depends solely on the success of the borrower's business," rather than being based on fixed repayment terms, that a transaction has the appearance of an equity investment. *In re Exide*, 299 B.R. at 741. That is not the case here, and, as a result, this factor supports respecting the loans as true loans.

5. Adequacy or Inadequacy of Capitalization

As discussed below at 87-88, plaintiffs have not adequately pleaded that the Debtor had inadequate capital at the time that any particular loan was advanced. Moreover, even if Plaintiffs' conclusory allegations regarding capitalization were credited, this factor is "not determinative" of the recharacterization inquiry. *In re Exide*, 299 B.R. at 741 (internal quotations and citations omitted). Indeed, the Third Circuit in *In re SubMicron* affirmed the lower court's holding that insolvency (or the potential therefor) is not a ground for recharacterization. 432 F.3d at 457. In that case, the lower court noted that when "existing

- 76 -

lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply." *Id.*

6.  Identity of Interest Between Creditor and Stockholder

"If stockholders make advances in proportion to their respective stock ownership," an equity infusion is indicated. *In re Exide*, 299 B.R. at 741 (quoting *In re AutoStyle*, 269 F.3d at 751). While this factor may be probative of intent when there are numerous stockholders, it is not significant in the context of a wholly owned subsidiary. A sole shareholder *always* makes advances in proportion to its holdings, so if this factor is given undue weight it could improperly deter a corporation's 100% owner from extending financing to a subsidiary in need. In fact, courts hesitate to recharacterize insider loans simply because the lender is an insider, recognizing that insiders would otherwise be discouraged from making loans that might "salvage" floundering companies. *In re AutoStyle*, 269 F.3d at 747; *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997) ("To hold otherwise would discourage those most interested in a corporation from attempting to salvage it through an infusion of capital." (citation and internal quotation marks omitted)). Notwithstanding that AB Strauss was an indirect wholly owned subsidiary of AB7, each of the challenged loans bears all the hallmarks of arm's-length, commercial lending transactions and was intended to function as such.

7.  Security, If Any, for the Advances

AB7's loans were unsecured, consistent with proffers to the bankruptcy court that AB Strauss had no intention of incurring secured debt. Compl. ¶¶ 62, 63. While courts have held that the absence of security for an advance may weigh in favor of characterizing the advance as equity, *see, e.g.*, *In re Exide*, 299 B.R. at 741-42, this factor should have no relevance

KL3 2769268.15

here where AB Strauss represented that it would not incur secured debt. Indeed, were the loans secured, unsecured creditors would have no recovery in this case.

8.    Borrower's Ability to Obtain Loans From Outside Institutions

The fact that a corporation can obtain a loan from other reasonable creditors weighs in favor of treating an advance as a loan. *In re Exide*, 299 B.R. at 742; *In re AutoStyle*, 269 F.3d at 752. Plaintiffs do not allege that any third party refused to lend cash to AB Strauss at the time each loan was advanced. Even assuming, however, that was the case, this factor "by itself does not tip the scale." *In re Exide*, 299 B.R. at 742 (quoting *Farr v. Phase-1 Molecular Toxicology, Inc. (In re Phase-1 Molecular Toxicology, Inc.)*, 287 B.R. 571, 578 (Bankr. D.N.M. 2002)). That AB7 was perhaps more interested than other lenders to support AB Strauss does not justify recharacterization. *See In re Lifschultz*, 132 F.3d at 347 (recognizing that "those most interested in a corporation" are most likely to try to "salvage it").

9.    Extent Advances Were Subordinate to Claims of Outside Creditors

Subordination of advances to claims of other creditors indicates that the advances were intended to be equity infusions. *In re Exide*, 299 B.R. at 742. The Complaint does not allege and none of the Loan Agreements provide that AB7's loans were subordinate to the claims of other creditors. This factor must be construed in favor of respecting the loans as true loans.

10.    Use of Proceeds

The use of advances "to meet the daily operating needs of the corporation . . . is indicative of bona fide indebtedness." *In re AutoStyle*, 269 F.3d at 752. Here, each of the working capital loans indicates in the recitals that the purpose of the loan was to provide working capital. Exs. J - V. While the initial $23 million loan was advanced for purposes of acquiring the assets of the New Jersey Debtors, this factor should have little relevance where, as part of the same transaction, AB7 also infused $20 million in equity. Again, that AB7 differentiated

- 78 -

simultaneously between the $20 million equity infusion and the $23 million loan demonstrates that it intended the two infusions to be treated differently.

      11.    Presence or Absence of a Sinking Fund

Although the absence of a sinking fund may indicate that the advances were equity investments, this factor is not determinative, and it certainly does not carry more weight than all of the other factors that favor respecting the loans as true loans. *See In re SubMicron*, 432 F.3d at 456 ("No mechanistic scorecard suffices.").

*   *   *

Judge Carey's recent decision in *In re Exide* makes clear that dismissal of a recharacterization claim is appropriate where, as here, the relevant factors tip overwhelmingly in favor of establishing that the challenged loans are what they say they are: loans. *See In re SubMicron*, 432 F.3d at 457-58 (affirming lower court's refusal to recharacterize where three factors weighed in favor of finding loans were debt); *see also In re Hedged-Invs. Assocs.*, 380 F.3d 1292, 1299 (10th Cir. 2004) (affirming denial of recharacterization despite debtor's "thin" capitalization where other factors weighed in favor of finding debt). The advances here bear the indicia of, and are and were intended to be, actual loans. As a matter of law, they should be respected as such.[29]

---

[29]     Count Seven seeks a declaratory judgment "that the Loans were in fact equity contributions for which no debt was incurred or due" (Compl. ¶ 280), and Count Fourteen objects to the AB7 proof of claim on the same ground (*id.* ¶ 324). To the extent these counts are just variations on Count Eight, they should be dismissed for the same reasons. Count Seven also references breach of contract (*id.* ¶ 276) and breach of fiduciary duty (*id.* ¶ 278), but similarly adds nothing to the counts expressly based on those legal theories.

Count Seven also alleges that AB7's unsecured loans "were never approved by the Autobacs Strauss board of directors and otherwise violated Delaware law, and internal requirements of Autobacs Strauss" (*id.* ¶ 278), but this does not provide an independent ground for invalidating AB7's claim. Plaintiffs do not allege that the loan agreements were unenforceable as a matter of basic contract law or that AB Strauss did not receive the full value promised under those agreements, obligating it to repay the loan (footnote continued)

## VIII.  THE COMPLAINT DOES NOT ALLEGE FACTS SUPPORTING EQUITABLE SUBORDINATION OF AB7'S CLAIMS

Count Nine of the Complaint seeks to equitably subordinate AB7's claims to those of AB Strauss's unsecured creditors.  But equitable subordination is "a 'drastic' and 'unusual' remedy" that should not be granted lightly.  *See, e.g., In re Fedders*, 405 B.R. at 554 (quoting *In re Radnor*, 353 B.R. at 841); *Cox v. Hess (In re Big Wheel Holding Co.)*, 214 B.R. 945, 951 (D. Del. 1997) ("the relief of subordination should be applied only in limited circumstances" (citation and internal quotation marks omitted)).  Plaintiffs allege no valid basis for it here.

Courts generally examine three elements to determine whether a claim should be equitably subordinated: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code."  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998).  Equitable subordination is remedial — it is not penal.  *In re SubMicron*, 432 F.3d at 462.  Recognized categories of inequitable conduct include (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. *In re Exide*, 299 B.R. at 744.

---

absent some other valid defense.  Even assuming that the loans was not authorized under AB Strauss's internal rules, Section 124 of the Delaware General Corporation Law specifically provides that "[n]o act of a corporation . . . shall be invalid by reason of the fact that the corporation was without capacity or power to do such act."  Del. Code Ann. tit. 8, § 124.  Moreover, the creditors on whose behalf this litigation is being prosecuted do not independently have standing to complain about any alleged failure to satisfy AB Strauss's internal procedures for approving loans.  *See Law Debenture Trust Co. of N.Y. v. Petrohawk Energy Corp.*, No. Civ.A. 2422-VCS, 2007 WL 2248150, at *11 (Del. Ch. Aug. 1, 2007) ("technical arguments" regarding internal corporate formalities are not properly asserted by creditors so long as they receive what they were entitled to from corporation as matter of contract law).

KL3 2769268.15

As demonstrated throughout this brief and explained further below, plaintiffs have failed to allege facts establishing either inequitable conduct or injury to creditors.

The Complaint does not allege, nor could it, that AB7, as a mere shareholder, itself owed any fiduciary duty to AB Strauss or the New Jersey Debtors. Nor does it allege a viable claim that AB7 engaged in any illegal conduct. The Complaint's allegations of fraud, breach of fiduciary duty, and alter ego liability are conclusory, internally inconsistent, implausible, and lacking in substance. All should be dismissed. *See* above at 37-72. Therefore, none of these allegations can serve as the predicate wrongdoing for a claim of equitable subordination.

Likewise, plaintiffs' conclusory allegations concerning AB Strauss's financial condition fail to set forth inequitable conduct. Even assuming that AB Strauss was undercapitalized, "mere undercapitalization does not, and should not, justify equitable subordination." *In re Lifschultz*, 132 F.3d at 345. This is so for good reason: a rule subordinating loans made by insiders where the firm is in financial distress would "discourage those most interested in a corporation from attempting to salvage it." *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir. 1977).

Far from plausibly alleging inequitable conduct by AB7, the Complaint and the documents referred to therein establish that AB7 provided AB Strauss with cash far in excess of what was required under the R&S Plan and the APA. *See* above at 19-21. In no way did AB7 profit or obtain an unfair advantage by throwing in good money after bad in a failed but earnest attempt to salvage AB Strauss. Instead, after sinking $75 million net of its own cash into the AB Strauss business and ensuring that the R&S Creditors received payment of the majority of their claims, AB7 — whose 100% equity position has been completely obliterated — remains AB

Strauss's largest unsecured creditor. These facts, all of which are set forth in the Complaint (*see* Compl. ¶¶ 79, 111, 134, 219), fail to establish the inequitable conduct necessary to support the equitable subordination of AB7's claims.

The same facts refute any suggestion that AB Strauss's creditors were harmed by AB7's conduct. Not only did the challenged loans permit AB Strauss to continue functioning and making scheduled payments to the Class 4 Creditors, but the Complaint fails to allege coherently that AB Strauss's business *failed* because of the loans or because of the so-called "expansion" plan. *See* above at 54-55.

AB7's alleged expansion of AB Strauss's inventory levels actually *benefited* the trade creditors who sold AB Strauss the purchased inventory in the first place. There is no allegation that AB Strauss did not pay its vendors for the purchased inventory. Indeed, the Complaint acknowledges that the principal increase in inventory occurred in 2007 — more than one year prior to the Petition Date. Compl. ¶ 106. The Debtor's creditors (other than AB7) consist primarily of the very same trade creditors who were paid to increase AB Strauss's inventory in the first instance. Those creditors cannot now claim that they were harmed by such increase. Not only is there no basis to equitably subordinate AB7's claims to theirs, but, on the facts alleged, it would be affirmatively unjust to do so.

## IX. PLAINTIFFS' AVOIDANCE CLAIMS FAIL AS A MATTER OF LAW

Counts Three and Four of the Complaint seek to avoid as actual and constructive fraudulent transfers (i) $40,250,000 in intercompany loan obligations (the "Loan Obligations") and (ii) $10,952,035 in interest and principal payments (the "Payments").[30] Count Five seeks to

---

[30]     Specifically, the $40,250,000 in Loan Obligations sought to be avoided as actually and/or constructively fraudulent are comprised of (i) $23 million on April 26, 2007; (ii) $2.5 million on October
(footnote continued)

avoid those Payments that were made within one year of the Petition Date (the "Preference

Period Payments") as preferential transfers under Section 547 of the Bankruptcy Code.[31]  Count

Six seeks to recover, pursuant to Section 550 of the Bankruptcy Code, any transfers avoided

under Counts Three, Four, or Five.

As discussed below, Counts Three and Four should be dismissed because the

Complaint fails to state a plausible basis upon which the Loan Obligations and Payments can be

avoided as actual and/or constructive fraudulent transfers.[32]  Because the Complaint fails to plead

a plausible preferential transfer claim, Count Five should be dismissed with respect to all

Preference Period Payments, with the exception of (i) the $17,393 interest payment made on

December 3, 2008 and (ii) the $27,091 interest payment made on January 14, 2009 (the

"Surviving Preference Payments").  Count Six should be dismissed as to all Payments except for

---

11, 2007; (iii) $2.1 million on December 19, 2007; (iv) $4 million on January 9, 2008; (v) $5 million on May 2, 2008; (vi) $2.6 million on June 20, 2008, (vii) $3.65 million on July 29, 2008 and (viii) $2 million on November 6, 2008. Compl. ¶ 248.

The $10,952,035 in principal and interest payments sought to be avoided as actually and/or constructively fraudulent are comprised of a $10.6 million principal payment made on April 22, 2008 (the "Principal Payment") and the following interest payments (the "Interest Payments"): (i) $44,065 on January 9, 2008; (ii) $128,085 on April 22, 2008; (iii) 38,864 on July 8, 2008; (iv) $96,537 on November 6, 2008; (v) $17,393 on December 3, 2008; and (vi) $27,091 on January 14, 2009. Compl. ¶¶ 128, 129, 132, 249.

[31]    The Preference Period Payments total $10,907,970 and comprise the Principal Payment and all of the Interest Payments except for the $44,065 payment that was allegedly made outside of the one-year insider preference period.

[32]    Counts Three and Four assert claims under Section 548 of the Bankruptcy Code and the Uniform Fraudulent Transfer Acts of New Jersey and Delaware.  Plaintiffs do not plead the requirements of either Delaware or New Jersey law but rather allege that those states' statutes track the language of Section 548(a)(1)(A) and (B) of the Bankruptcy Code.  Compl. ¶¶ 252, 261.  As a result, Plaintiffs' failure to plead Bankruptcy Code fraudulent transfer claims results in a failure to plead fraudulent transfer claims under state law.  See In re Fedders, 405 B.R. at 547 (dismissing New Jersey and Delaware fraudulent transfer claims where plaintiff failed to plead Bankruptcy Code fraudulent transfer claims).

KL3 2769268.15

the Surviving Preference Payments because there are no other avoidable Payments that can be recovered.[33]

### A. The Complaint Fails To Allege a Viable Claim for Constructive Fraudulent Transfer

Bankruptcy Code Section 548(a)(1)(B) provides, in relevant part, that transfers of property or obligations incurred by a debtor are constructively fraudulent if (1) the debtor received less than reasonably equivalent value in exchange for such transfer or obligation and (2) at least one of the three following financial criteria is present:

> (i) the debtor was insolvent on the date the transfer was made or obligation incurred (or became insolvent as a result of such transfer or obligation);
>
> (ii) the debtor was engaged (or about to engage) in a business or transaction for which the debtor had an unreasonably small capital; or
>
> (iii) the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B). Claims for constructive fraudulent transfer are subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements. *See OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005). Here, plaintiffs fail to adequately plead either element.

### 1. The Complaint Fails To Adequately Allege That the Debtor Received Less Than Reasonably Equivalent Value in Exchange for the Loan Obligations and the Payments

The Complaint states on its face that the Debtor received reasonably equivalent value in exchange for both the Loan Obligations and the Payments. The Debtor received

---

[33] Count Fifteen, seeking disallowance of AB7's proof of claim pursuant to Bankruptcy Code Section 502(d) for failure to repay avoidable transfers, should be dismissed to the same extent.

$40,250,000 *in cash* in exchange for the Loan Obligations. Compl. ¶¶ 79, 111. In exchange for

the $10,952,035 in Payments, the Debtor received a dollar-for-dollar reduction of $10,952,035 of

debt. "Value" includes "satisfaction or securing of a present or antecedent debt." 11 U.S.C.

§ 548(d)(2)(A); *see Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004)

(payment of debt constitutes reasonably equivalent value); *see also Feldman v. Chase Home Fin.*

*(In re Image Masters, Inc.)*, 421 B.R. 164, 180 n.19 (Bankr. E.D. Pa. 2009) (same). Count Four

fails on this ground alone.

### 2. The Complaint Fails To Adequately Allege That One of the Required Financial Criteria Was Present When the Loan Obligations Were Incurred and the Payments Were Made

#### a. Insolvency

The Complaint fails to allege facts demonstrating that the Debtor was insolvent at

the time each Loan Obligation was incurred and each Payment was made, ignoring the

Bankruptcy Code's definition of "insolvent," which in relevant part is a "financial condition such

that the sum of such entity's debts is greater than all of such entity's property, at a fair

valuation." 11 U.S.C. § 101(32)(A). The Debtor's insolvency pleading fails at the outset

because it is based entirely on a *liquidation* analysis. *See* Compl. ¶ 83 (alleging that AB

Strauss's financials must be adjusted to reflect values in a liquidation context). But the law in

the Third Circuit is clear that a company operating as a going concern (with bankruptcy not

clearly imminent on the date of the challenged transfer) must be valued as a going concern for

purposes of determining insolvency. *See Moody v. Sec. Fin. Pac. Bus. Credit, Inc.*, 971 F.2d

1056, 1068 (3d Cir. 1992); *Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002) (valuing assets on

going concern basis where bankruptcy not clearly imminent), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003).[34]

It would be frivolous to suggest that AB Strauss was insolvent on a going concern basis at its inception. AB Strauss was initially capitalized with a $20 million equity infusion and the $23 million loan. Compl. ¶ 79. Therefore, immediately after the $23 million loan was made, AB Strauss had $43 million in cash and only $23 million in liabilities.

Nor did the acquisition of the R&S Strauss business render AB Strauss insolvent. The arm's length negotiations leading to the APA assigned a fair market value for the business assets (net of assumed liabilities) of $45 million. In addition, AB Strauss had more than $10 million in cash on hand after funding the initial cash portion of the purchase price. *See* above at 19. These total assets (more than $55 million) far exceeded AB Strauss's liabilities — the $23 million long-term loan, plus the present value of the $16 million in future Deferred Payments (less than $39 million). The allegation of insolvency fails as a matter of simple math, not to mention rational business behavior. In *Baldi v. Samuel Son & Co.*, 548 F.3d 579 (7th Cir. 2008), Judge Posner rejected a similar "insolvent from inception" argument: "Now it is very strange to suppose a start-up company bankrupt from the day of its formation. . . . Why would experienced businessmen . . . pay $140 million for a firm that had negative value?" *Id.* at 582.[35]

---

[34] Even the Debtor's liquidation-based analysis is flawed. The allegation that the $17.5 million in favorable lease assets and inventory would have had zero value in a liquidation context directly contradicts the New Jersey Debtors' own liquidation analysis, which valued the assets acquired by AB Strauss in the R&S transaction (including lease assets and inventory) at $40,058,000. *See* Ex. CC.

[35] Were plaintiffs to allege that the business was in fact worth *less* than the $36,263,372 they received for it, comprised of (i) $27,878,470 paid on May 2, 2007 at closing (Compl. ¶ 71) and (ii) $8,384,902 in subsequent deferred payments (*see* Ex. DD), AB Strauss would have a constructive fraudulent conveyance claim *against the New Jersey Debtors*.

KL3 2769268.15

### b.    Unreasonably Small Capital

The Bankruptcy Code does not define "unreasonably small capital," but the Third Circuit has held that the term relates to "an inability to generate enough cash flow to sustain operations" and "denotes a financial condition short of equitable insolvency." *Moody*, 971 F.2d at 1070; *see also Peltz*, 279 B.R. at 744-48. The test is one of "reasonable foreseeability" at the time the transfer was made or the obligation incurred. *Moody*, 971 F.2d at 1073. While these issues often turn on questions of fact, the Complaint on its face fails to plead facts sufficient to support a plausible inference that the Debtor was left with unreasonably small capital at the time each of the Payments was made and each of the Loan Obligations was incurred.

Plaintiffs allege that AB Strauss had unreasonably small capital at its inception (Compl. ¶¶ 89-91), although they also acknowledge that in connection with the R&S Transaction, AB Strauss was provided with $10 million in working capital, just as the APA required. *Id.* ¶ 90; Ex. I ¶ 20. Recognizing this, Plaintiffs now allege that this was inadequate in light of AB7's plan to undertake a "vast, rapid, and high risk expansion of the Autobacs Strauss business." Compl. ¶ 89. But as discussed above (at 21-22), the actual facts alleged show that there was no such radical "expansion" — merely restocking of depleted store shelves and a 5.4% staffing increase after emerging from bankruptcy. In fact, the New Jersey Debtors and their creditors were well aware of the Debtor's business plan, and there is no allegation that they or anybody else found $10 million to be inadequate.

Moreover, in determining whether a business had unreasonably small capital, a court must consider the debtor's ability to access credit. *Moody*, 971 F.2d at 1073; *accord Peltz*, 279 B.R. at 744-47 (debtor did not have unreasonably small capital where debtor had reasonable belief that it could raise money in capital markets); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I,*

- 87 -

*Inc.*), 380 B.R. 348, 359-60 (Bankr. D. Del. 2008) (debtor had adequate capital where it had access to credit for operations), *aff'd*, 400 B.R. 13 (D. Del. 2009).

The Complaint does not allege (nor could it) that, at the time each Loan Obligation was incurred and each Payment was made, AB Strauss did not reasonably believe that it would have access to capital markets. In fact, AB Strauss was able to borrow $27,850,000 in cash for working capital needs — all of which was borrowed after the R&S transaction closed and $13,250,000 of which was borrowed after the $10.6 million Principal Payment was made on April 22, 2008. *See* chart above at 20. Nor does the Complaint allege that AB Strauss defaulted on any obligation or otherwise did not have access to capital markets before January 2009. As a result, the Complaint fails to allege a plausible theory upon which the Court could conclude that AB Strauss was inadequately capitalized at the time that each Loan Obligation was incurred and each Payment was made.

### c. *Inability to Pay Obligations As They Come Due*

As an alternative measure of solvency, the Bankruptcy Code permits a debtor to avoid a transfer made, or obligation incurred, for less than reasonably equivalent value where, at the time of transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III).

The Complaint does not allege a plausible theory upon which the Court could conclude that, at the time that each Loan Obligation was incurred and each Payment was made, AB Strauss intended to incur or believed that it would incur debts beyond its ability to pay as those debts matured. If it were apparent that AB Strauss would not be in a position to pay its debts, it would have made no sense for AB7 (which plaintiffs allege dominated and controlled the Debtor) to repeatedly provide both equity and unsecured loans to permit AB Strauss to continue operating. Indeed, the Complaint does not allege that AB Strauss defaulted on any

- 88 -

obligation until January 2009. For that reason alone, the Complaint fails to adequately allege AB Strauss's insolvency. *See EBC*, 380 B.R. at 359 (debtor did not satisfy "cash flow test" where debtor was paying its debts as they matured on transfer date).

### B. The Complaint Fails To Allege a Plausible Claim for Actual Fraudulent Transfer

Section 548(a)(1)(A) provides that transfers of property or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay, or defraud a past or future creditor. 11 U.S.C. § 548(a)(1)(A). Claims for actual fraudulent transfer are subject to Rule 9(b)'s heightened pleading requirements. *Oakwood Homes*, 325 B.R. at 698. To state a claim for actual fraudulent transfer, plaintiff must allege intent with the requisite particularity with respect to each transfer or obligation sought to be avoided and must connect those allegations to the defendant's alleged scheme to defraud. *In re Image Masters*, 421 B.R. at 183.

Here, plaintiffs' allegations of actual intent to defraud are fundamentally incoherent for much the same reason as its veil-piercing allegations: when money flows *into* a company as equity or unsecured debt, it makes no sense that this is done with an intent to defraud creditors. In lieu of a plausible theory of actual intent to defraud, plaintiffs merely cross-reference a grab-bag of other allegations about insolvency (refuted above) and the requirements of the APA, but do not explain how the transfer of $40 million *into* AB Strauss, which permitted it to continue operating and *paying* creditors, reflected an intent to "hinder, delay, or defraud" those same creditors.

Nor does the Complaint explain how even the one significant payment *out* of the company could give rise to the necessary inference of actual intent to defraud. The $10.6 million Principal Payment on April 22, 2008 was made only *after* AB7 made an additional equity investment of $12.3 million (an exchange that benefitted the Debtor by reducing its outstanding

- 89 -

debt) and was followed by additional unsecured new cash loans of $13.2 million, advanced at interest rates *lower* than the rates provided under the repaid loans. *See* above at 20-21. These facts simply fail to support a reasonable inference of fraudulent intent.

Courts consider a list of so-called "badges of fraud" to assess whether an actual fraud pleading satisfies Rule 9(b)'s particularity requirement. *In re Image Masters*, 421 B.R. at 183. These "badges" involve consideration of whether:

(i)     the transfer or obligation was to an insider;

(ii)    the debtor retained possession or control of the property transferred after the transfer;

(iii)   the transfer or obligation was disclosed or concealed;

(iv)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(v)     the transfer was of substantially all of the debtor's assets;

(vi)    the debtor absconded;

(vii)   the debtor removed or concealed assets;

(viii)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(ix)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(x)     the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(xi)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider.

*Id.* at 183-84; *see also In re Fedders*, 405 B.R. at 545. With the exception of the mere fact that AB7 was AB Strauss's indirect parent, the Debtor alleges none of the other badges of fraud with the requisite particularity, if at all. As noted above, the Complaint fails to adequately plead insolvency and actually *establishes* reasonably equivalent value. While plaintiffs may suggest

that they allege concealment, that allegation was made against AB7, not the Debtor, and focuses on the period *before* the R&S transaction. There is no suggestion that the Loan Obligations or Payments were concealed when they were actually made. The Complaint simply fails to state a plausible claim that AB Strauss acted with intent to defraud creditors.

## X.   THE COMPLAINT FAILS TO ALLEGE A VALID CLAIM FOR MORE THAN A MINIMAL AVOIDABLE PREFERENCE

In Count Five of the Complaint, the Debtor seeks to avoid the Preference Period Payments of principal and interest that were made within one year of the Petition Date as preferential transfers under Section 547 of the Bankruptcy Code. Section 547 permits a Debtor to avoid transfers of property of the debtor:

> (1)   to or for the benefit of a creditor;
>
> (2)   for or on account of an antecedent debt;
>
> (3)   made while the Debtor was insolvent;
>
> (4)   made (A) on or within 90 days before the petition date or (B) if the transfer is to an insider, between 90 days and one year before the petition date; and
>
> (5)   that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7; (B) the transfer had not been made and (C) such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

11 U.S.C. § 547(b).

As an initial matter, the Complaint fails to adequately plead a prima facie preference claim with respect to the $10,766,949 in Preference Period Payments made within one year but more than 90 days before the Petition Date — between April 22, 2008 and July 8, 2008. While Section 547(f) of the Bankruptcy Code provides that a debtor is presumed to be insolvent during the 90 day period prior to the petition date, no such statutory presumption exists

for transfers made to insiders before that period. *See Raslavich v. Elkins (In re Old World Cone Co.)*, 119 B.R. 473, 476 (Bankr. E.D. Pa. 1990). As noted above, the Complaint fails to plead facts affirmatively establishing insolvency.

In addition, the Complaint on its face establishes a subsequent new value defense with respect to the $10,863,486 in Preference Period Payments made between April 22, 2008 and November 6, 2008. Section 547(c)(4) of the Bankruptcy Code provides that a trustee may not avoid a transfer that is made to a creditor to the extent that, after such transfer, such creditor gave new value to the debtor that is (a) not secured by an otherwise unavoidable security interest and (b) on account of which new value the debtor did not make an otherwise unavoidable transfer to such creditor. 11 U.S.C. § 547(c)(4). *See Official Comm. of Unsecured Creditors v. Seven D. Wholesale (In re Contempri Homes, Inc.)*, 269 B.R. 124, 131 (Bankr. M.D. Pa. 2001) (dismissing preference claims to extent defendant provided subsequent new value). "New value" is defined by the Bankruptcy Code to include "money." 11 U.S.C. § 547(a)(2).

Although Section 547(g) places the burden of proving a subsequent new value defense on the defendant, "a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also In re Image Masters*, 421 B.R. at 181 (dismissing fraudulent transfer claim where complaint established good faith defense). Here, plaintiffs concede that AB Strauss received unsecured subsequent new value in the form of $13.2 million in cash (on account of which AB Strauss did not also make an otherwise unavoidable transfer) after the lion's share (in amount) of Preference Period Payments were made. *Compare* Compl. ¶ 111 *with id.* ¶ 266. For the Court's convenience, the chart below illustrates the timing of the Preference Period Payments as compared to the subsequent new value provided by AB7:

KL3 2769268.15

| Date | Payment | New Value | Net Preference |
|---|---|---|---|
| 4/22/2008 | $128,085 | | $128,085 |
| 4/22/2008 | $10,600,000 | | $10,778,085 |
| 5/2/2008 | | ($5,000,000) | $5,778,085 |
| 6/20/2008 | | ($2,600,000) | $3,178,000 |
| 7/8/2008 | $38,864 | | $3,216,949 |
| 7/28/2008 | | ($3,650,000) | $0 |
| 11/6/2008 | $96,537 | | $96,537 |
| 11/6/2008 | | ($2,000,000) | $0 |
| 12/3/2008 | $17,393 | | $17,393 |
| 1/14/2009 | $27,091 | | **$44,484** |

As illustrated above, AB Strauss made only $44,484 in Interest Payments to AB7 that were not followed by subsequent new value transfers from AB7. As a result, Count Five must be dismissed to the extent it seeks to avoid the Preference Period Payments other than the December 3, 2008 and January 14, 2009 interest payments.[36]

## XI.    PLAINTIFFS' PRAYER FOR PUNITIVE DAMAGES SHOULD BE STRICKEN BECAUSE SUCH DAMAGES ARE UNAVAILABLE AS A MATTER OF LAW ON THE FACTS ALLEGED

Plaintiffs seek to recover punitive damages on the basis of their purported claims for breach of fiduciary duty, avoidance of alleged fraudulent transfers and obligations, breach of the APA and R&S Plan, tortious interference, and fraudulent inducement. Compl. at 106-07. Even if the Complaint stated a valid claim for relief under any of these theories — which it does not — plaintiffs' prayer for punitive damages should be stricken because plaintiffs have failed to allege a basis for this extraordinary remedy. *See Boring v. Google, Inc.*, No. 09-2350, 2010 WL

---

[36]    AB7 has an ordinary course defense to those payments under Bankruptcy Code Section 547(c)(2), but such defense is not apparent on the face of the Complaint.

KL3 2769268.15

318281, at *7 (3d Cir. Jan. 28, 2010) (affirming dismissal of punitive damages claim at pleading stage where "there is simply no foundation in the complaint for a demand for punitive damages.") (citing *Iqbal*, 129 S. Ct. at 1950); *see also Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1346 (D. Del. 1983) (dismissing punitive damages on motion to dismiss because "punitive or exemplary damages are not recoverable under the federal securities laws").

  As an initial matter, New Jersey courts have long held that punitive damages are not available in an action for breach of a business contract absent an "unusual relationship between the parties reflect[ing] a breach of trust beyond the mere breach of a commercial contract." *Sandler v. Lawn-a-Mat Chem. & Equip. Corp.*, 358 A.2d 805, 812 (N.J. Super. Ct. App. Div. 1976); *see also Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1034 (D.N.J. 1995); *Buckley v. Trenton Saving Fund Soc'y*, 544 A.2d 857, 865 (N.J. 1988); *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 512 (N.J. 1980). "'In actions . . . upon mere private contracts . . . even where the breach is malicious and unjustified, exemplary damages are not allowable.'" *Sandler*, 358 A.2d at 812 (quoting Charles T. McCormick, *Handbook on the Law of Damages* § 81 (1935)).

  Plaintiffs have not alleged a special relationship between AB7 and the other parties to the APA. In fact, the New Jersey Bankruptcy Court noted that "[t]he APA was negotiated, proposed, and entered into . . . without collusion, in good faith, and from arm's-length bargaining positions." Ex. I ¶ 11. Thus, as a matter of law, plaintiffs cannot recover punitive damages on their contract claims.

  Similarly, numerous courts have held that punitive damages are unavailable under the Bankruptcy Code, and punitive damages are not among the enumerated remedies for alleged fraudulent transfers under the Uniform Fraudulent Transfer Acts of New Jersey or Delaware.

*See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, No. 09-1198, 2010 WL 1253157, at *30 (Bankr. S.D.N.Y. Mar. 31, 2010) (denying punitive damages under 11 U.S.C. § 550 and Oklahoma's Uniform Fraudulent Transfer Act because "[p]ersuasive authority holds that § 550 bars punitive damages notwithstanding their possible availability under state law."); *Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 376 (Bankr. E.D. Okla. 2010) (denying punitive damages because "'[t]he court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer'") (quoting *Sherman v. FSC Realty LLC (In re: Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003)); Del. Code Ann. tit. 6, § 1307; N.J. Stat. Ann. § 25:2-29. Thus, plaintiffs cannot recover punitive damages on their purported fraudulent transfer claim.

Plaintiffs' New Jersey tortious interference and fraudulent inducement claims cannot support recovery of punitive damages either because the Complaint does not allege that defendants acted with malice. By statute, punitive damages may be awarded under New Jersey law only upon a showing "that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12(a). Thus, punitive damages are awarded only "where the wrongdoer's conduct is especially egregious." *Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 421 (S.D. Tex. 2008) (applying New Jersey law) (citation and internal quotation marks omitted). To be awarded punitive damages premised on a tortious interference theory, a plaintiff must allege and prove "conduct more outrageous than that comprising the tort at issue." *Intermilo, Inc. v. I.P. Enters.*, 19 F.3d 890, 894 (3d Cir. 1994) (reversing punitive damage award where acts were motivated by defendants' "own business interests" rather than "'evil-motive'" or

"some desire to harm [plaintiff] or its employees." (citation omitted)). With respect to plaintiffs'

fraudulent inducement claim, New Jersey courts have recognized that "[f]raud, standing alone,

without some additional aggravating element, will not sustain a claim for punitive damages." *Lo*

*Bosco*, 891 F. Supp. at 1034. In *Lo Bosco*, plaintiff alleged, among other causes of action,

negligent misrepresentation and fraud arising out of an oral business agreement to enter into a

joint venture. *Id.* at 1031-34. Though the court denied summary judgment as to the underlying

claims, it dismissed plaintiff's claim for punitive damages because "plaintiff has provided no

evidence of heightened culpability, malice or outrageous conduct that would support his

allegation." *Id.* at 1035. Here, like in *Intermilo* and *Lo Bosco*, plaintiffs have failed to allege any

facts of malicious or outrageous conduct that would justify an award of punitive damages. Far

from demonstrating malicious intent, the Complaint establishes that AB7 went above and beyond

its obligations under the APA to ensure that AB Strauss would have sufficient cash to operate

and satisfy the claims of Class 4 Creditors for nearly two years.

Plaintiffs' Delaware breach of fiduciary duty claim also cannot support recovery

of punitive damages, notwithstanding plaintiffs' conclusory allegations of a "knowing, willful,

and reckless" breach. Compl. ¶ 246; *see Iqbal*, 129 S. Ct. at 1949-50. Under Delaware law,

punitive damages are appropriate only where the defendant's conduct is outrageous due to an

evil motive or "reckless indifference to the rights of others." *Jardel Co. v. Hughes*, 523 A.2d

518, 529 (Del. 1987) (citing Restatement (Second) of Torts § 908 cmt. b (1979)); *see also Reeves*

*v. Am. Airlines, Inc.*, 408 A.2d 283, 284 (Del. 1979) (requiring "ill will or wanton or malicious

conduct" to recover punitive damages); *McClain v. Faraone*, 369 A.2d 1090, 1095 (Del. Super.

Ct. 1977) (requiring "element of ill will, malice or intention to cause injury to the plaintiff").

Plaintiffs base their breach of fiduciary duty claim on allegations that AB Strauss's directors

caused the company to incur intercompany loans to AB7 and embraced a business strategy that plaintiffs now find wanting. Compl. ¶¶ 238-45. But plaintiffs do not allege, nor could they, that AB Strauss's decision to borrow money from AB7 when AB Strauss sorely needed it, or to implement the inventory and merchandizing strategy AB7 had previously disclosed to the New Jersey Debtors and their creditors, was intended to harm plaintiffs.

Plaintiffs' prayer for punitive damages should be stricken in its entirety.

## Conclusion

For the foregoing reasons, the Complaint should be dismissed except with respect to the Surviving Preference Payments.

Dated: April 23, 2010
Wilmington, Delaware

LANDIS RATH & COBB LLP

Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
Jeffrey S. Trachtman
Michael J. Sternhell
Daniel M. Eggermann
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Autobacs Seven Co., Ltd., Kenichi Takeda, Akihiro Yamada and Hiroyoshi Kojima*