## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUTOBACS STRAUSS, INC., | ) | Case No. 09-10358 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| AUTOBACS STRAUSS, INC., and 1945 Route | ) | |
| 23 ASSOCIATES, INC. and R&S PARTS and | ) | |
| SERVICE, INC., by their Chief Liquidating | ) | |
| Officer EXECTUIVE SOUNDING BOARD | ) | |
| ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 09-52849 (CSS) |
| | ) | |
| AUTOBACS SEVEN CO., LTD. KENICHI | ) | |
| TAKEDA, AKIHIRO YAMADA, HIROYOSHI | ) | |
| KOJIMA, AND YOKUO TAKENAKA, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

LANDIS RATH & COBB
Richard S. Cobb
James S. Green
919 Market Street, Suite 1800
Wilmington, DE  19801

　　　-and-

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Jeffrey S. Trachtman
Daniel M. Eggermann

YOUNG CONAWAY STARGATT
& TAYLOR
M. Blake Cleary
Jamie N. Luton
Michael S. Neiburg
1000 North King Street
Wilmington, DE  19801

Counsel for Plaintiff Autobacs Strauss

- and -

---

[1] In ruling on a motion to dismiss under Rule 7012 of the Federal Rules of Bankruptcy Procedure, the Court is not required to state findings of fact nor conclusions of law under Bankruptcy Rule 7052.

Michael J. Sternhell
1177 Avenue of Americas
New York, New York 10036

Counsel for Defendants Autobacs
Seven Ltd, Koichi Sumino, Kenichi
Takeda, Akihiro Yamada and
Hiroyoshi Kojima

BLANK ROME LLP
Bonnie Glantz Fatell
1201 Market Street, Suite 800
Wilmington, DE  19801

- and -

Harris N. Cogan
Jeremy L. Reiss
405 Lexington Avenue
New York, NY 10174

Counsel for Yukuo Takenaka

MILBERG LLP
Jonathan M. Landers
Jerome M. Congress
Lois F. Dix
Gary S. Snitow
One Pennsylvania Plaza
New York, NY  10119-0165

Counsel for All Plaintiffs

-and-

GIBBONS P.C.
Natasha Songonuga
1000 N. West Street, Suite 1200
Wilmington, DE  19801

Counsel for Plaintiffs 1945 Route 23
Associates and R&S Parts and Service,
Inc., by their Chief Liquidating Officer
Executive Sounding Board Associates,
Inc.

Dated:  May 21, 2012

Sontchi, J. _____

## INTRODUCTION

This adversary proceeding arises in the *third* Chapter 11 bankruptcy of a chain of

stores providing automotive parts and services doing business as "Strauss Discount

Auto." In 2007, through the plan of reorganization in the *second* Chapter 11 case, a

Japanese company known as "AB7" - through two of its newly-formed subsidiaries -

purchased the Strauss business for approximately $45 million. AB7 funded its

subsidiaries' purchase of the assets. In its simplest terms, this dispute is over whether,

(i) as plaintiffs argue, AB7's funding of ABST (both purchase and after) was or should

have been solely a capital contribution/equity infusion by AB7 to its subsidiaries; or, (ii) as AB7 argues, its funding was allowed to be and, in fact, was a combination of debt and capital contribution/equity to its subsidiaries.

The plaintiffs in this case are (i) the reorganized debtor in the third Chapter 11 case known as "ABST"; and (ii) certain creditors in the second Chapter 11 case known as the R&S Plaintiffs. Under the plan of reorganization in the second Chapter 11 case, the R&S Plaintiffs were to receive approximately $45 million from the purchaser. At the time of the filing of the third Chapter 11 case, however, they were still owed approximately $8 million. Under ABST's confirmed plan in this – the third – Chapter 11 case, unsecured creditors, including the R&S Plaintiffs, will share *pro rata* in the proceeds, if any, of this litigation.

The facts surrounding AB7's purchase of the assets and the provisions of the plan of reorganization in the second Chapter 11 case have given rise to a number of claims asserted by the plaintiffs against AB7 and certain AB7-related officers and directors of the debtor known as the "Individual Defendants." In summary, these claims are:

| Count | Claim | Asserted By | Against |
|-------|-------|-------------|---------|
| 1 | *Alter Ego/Piercing the Veil:*<br>Plaintiffs allege that ABST is an alter ego of AB7. | ABST & R&S Plaintiffs | AB7 |
| 2 | *Breach of Fiduciary Duties:*<br>ABST alleges that the Individual Defendants owed and breached fiduciary duties of loyalty and care to ABST and its creditors. | ABST | Individual Defendants |
| 3 | *Avoidance of Fraudulent Transfers:*<br>ABST alleges that AB7, through overlapping ABST directors and AB7's controlling power as an | ABST | AB7 |

| | | | |
|---|---|---|---|
| | insider, caused ABST to incur loan obligations with the intent to defraud or hinder ABST's creditors. | | |
| 4 | *Avoidance of Constructively Fraudulent Transfers:*<br><br>ABST alleges that the loan transactions were "constructively fraudulent" it was insolvent from its inception and it did not receive reasonably equivalent value for incurring debt owed to AB7. | ABST | AB7 |
| 5 | *Avoidance of Preferential Transfers:*<br><br>ABST alleges AB7 received preferential payments. | ABST | AB7 |
| 6 | *Recovery of Avoidable Transfers:*<br><br>ABST alleges that it should recover the transfers set forth in counts 3 – 5. | ABST | AB7 |
| 7 | *Declaratory Judgment:*<br><br>ABST alleges it should obtain declaratory judgment invalidating the loan obligations it incurred in favor of AB7. | ABST | AB7 |
| 8 | *Recharacterization of Debt to Equity:*<br><br>ABST alleges that the loan obligations it incurred in favor of AB7 should be recharacterized as equity. | ABST | AB7 |
| 9 | *Equitable Subordination:*<br><br>ABST alleges that the loan obligations it incurred in favor of AB7 should be equitably subordinated to the unsecured claims against ABST. | ABST | AB7 |
| 10 | *Breach of Plan of Reorganization:*<br><br>Plaintiffs allege that the order confirming the plan in the second Chapter 11 case required AB7 to fund ABST with equity, not debt. Plaintiffs further allege that AB7 funded ABST in relevant part with debt, which was a breach of the plan reorganization. | ABST & R&S Plaintiffs | AB7 |

| | | | |
|---|---|---|---|
| 11 | *Breach of Asset Purchase Agreement:*<br><br>Plaintiffs allege that the asset purchase agreement in the second Chapter 11 case (which was executed in connection with the plan of reorganization) required AB7 to fund ABST with equity, not debt. Plaintiffs further allege that AB7 funded ABST in relevant part with debt, which was a breach of the asset purchase agreement. | ABST & R&S Plaintiffs | AB7 |
| ~~12~~[2] | ~~*Tortious Interference with Contract*~~ | ~~R&S Plaintiffs~~ | ~~All Defendants~~ |
| 13 | *Fraudulent Inducement:*<br><br>R&S Plaintiffs allege that the Defendants fraudulently induced: (i) the R&S Plaintiffs to vote in favor of the plan in the second Chapter 11 case; and (ii) the bankruptcy court to approve confirmation of that plan. | R&S Plaintiffs | All Defendants |
| 14 | *Objection to Proof of AB7's Claim:*<br><br>ABST objects to AB7's claim because ABST's loan obligations to AB7 that form the basis of the claim should be recharacterized as equity. | ABST | AB7 |
| 15 | *Disallowance of AB7 Proof of Claim:*<br><br>ABST objects to AB7's claim because ABST's loan obligations to AB7 that form the basis of the claim were the result of fraudulent and/or preferential transfers. | ABST | AB7 |

The defendants have sought to dismiss all of the counts under Federal Bankruptcy Rule 7012(b)(6). Counts 1-3, 5-11 and 14-15 allege facts sufficient to show a plausible claim for relief and, thus, the motion to dismiss those counts will be denied.

---

[2] The adversary proceeding initially entailed fifteen counts, but the R&S Plaintiffs subsequently withdrew Court Twelve (Compare D.I. #1, at 100, with D.I. #46, at 4 n.5).

Counts 4 fails to sufficiently plead a plausible claim and the motion to dismiss will be granted for Count 4. Finally, Count Thirteen, only alleges facts sufficient to show a plausible claim for a part of the relief requested.  Thus, the defendants' motion to dismiss Count Thirteen will be granted in part and denied in part.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Except as set forth below, this Court has the judicial power to enter a final order.

## PROCEDURAL BACKGROUND

Before the Court are two related motions to dismiss[3] an adversary proceeding filed by the reorganized debtor, Autobacs Strauss Inc. ("ABST"), along with R&S Parts and Service Inc., and 1945 Route 23 Associates, Inc., by their Chief Liquidating Officer Executive Sounding Board Associates, Inc. (together, the "R&S Plaintiffs") (ABST and the R&S Plaintiffs, collectively, the "Plaintiffs").[4]   The suit is comprised of fourteen counts.   Twelve of the counts are brought against Autobacs Seven Co. Ltd. ("AB7") alleging various causes of action such as alter ego, breach of fiduciary duty, fraudulent transfer, preferential transfer, etc. A separate count asserts claims for breach of fiduciary

---

[3] Motion to Dismiss filed by Autobacs Seven Co. Ltd., Hiroyoshi Kojima, Kenichi Takeda, Akihiro Yamada) ("D.I. # 24" or "Motion to Dismiss"); Motion to Dismiss Defendant Yukuo Takenaka with respect to Counts Two, Twelve and Thirteen and Joinder in Autobacs Seven Co. Ltd.'s Motion to Dismiss ("D.I. # 30" or "Takenaka's Motion") (together, the Motion to Dismiss and Takenaka's Motion, the "Motions to Dismiss").

[4] Complaint by Autobacs Strauss Inc., 1945 Route 23 Associates, Inc., R&S Parts and Service, Inc by their Chief Liquidating Officer Executive Sounding Board Associates, Inc. ("D.I. # 1" or the "Complaint").

duties against certain AB7-related individuals: Kenichi Takeda, Akihiro Yamada, Hiroyoshi Kojima, and Yukuo Takenaka (together, the "Individual Defendants"). Finally, there is a count asserting a claim for fraudulent inducement brought against both AB7 and the Individual Defendants (collectively, the Individual Defendants and AB7, the "Defendants").

On February 4, 2009, ABST filed a voluntary Chapter 11 petition. No trustee was appointed and ABST continued to operate its business as a debtor-in-possession, pursuant to 11 U.S.C. §§1107 and 1108. AB7 filed a proof of claim in the amount of $43,994,044.12 against ABST on May 1, 2009. Plaintiffs commenced this adversary proceeding by filing the Complaint on December 11, 2009. Then, on April 23, 2010, AB7 moved to dismiss the adversary proceeding. One week later, Yukuo Takenaka moved separately to dismiss Counts Two, Twelve, and Thirteen, joining AB7 with respect to the remaining counts.

Meanwhile, the parties were negotiating the terms of the plan of reorganization. This culminated on September 15, 2010, with this Court entering its Findings of Fact and Conclusions of Law and Order Confirming the Fourth Amended Joint Plan of Reorganization Proposed by Autobacs Strauss Inc. and the Official Committee of Unsecured Creditors ("Fourth Amended Joint Plan"). On October 6, 2010, the Fourth Amended Joint Plan of Reorganization became effective. Under the confirmed plan, ABST reorganized its business and continues to operate. Unsecured creditors and the R&S Plaintiffs were classified as classes 3a and 3b respectively. The claimants in both classes will share *pro rata* in the net proceeds, if any, from this litigation.

7

Briefing is complete and this matter is ripe for decision.

## THE PARTIES[5]

### 1.  R&S Parts and Service Inc. and 1945 Route 23 Associates, Inc.

From 2000 until May 2, 2007, the "R&S Plaintiffs"[6] owned the chain of stores providing automotive parts and services, doing business as "Strauss Discount Auto." The R&S Plaintiffs themselves acquired the chain's assets through the *first* Strauss-related bankruptcy case.

On August 10, 2006, the R&S Plaintiffs filed their own voluntary Chapter 11 petition in the New Jersey Bankruptcy Court.[7]  This was the *second* Strauss-related Chapter 11 case.  The bankruptcy events relating to this second case are referred to as "R&S" events.

### 2.  AB7

AB7 is a Japanese corporation with its principal place of business in Japan.  It is a multi-billion dollar "total car-life service" company.  AB7 buys and sells cars, sells and installs after-market car parts and accessories, and performs various other automotive services.

---

[5] This section largely relies on D.I. # 1, ¶¶ 16-25.

[6] As defined by Plaintiffs' papers, the "R&S Plaintiffs" are "the reorganized debtors under the confirmed plan of reorganization" of R&S Parts and Service, Inc. and 1945 Route 23 Associates – the second Chapter 11.  The Plaintiffs' papers define R&S Parts and Service, Inc. and 1945 Route 23 Associates together as "R&S Parts and Service."  These two terms are combined here for ease of reference, but if the distinction makes a difference in context, it should be applied.

[7] In AB7's papers, R&S Parts and Service Inc. and 1945 Route 23 Associates, Inc. are referred to together as the "New Jersey Debtors."  But rather than refer to the New Jersey Debtors' bankruptcy case as the New Jersey Bankruptcy, and the related bankruptcy plan or confirmation order as the New Jersey Plan or New Jersey Confirmation Order, AB7 refers to the New Jersey Debtors' bankruptcy events as the "R&S Plan" etc.

### 3. Autobacs U.S.A.

Autobacs U.S.A. ("ABUSA") is a wholly-owned subsidiary of AB7, which was formed to facilitate the purchase of the Strauss business in the second Chapter 11 case. ABST, in turn, is a wholly-owned subsidiary of ABUSA. Contemporaneously with the filing of ABST's Chapter 11 case in Delaware, ABUSA filed its own Chapter 11 case in the United States Bankruptcy Court for the Central District of California. In that bankruptcy, GRL Capital Advisors LLC purchased 100% of ABST's common stock on June 2, 2009.  Glenn Langberg (described further below) is the sole member of GRL Capital Advisors LLC and the chief executive officer ("CEO") of ABST.

ABUSA is not a defendant in this case.

### 4. ABST

ABST is a Delaware corporation with its principal place of business in South River, New Jersey.  It filed a voluntary Chapter 11 petition in Delaware on February 4, 2009.  ABST continued as the debtor in possession under 11 U.S.C. §§1107 and 1108 in this bankruptcy case.  It does business as Strauss Discount Auto and provides after-market automotive parts, accessories, and services in New Jersey, New York, and Pennsylvania.  As of the effective date of confirmation of ABST's plan, it was operating approximately 63 stores.

ABST was incorporated on March 8, 2007, by AB7 as part of AB7's purchase of the Strauss business in the second Chapter 11 case.  At all relevant times, AB7 was the 100% owner of ABUSA, which, in turn, was the 100% owner of ABST.   GRL Capital

Advisors, LLC became the 100 percent owner of ABST in June 2009 through ABUSA's bankruptcy in California.

The Fourth Amended Joint Plan was confirmed in this case on September 15, 2010, and became effective on October 6, 2010. ABST continues to do business as a reorganized debtor.

Under the terms of the Fourth Amended Joint Plan, GRL Capital Advisors, LLC's equity in ABST was cancelled. Eighty percent of the new equity in the reorganized company was placed in trust to be distributed *pro rata* to the debtor's unsecured creditors.

### 5. Takenaka Partners

Takenaka Partners LLC ("Takenaka Partners") is a California limited liability company. It provides investment banking and consulting services. In April 2006, AB7 retained Takenaka Partners as it general advisor, financial advisor, and representative.

### 6. Kenichi Takeda

Kenichi Takeda ("Takeda") is a Japanese citizen. From March 9, 2007 to June 25, 2009, Takeda served as a director of ABST. Takeda is the former chairman of the board of directors at ABST (collectively, the "Board of Directors" and, individually, "ABST Director") . Additionally, he was a director at AB7 from June 28, 2006 to April 30, 2007. He was also the co-chief operation officer ("COO") for AB7. Finally, from April 30, 2007 to June 2009, he was a senior executive merchandising strategy officer at AB7.

### 7.  Akihiro Yamada

Akihiro Yamada ("Yamada") is a Japanese citizen.  He was the president of ABST from March 9, 2007 to February 3, 2009.  He was also the CEO of ABST and a member of its Board of Directors from March 9, 2007 to June 25, 2009.  Yamada is an AB7 employee and a former ABUSA director, and was employed by AB7 while holding his ABST positions.

### 8.  Hiroyoshi Kojima

Hiroyoshi Kojima ("Kojima") is a Japanese citizen.  He was the chief financial officer ("CFO") of ABST and a member of its Board of Directors from March 9, 2007 to June 25, 2009.  Kojima is an AB7 employee, and was employed by AB7 while holding his ABST positions.

### 9.  Yukuo Takenaka

Yukuo Takenaka ("Takenaka") is a citizen of the United States.  Takenaka is president and CEO of Takenaka Partners, which, at the time, was serving as a general advisor, financial advisor and representatives of AB7.  Takenaka was a member of ABST's Board of Directors from March 9, 2007 to March 4, 2009.  During that same period, Takenaka was ABUSA and a European subsidiary of AB7, Autobacs France.

Takenaka represented AB7 during the confirmation process of the R&S Plaintiffs' bankruptcy case.

### 10.  The "Individual Defendants"

Takeda, Yamada, Kojima, and Takenaka are collectively referred to as the "Individual Defendants."

**11. Glenn Langberg**

According to AB7, Glenn Langberg ("Langberg") previously owned a majority of the equity interests and was CEO of the R&S Plaintiffs. Then, after the purchase of the Strauss business in 2007 through the filing of bankruptcy, in 2009, Langberg was ABST's chief strategy officer and a member of ABST's board of directors.

Langberg is the sole member of GRL Capital Advisors, LLC. As described above, that entity purchased 100 percent of the equity interest of ABST on June 12, 2009, through the California bankruptcy proceedings of ABUSA. Langberg is currently (to the Court's most recent knowledge) CEO of ABST. The Plaintiffs consider Langberg one of two disinterested, non-AB7 related members of ABST's Board of Directors.

**12. Joseph Catalano**

Joseph Catalano ("Catalano") is a former executive and director of the R&S Plaintiffs and was also an ABST executive and a member of its Board of Directors. The Plaintiffs consider Catalano the second of two disinterested, non-AB7 related members of ABST's Board of Directors.

**13. ABST Board Of Directors**

Takeda, Yamada, Kojima, Takenaka, Langberg, and Catalano constituted ABST's Board of Directors during the relevant period. Takeda, Yamada, and Kojima were directors or otherwise employees of AB7. Takenaka was related to AB7 as a director of its wholly-owned subsidiary, ABUSA, a director of its European subsidiary, Autobacs France, and through the relationship between AB7 and Takenaka Partners (of which he

was president and CEO).  Langberg and Catalano were non-AB7-related members of ABST's Board of Directors.

### 14. Koichi Sumino

Koichi Sumino ("Sumino") is a citizen of Japan.  He was director and CEO of AB7 for many years, retiring in June 2008.

### 15. Joseph Kim

Joseph Kim ("Kim") is a vice president of Takenaka Partners.  He drafted what is discussed below as the "Three-Year Projection."

## FACTUAL BACKGROUND

### 1.  R&S Plaintiffs' Bankruptcy Provides Strategic Opportunity for AB7

The R&S Plaintiffs' market presence in New Jersey, New York, and Pennsylvania intrigued AB7.  AB7 first moved (from Japan) into the United States market in August 2003.  In 2006, when AB7 sought to increase its international market presence, AB7 viewed the R&S Plaintiffs' East Coast chain of Strauss Discount Auto stores as a possible United States foothold.  When the R&S Plaintiffs filed a voluntary Chapter 11 petition on August 10, 2006, AB7 retained Takenaka Partners to investigate and facilitate a potential acquisition.  In late August 2006, Takenaka Partners contacted Langberg, proposing AB7's acquisition of the R&S Plaintiffs' assets.

### 2.  AB7 Structures a Deal to Acquire the R&S Plaintiffs' Assets

On December 11, 2006, Yamada, an employee of AB7, prepared a business plan for AB7's acquisition of the R&S Plaintiffs' assets.  AB7 retained the law firm of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").  Pillsbury advised Yamada and

Takenaka (who was serving as a financial advisor to AB7), to use ABUSA or a new company wholly-owned by ABUSA to acquire the R&S Plaintiffs' assets.  Pillsbury circulated a letter to Yamada, Takenaka, Kim (an employee of Takenaka Partners), and (undisclosed) others on February 6, 2007.  This letter described tax considerations and stated that AB7 would provide funding with equity or debt to ABUSA, which in turn would provide funding to ABST.[8]  This structure was designed to preserve a net operating loss tax carry forward worth $7 million.

On February 26, 2007, AB7's board of directors met and agreed to fund the acquisition with $20 million in equity, $33.65 million in long-term loans, and $8 million in short-term loans.  Two days later, on February 28, 2007, the AB7 board approved a $23 million loan to acquire the R&S Plaintiffs' assets.  Takeda, Kojima, Takenaka, and Sumino approved the $23 million loan.

Moving forward with the acquisition game plan, on March 8, 2007, AB7 incorporated ABST, a new company wholly-owned by ABUSA (ABUSA was in turn wholly-owned by AB7).  ABST's certificate of incorporation included an exculpatory provision[9] pursuant to Delaware General Corporate Law §102(b)(7).  ABST's by-laws require that the ABST Directors "shall act only as a Board, and the individual directors shall have no power as such."  To "act," the ABST Directors must have a quorum (a

---

[8] D.I. # 1, at ¶ 77.

[9] The provision provides:  "Ninth:  A Director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; *provided, however,* that the foregoing shall not eliminate or limit the liability of the director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit."  D.I. # 26, Ex. Z, at 3 (emphasis in original).

majority of the total number of directors) and a majority vote of said quorum constitutes the "act of the Board of Directors."[10]  The ABST Accounting Rules state that "[f]inancing arrangements must have [Board of Directors] approvals prior to action on the financing plan" and all payments over $100,000 require final approval after a meeting of the ABST Directors.[11]

### 3.  AB7 Takes the Stage and Its Plan to Acquire the R&S Plaintiffs Goes Public

AB7's presence became visible on March 26, 2007.  The R&S Plaintiffs held a "Vendor Breakfast" to introduce AB7 and to request increases in credit lines and merchandise releases.  AB7 announced at that meeting that it would soon acquire the R&S Plaintiffs' assets.

AB7 made a  presentation at the meeting discussing how "[i]nventory levels [are] significantly higher at competitive outlets" and that a primary business driver going forward would be expanding merchandise offerings with "[b]roader and [d]eeper [a]ssortments."[12]  It also provided a "Strauss Three-Year Business Strategy" that touted re-mixing, enhancing, and promoting a "vibrant merchandise assortment," market expansion, new stores, and "aggressive moves" in the tire and service business sectors.[13]

Three days later, on March 29, 2007, the R&S Plaintiffs' and AB7 signed an asset purchase agreement (the "R&S APA").

---

[10] D.I. # 26, Ex. BB, Article III, SECTION 8.

[11] D.I. # 1, at ¶ 130 (citing ABST's Accounting Rules, including section 3.6).

[12] D.I. # 26, Ex. E.

[13] *See id*.

### 4. R&S Plan Negotiations, the R&S Disclosure Statement and the R&S Plan

"During negotiations on the proposed R&S Plan, in or about January 2007, AB7 and Takenaka Partners, through Kim and Takenaka, represented to the principals of [the R&S Plaintiffs], who acting as the conduit for AB7's information, stated to counsel to the R&S Creditors Committee that the [R&S APA] would be a *full equity deal with the purchase price being funded by capital contributions rather than debt.*"[14]

On behalf of the R&S Plaintiffs, attorneys Kenneth A. Rosen, Bruce Buechler, and Eric Horn from Lowenstein Sandler PC ("Lowenstein") filed the R&S Disclosure Statement on March 30, 2007.[15] The R&S Plaintiffs stated that the R&S Plan was in the best interests of creditors and urged its acceptance. The R&S Disclosure Statement describes the R&S Plaintiffs' marketing efforts and concludes that AB7's offer to purchase substantially all of the assets is the best available opportunity.

In Article VI, Section B, the R&S Disclosure Statement describes the means to implement the plan through the sale of substantially all of the R&S Plaintiffs' assets. Sub-part 3 details the R&S APA's "Purchase Price."

Specifically, the R&S Disclosure Statement provides that "[o]n or prior to the Effective Date, [AB7] will make a *capital contribution* to [ABST] in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital . . . ."[16] The "Effective Date" and the "purchase price" are defined terms. The

---

[14] D.I. # 1, ¶ 86(a)(emphasis added).

[15] D.I. # 26, Ex. A.

[16] D.I. # 26, Ex. A, at 38 (emphasis added).

"cash portion of the Purchase Price" must be an amount at least equal to the sum of various addends described in the R&S Disclosure Statement.[17]

In short, the R&S Disclosure Statement asserts that AB7 will make a "capital contribution" in an amount sufficient to pay the "cash portion of the purchase price plus $10 million of working capital." The total amount due as the "cash portion of the purchase price" was approximately $27,878,470. After adding $10 million for working capital, the aggregate "capital contribution" required from AB7 on or before the Effective Date was $37,878,470.

A three-year projection was annexed to the R&S Disclosure Statement (the "Three-Year Projection").[18] The single-page Three-Year Projection was drafted by Kim on behalf of AB7. It was circulated to all parties receiving the R&S Disclosure Statement. It did not contain a line item reflecting interest paid or accrued over the three-year period. No Defendants objected to the lack of stated interest (paid or accrued) in the Three-Year Projection.

Drafts of the Three-Year Projection were rejected by Kim because they had shown interest due on existing debt of the R&S Plaintiffs. Kim directed a re-draft of the

---

[17] D.I. # 26, Ex. A, at 38 ("As set forth in the Plan, on or prior to the Effective Date, [ABST] shall deliver to [the R&S Plaintiffs] the cash portion of the Purchase Price under the Asset Purchase Agreement in an amount at least equal to the sum of the following: (i) an amount sufficient to satisfy all obligations due under the Kimco Secured Claim; (ii) an amount sufficient to pay all Administrative Claims, Professional Fee Claims and 20 Day Administrative Day Claims; (iii) an amount sufficient to pay Allowed Class 1 Claims in full; (iv) an amount sufficient to provide funds for the initial dividend to holders of Allowed Priority Tax Claims and Allowed Class 4 Unsecured Claims; and (v) an amount sufficient to satisfy any and all cure costs resulting from the Debtors' assumption and assignment to [ABST] of Executory Contracts; *provided however*, that in no event will the aggregate amount of the cash portion of the Purchase Price paid by [ABST] under the Asset Purchase Agreement exceed $45 million.").

[18] D.I. # 26, Ex. F.

Three-Year Projection, such that it would show no interest paid or accrued in the first three years, as he "did not want the projection to show any debt on [ABST's] opening books.[19]

The R&S Plan also provides that "ABST shall not make any dividends or *distributions* to ABST's equity holders [AB7/ABUSA] on account of such equity holders' interests in ABST until such time as ABST's obligations under the R&S Plan are fully satisfied."[20]  These obligations ultimately included paying $19.34 million to satisfy "Class 4 Claims" under the R&S Plan.

### 5. AB7's Financial Obligations as Described in the R&S APA[21]

The language in the R&S APA does *not* match the language in the R&S Disclosure Statement with respect to the "Purchase Price" and "Payment of Purchase Price."   In the R&S Disclosure Statement, the "Purchase Price" and AB7's related financial obligations are included in a two-paragraph long description of "Purchase Price."  In contrast, in the R&S APA, the "Purchase Price" is defined in section 3.2[22] and AB7's financial obligations are separately stated in ARTICLE IV FORMATION AND FUNDING NEWCO.[23]

Article IV provides **in whole**:  "Autobacs [AB7] indirectly owns and, at least until all Deferred Amounts required to be paid by Buyer hereunder shall have been

---

[19] D.I. # 1, at ¶ 57.

[20] D.I. #26, Ex. EE at 31.

[21] Pillsbury attorney Jerry P. Peppers is listed as the "Buyer" contact on the R&S APA.  Lowenstein attorney Kenneth Rosen is the "Seller" contact.

[22] D.I. # 26, Ex. B, at 12.

[23] D.I. # 26, Ex. B, at 13.

paid in full, will indirectly own 100% of the equity interest of Buyer. [AB7] is causing Buyer to enter into this Agreement, and [AB7] specifically agrees, for the benefit of Seller and its creditors, to provide Buyer with the funds up to the total amount set forth on Schedule 4, provided, however, that the aggregate amount provided by [AB7] to Buyer pursuant to this ARTICLE IV shall not exceed $39,000,000."[24]

Essentially, Article IV provides that AB7 has a financial obligation to provide ABST, the buyer, with funds, up to a specified amount on Schedule 4. Schedule 4 lists the "Total Payment as per Article IV of APA" as $38,919,235.[25] Unlike the in the "Purchase Price" section of the R&S Disclosure Statement, Article IV of the R&S APA does not include the term "capital contribution."

The R&S APA was signed on March 29, 2007, by Langberg, on behalf of the "seller" (the R&S Plaintiffs), by Akihiro Yamada, on behalf of the "buyer" (ABST), and by someone whose signature is illegible on behalf of AB7.[26]

## 6. The R&S Confirmation Hearing, Confirmation Order, and Related Emails

On April 25, 2007, Judge Novalyn L. Winfield held the R&S Confirmation Hearing in the United States Bankruptcy Court in the District of New Jersey.[27] There, Takenaka represented on behalf of AB7 that "he and AB7 were not aware of any other arrangement or agreement involving AB7 and ABST [that had not been disclosed to the

---

[24] D.I. # 26, Ex. B, at 13.

[25] D.I. # 26, Ex. C. Neither party takes issue with the minor discrepancy between $38,919,235 (listed in Schedule 4) and $37,878,470 (the amount paid to ABST, representing the cash portion of the purchase price and the $10 million for working capital).

[26] Oddly, the names and titles, in addition to the signatures, of the R&S Plaintiffs and ABST are included. However, for AB7, there is just a signature line.

[27] D.I. # 26, Ex. H, at 24:10-12.

court]."[28]  Takenaka also represented that "there will be sufficient cash flow from the operations and *AB7's capital contribution* that would be sufficient funds to remain current with all obligations . . . ."[29]

Also at the R&S Confirmation Hearing, an attorney proffered testimony on behalf of Langberg.  Langberg would have testified that the R&S Plaintiffs' business was a "turnkey operation" with "an existing base of approximately 90 stores that are open for business stocked with inventory and with experienced employees who are operating there on a day to day basis.  And, therefore, [ABST] would be stepping in . . . with a going business that is generating a positive cash flow."[30]

On April 26, 2007, the attorney[31] for the R&S Plaintiffs' Creditors Committee began an email string.  He suggested adding language to the proposed R&S Confirmation Order, which, as revised, would state, "[t]o the extent any inconsistencies exist between the [R&S APA] and the [R&S Plan], the terms of the [R&S Plan] shall control."[32]  He also suggested adding "[a]s governed by the [R&S] Plan, and notwithstanding any provision in the [R&S APA] to the contrary . . . ."

AB7's attorney[33] responded that the requested changes were unacceptable.  They were "unacceptable" to AB7 "for the same reason [as] before . . . . [AB7] executed the [R&S APA] and is bound by and prepared to perform its obligations under the [R&S

---

[28] D.I. # 25, at 16, 40 n.14.

[29] D.I. # 26, Ex. H, at 23:21-25; 24:1-3 (emphasis added)

[30] D.I. # 26, Ex. H, at 17.

[31] The attorney was Joseph Coleman, of Kane Russell Coleman & Logan, PC.

[32] D.I. # 51, Ex. GG.

[33] AB7's emailing attorney was Rick B. Antonoff of Pillsbury.

APA].  [AB7] did not negotiate or vote on the [R&S Plan]."[34]  No emails provided to the Court specifically address the issue of ambiguity related to the term "capital contribution." But no specific ambiguity issues were singled out.

On April 27, 2007, Judge Winfield signed the R&S Confirmation Order.[35]  Article VI B.3 of the R&S Plan was replaced in ¶ 20 of the R&S Confirmation Order.  That section of the R&S Plan was the "Purchase Price" section.  Although some language changed, the R&S Confirmation Order keeps the language from the R&S Plan that "[o]n or prior to the Effective Date, Autobacs [AB7] will make a capital contribution to Autobacs/Strauss [ABST] in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital."[36]  This language is identical to the language in the R&S Disclosure Statement.

The R&S Confirmation Order also states: "[t]he Asset Purchase Agreement between Autobacs/Strauss [ABST] and the Debtors dated as of March 29, 2007 (the 'APA') and the transactions contemplated thereby are hereby approved in all respects."[37]

### 7.  The R&S APA Closing, Payment, Bookkeeping, and Insolvency

On April 26, 2007, the day between the R&S Confirmation Hearing and issuance of the R&S Confirmation Order, AB7 funded ABST with $43 million.  The $43 million was provided to fund the R&S APA closing.  Of the $43 million, $20 million was equity,

---

[34] D.I. # 51, Ex. HH.

[35] D.I. # 26, Ex. I.

[36] D.I. # 26, Ex. I, at 9, § 20.

[37] D.I. # 26, Ex. I, at 4, § 7.

and $23 million was a long term interest bearing loan (the "$23 Million Loan").  The "Loan Agreement" reflecting the $23 Million Loan was signed by Sumino on behalf of AB7, and by Yamada on behalf of ABST.  The $23 Million Loan Agreement was never circulated for approval to the full board of ABST Directors.  It was never approved by Langberg or Catalano.  There are no recorded minutes evidencing an ABST Directors' meeting regarding the $23 Million Loan Agreement, nor does any party suggest that such a meeting was held.

On May 2, 2007, the R&S APA purchase closed.  ABST paid $27,878,470.60 to the R&S Plaintiffs.  None of the non-AB7-related ABST employees or directors knew that of the $43 million transferred, or that $23 million took the form of a loan.

Over a month after closing, on June 5, 2007, William Drozdowski, ABST's non-AB7-related director of accounting, began to prepare financial statements for ABST in preparation for the first meeting of ABST's Board of Directors.  Drozdowski prepared a balance sheet and listed the entire $43 million provided by AB7 as "Contributed Capital."  Kojima (ABST CFO and AB7 employee) directed Drozdowski to list $20 million as capital and $23 million as a long-term loan.  Drozdowski spoke with Langberg, Catalano, and Paul Dawson,[38] informing the three of them of the $23 Million Loan on June 5, 2007.  This was the first time that Langberg, Catalano and Dawson had heard of the loan. Drozdowski requested the loan documents from Kojima, who did not have them in his possession and sent emails to Japan to obtain them electronically.[39]

---

[38] Paul Dawson was ABST's director of finance, with no known relationship to AB7.

[39] D.I. # 1, at ¶ 152.

The Plaintiffs contend that out of the $43 million transferred to ABST, $28 million went right out the door to the R&S Plaintiffs in accordance with the R&S APA. Thus, while $43 million was transferred to ABST, once $28 million was paid out under the plan, ABST was left with $15 million in cash. But, since ABST owed $23 million under the long-term loan, the $15 million in remaining cash was insufficient to cover their liabilities, i.e., they were underwater by $8 million. Therefore, ABST contends it was insolvent immediately.

### 8. Kojima's Email of July 5, 2007

On July 5, 2007, Kojima (ABST's CFO and an employee of AB7) sent an email to Takeda and other AB7 employees in Japan. The email stated that "[i]n the [R&S] Disclosure Statement [sic] issued by the court in the current Strauss asset purchase there is a phrase that says, 'there will be no asset dividends or distributions until the completion of the [ABST] repayment.' . . . I [Kojima] think I want to temporarily stop payment of interest until the completion of repayment in 2010 because we will avoid the risk of litigation by the wording of the 'Disclosure Statement.'"

### 9. Non-AB7-Related ABST Employees are Excluded as AB7 Adds to ABST's Debt

Non-AB7-related ABST employees, including Langberg, Catalano, Dawson, and Drozdowski, were actively excluded by the AB7-related ABST Directors from making decisions concerning ABST finances.[40]  Though Catalano, Langberg, Dawson, or Drozdowski inquired about funding, they were told by the AB7-related ABST Directors

---

[40] D.I. # 1, at ¶ 154.

not to worry about financing, because "Mama" (AB7) would provide, and that "the money would be there" for ABST.[41]

When ABST's cash was low, Drozdowski or Dawson would inform Kojima that additional funds were needed to continue operating.  Kojima would acquire funds from AB7 and tell Drozdowski or Dawson to record the money from AB7 as **a short-term loan**.[42]  Under the ABST bylaws and ABST Accounting Rules, Dawson, as director of finance, was responsible for negotiating loan terms; but, instead, Dawson's involvement only extended to requesting funds from Kojima.  Another ABST Accounting Rule required the actual result of cash management budgets be reported monthly to the ABST Directors.  Despite their positions as ABST Directors, Langberg and Catalano did not receive the monthly reports.

---

[41] *Id.*

[42] D.I. # 1, at ¶ 155.

The following chart reflects the loan agreements between AB7 and ABST related to the funds provided by AB7 when Drozdowski or Dawson expressed ABST's need for funding.  The chart also shows when interest payments and a $10.6 million loan prepayment were made from ABST to AB7.[43]

| Date | Debt (ABST owed AB7) | Interest Paid (by ABST to AB7)[44] | Loan Payment (by ABST to AB7) | Total Debt (ABST owed AB7) |
|---|---|---|---|---|
| 4/26/2007 | $23 million | | | $23.0 million |
| 10/11/2007 | $2.5 million | | | $25.5 million |
| 11/14/2007 | $2 million | | | $27.5 million |
| 12/19/2007 | $2.1 million | | | $29.6 million |
| 1/9/2008 | $4 million | | | $33.6 million |
| 1/9/2008 | | ($44,065) | | $33.6 million |
| 1/10/2008[45] | $4.5 million | | ($4.5 million) | $33.6 million |
| 3/3/2008 | $4 million | | | $37.6 million |
| 4/22/2008 | | ($128,085) | | $37.6 million |
| 4/22/2008 | | | ($10.6 million) | $27.0 million |
| 5/2/2008 | $5 million | | | $32.0 million |
| 6/20/2008 | $2.6 million | | | $34.6 million |
| 7/8/2008 | | ($38,864) | | $34.6 million |
| 7/9/2008[46] | $4 million | | ($4 million) | $34.6 million |

[43] The court has done its best to accurately set forth in the loan transactions. The most part, the parties agree as to the dates and amounts, however, they do not agree on the totals and, indeed, their internal mathematical contributions appear inaccurate.  Nonetheless, for purposes of this motion to dismiss, the Court considers this chart to reflect the transactions.

[44] No change in principal balance.

[45] Roll up of 10/11/07 and 11/14/07 loans.

[46] Roll up of 3/3/08 loan.

| Date | Debt (ABST owed AB7) | Interest Paid (by ABST to AB7)[47] | Loan Payment (by ABST to AB7) | Total Debt (ABST owed AB7) |
|---|---|---|---|---|
| 7/28/2008 | $3.65 million | | | $38.25 million |
| 11/6/2008[48] | $10.65 million | ($96,537) | ($8.65 million) | $40.25 million |
| 12/3/2008 | | ($17,393) | | $40.25 million |
| 1/14/2009 | | ($27,091) | | $40.25 million |

None of the loans in the chart above were presented to the full board of ABST Directors.   No ABST Director resolutions or minutes exist discussing or showing approval of them.[49]  Each loan was evidenced by a document titled "Loan Agreement." Each loan was unsecured with a fixed maturity date.  No principal was ever paid from ABST to AB7 on the date the loan matured.

### 10. Unconventional Circumstances Surrounding ABST's 2008 Audit and Credit

The loans on January 10, 2008, November 6, 2008 and December 6, 2008, were all "roll ups" of prior debt.  Each roll up took place on the maturity date of prior loans. They allowed ABST to avoid making principal repayments on the due dates.[50]

On April 10, 2008, ABST's auditor[51] issued a financial audit report for the year ending December 31, 2007.  On April 9, 2008, AB7 provided ABST with a $12.3 million

---

[47] No change in principal balance.

[48] Roll up of 5/2/2008 and 7/28/2008 loans plus $2 million in additional funds.

[49] D.I. # 1, at ¶ 112.

[50] D.I. #1, at ¶¶ 112-117.

[51] Hotta Liesenberg Saito & Co.

cash infusion, designated as a capital contribution.[52]  As a result of the improved cash position, ABST did not receive a going-concern qualification[53] in its audit report; but without the cash infusion, ABST would have received a going-concern qualification. Less than two weeks after the $12.3 million infusion of capital (April 10 – April 22, 2008), AB7 "compelled" ABST to return $10.6 million and to treat the transaction as a "loan prepayment." The net result was that the loan balance was reduced to $27 million and AB7 made a net cash/capital infusion of $1.7 million into ABST.

The cash infusion of $12.3 million on April 9, 2008, surprised Drozdowski.  He was not consulted, and no one at ABST other than Takeda, Yamada, and Kojima knew about the cash transfer until after the fact.

AB7's concerns regarding ABST's financial condition led AB7 to disseminate its own financial statements when any vendor, finance company, real estate landlord, or anyone else made a credit inquiry about ABST's credit.  Takeda, Yamada, and Kojima directed Catalano and other ABST employees to withhold ABST's financials when vendors and suppliers asked for proof of ABST's financial health.  ABST employees provided AB7's financial statements in good faith reliance on Takeda, Yamada, and Kojima's representation that AB7 would step in and pay for any obligations incurred related to transactions using AB7's financial statements.[54]

## 11. Questionable Purchasing Decisions by ABST's AB7-Related Directors

---

[52] D.I. # 1, at ¶ 134.

[53] A "going concern qualification" is added with an explanatory paragraph to a company's financial statements when the auditor has substantial doubts regarding the company's ability to continue the following year.

[54] D.I. # 1, at ¶¶ 158-160.

AB7 required ABST to purchase merchandise on unfavorable terms from AB7 or companies with relationships with AB7.   Examples of purchasing problems cited by ABST include:

- AB7 employees in Japan shipped 20,000 floor mats to ABST and charged high prices relative to the market and added fees for shipping outside of the industry shipping standards.[55]

- ABST was compelled by AB7 to purchase certain displays and pay international shipping.

- ABST was compelled to purchase twenty-five product lines with Japanese language labeling that could not be sold in stores in the United States.

- ABST negotiated a price for parts related to navigation systems in the United States.  AB7 negotiated separately for a price fifteen percent higher in Japan.  AB7 required ABST pay the higher price in Japan.[56]

- AB7-related Directors required inventory purchasing without market research, bidding, or profit projections.

- Takeda and Yamada required ABST to purchase poor items from ABUSA at a price greater than the original price paid by ABUSA.[57]

---

[55] D.I. # 1, at ¶ 191.

[56] D.I. # 1, at ¶ 197.

[57] D.I. # 1, at ¶ 184.

- AB7-related Directors caused ABST to overstock certain items, made poor purchasing choices, and refused to discontinue purchasing poorly performing items.

At many junctures, the two non-AB7-related ABST Directors (Catalano and Langberg) objected to no avail to the AB7-related ABST Directors' actions.

## 12. ABST's Financial Troubles and Forced Reliance on AB7 for Funds

In April 2008, Kojima informed Dawson that ABST would no longer receive a cash infusions from AB7. Dawson suggested approaching a factor to obtain loans based on ABST's inventory. Kojima told Dawson he would confer with Takeda and Yamada, and later returned to tell Dawson not to proceed with a factor because it was "unnecessary."[58] Around that same time period, Langberg and Catalano explored financing from a potential lender, Kimco. However, AB7 refused to allow ABST's inventory to be used as collateral to secure Kimco financing.[59]

ABST contends that after AB7-related ABST Directors stopped Dawson from seeking a factor and stopped Langberg and Catalano by refusing to allow the use of inventory as collateral, AB7 then "pulled the plug" on ABST.[60] This would reduce

---

[58] D.I. # 1, at ¶ 204.

[59] It is unclear how AB7 refused to allow ABST's inventory to be used as collateral to secure Kimco financing. AB7 held only unsecured loans against ABST and nothing in the loan agreements between ABST and AB7 precludes use of collateral. Thus, it appears ABST is saying "AB7 refused" and means the AB7-related ABST Directors.

[60] D.I. # 1, at ¶ 206.

losses to AB7, place ABST in bankruptcy, and allow AB7 to record a tax loss of approximately $20 million under the Japanese tax code.[61]

### 13. AB7 Serves ABST with a Notice of Event of Default

On February 2, 2009, AB7 served ABST with a Notice of Event of Default. AB7 declared that all amounts owing under the loan agreements described in the table above were immediately due and payable.[62] AB7 was aware of ABST's financial condition and prior squashed attempts to seek outside financing. Therefore, Plaintiffs argue that calling the loans caused ABST to file a voluntary Chapter 11 petition on February 4, 2009.

### 14. Yamada Failed to Renew ABST's License & Registration for Selling Service Contracts

Under New York Insurance Law §7903, a company, such as ABST, that historically sold (and continues to sell) service contracts has to remain current with its New York State Insurance Department license and registration. After ABST filed for bankruptcy, Yamada received a license and registration renewal notice for selling service contracts. He did not notify anyone and failed to renew the license by the renewal deadline. The license and registration lapsed in New York on February 28, 2009. This subjected ABST to over $250,000 in fines and could cause New York State to suspend ABST's license to sell service contracts.

---

[61] D.I. # 1, at ¶ 212.

[62] D.I. # 1, at ¶ 213.

**15. R&S Plaintiffs and AB7 Both File Proofs of Claim Against ABST's Estate**

On May 1, 2009, AB7 filed a proof of claim against ABST's estate for $43,994,044.12. This amount accounted for $42,575,218.47 in unpaid principal and interest on unsecured loans, as well as $1,400,184.72 for AB7's guarantee of an ABST continuing letter of credit with Bank of Tokyo-Mistsubishi UFJ, Ltd.[63]

On May 15, 2009, the R&S Plaintiffs filed a proof of claim against the ABST estate for $8,140,496.67. The R&S Plaintiffs' proof of claim describes the "Purchase Price" from the R&S Plaintiffs' reorganization. They allege they were to receive $45 million and that ABST was to pay a maximum of $19.34 million. Of that $19.34 million, the R&S Plaintiffs received $11,199,503.33. Therefore, the R&S Plaintiffs filed a claim for the difference: $8,140,496.67.

## LEGAL DISCUSSION

### Standard for Evaluating a Motion to Dismiss for Failure to State a Claim

The standard governing a motion under Rule 12(b)(6) is well known.[64] Such motion serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[65] The Third Circuit has guided lower courts to accept the complaint's well-pleaded facts as true and allows lower courts to disregard legal conclusions.[66] This Court must determine whether the facts alleged suffice to show a plausible claim for

---

[63] D.I. #1, at ¶ 219.

[64] Federal Rules of Civil Procedure 8(a) and 12(b)(6) are applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[65] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.").

[66] *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

relief.[67]   The question "is not whether plaintiffs' claims will ultimately succeed on their merits, but whether the facts as pled are sufficient to warrant discovery," viewed in the light most favorable to the non-moving party.[68]

Plausibility pleading requirements under Rule 8(a) differ from those under Rule 9(b).   "Complaints asserting claims for fraud must meet a heightened pleading standard.   Federal Rule of Civil Procedure Rule 9(b) requires these complaints to set forth facts with sufficient particularity to apprise the defendant of the charges against him so that he may prepare an adequate answer.   To provide fair notice, the complaint must go beyond merely quoting the relevant statute. . . .   Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.   It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them.   Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."[69] Where factual information is peculiarly within the defendant's knowledge or control, the 9(b) particularity requirement is somewhat relaxed.[70]

---

[67] *See id.*  For a lengthier discussion on this standard, see *In re USDigital, Inc.*, 443 B.R. 22, 34-35, (Bankr. D. Del. 2011).

[68] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 471-72 (3d Cir. 2001).

[69] *In re USDigital, Inc.*, 443 B.R. 22, 33-34, (Bankr. D. Del. 2011) (citations omitted).

[70] *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284-85 (3d Cir. 1992)).

### Undercapitalization, Unreasonably Small Capital and Insolvency

Undercapitalization and insolvency are the most relevant factors in determining "whether the corporation was established to defraud its creditors or [some] other improper purpose such as avoiding the risks known to be attendant to a type of business."[71]   Indeed, the keystone of the Complaint is the argument that ABST was undercapitalized and insolvent from its inception. Determining unreasonably small capital or insolvency requires addressing questions of mixed law and fact. [72]   Whether the Debtor was undercapitalized or insolvent is relevant to a number of the counts. This discussion applies to all of those counts.

### 1.   Undercapitalization or Unreasonably Small Capital

"Undercapitalization " or unreasonably small capital" is conceptually distinct from "insolvency."[73]   A debtor has unreasonably small capital if it cannot "generate enough cash flow to sustain operations" at the time of the transfer or obligation.[74] Reasonable forseeability is the standard.[75]   The Court also considers whether the debtor had the requisite access to capital markets in order to raise money.[76]   Defendants acknowledge that "these issues often turn on questions of fact."

---

[71] *Trevino v. Mescorp*, 583 F. Supp. 2d at 529.

[72] *Moody v. Security Pacific Business Credit Inc.*, 971 F.2d 1056, 1063 (3d Cir. 1992).

[73] *Id.* at 1069; however, the "unreasonably small capital test" is used as one test for solvency in the fraudulent transfer context.  *In re EBC I, Inc.*, 380 B.R. 348, 366 (Bankr. D. Del. 2008) (MFW).

[74] *Id*. at 1070.

[75] *Id*. at 1073 (discussing the test for unreasonably small capital in the context of a leveraged buyout).

[76] *In re EBC I, Inc.*, 380 B.R. 348, 366 (Bankr. D. Del. 2008) (MFW).

Plaintiffs allege that ABST planned all along to rapidly expand inventory and payroll, and that ABST was grossly undercapitalized from the outset (and therefore at the time of each transfer or obligation). Plaintiffs allege that the $10 million in working capital provided for in the R&S Confirmation Order, without regard to later provided funds, was grossly insufficient relative to ABST's planned rapid expansion. Thus, ABST had unreasonably small capital. Defendants respond by arguing that "the actual facts alleged show that there was no such radical 'expansion' – merely restocking of depleting store shelves and a 5.4% staffing increase after emerging from bankruptcy." This is a factual issue that cannot be resolved in the context of the motion to dismiss.

Defendants also argue that ABST had the ability to access credit, citing the loans from AB7 to ABST. Defendants contend that where a debtor has a reasonable belief it can raise money in capital markets, it does not have unreasonably small capital. But Plaintiffs allege that, in reality, AB7 did not have such a belief (and accordingly neither did ABST) as ABST was directed to provide AB7's financial documents whenever creditworthiness was at issue.

The natural inference from the substituted financial documents belies Defendants' contentions that ABST, standing alone, had access to raise money in capital markets. In fact, it implies the opposite. Plaintiffs also allege that avenues to access credit were actively blocked by Defendants' prohibition of granting collateral to potential lenders. The Complaint essentially explains that ABST had no ability to access capital aside from its parent because of the controlling AB7-related ABST Directors. Rather, all it could do was ask Kojima for operational funding for AB7 with hopes that

"Mama" would provide.    These allegations warrant discovery on the issue of undercapitalization.

### 2.  Insolvency

The Bankruptcy Code defines a corporation as "insolvent" when it is in a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[77]  In determining what constitutes a "fair valuation" the Court must decide whether to value assets on a going concern basis or at liquidation prices.[78]  A corporation's assets are valued on a going concern basis unless the business is "wholly inoperative, defunct, or dead on its feet" or if liquidation in bankruptcy was clearly imminent on the transfer date.[79]  There are two related disputes here.   Is a going concern valuation the only appropriate valuation and, if so, have Plaintiffs sufficiently alleged that ABST was insolvent on a going concern basis at its inception.

Plaintiffs assert that the $23 Million Loan rendered ABST insolvent from its inception.   AB7 does not dispute that ABST was insolvent from inception under a liquidation analysis. AB7 argues, however, that ABST incorrectly bases its argument on a liquidation analysis.   Rather, AB7 asserts that ABST can only be valued as a going concern.   Moreover, AB7 further argues that as ABST has not asserted that during the

---

[77] 11 U.S.C. § 101(32).

[78] *See Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R 500, 508 (Bankr. D. Del. 2007) (KJC) (citations and quotations omitted), aff'd, 384 B.R. 62 (D. Del. 2008).

[79] *See id.* (citing *Heilig-Meyers Co. v. Wachovia Bank (In re Heilig-Meyers Co.)*, 319 B.R. 447, 457 (Bankr. E.D. Va. 2004) aff'd 328 B.R. 471 (E.D. Va. 2005) (quotation omitted)).

relevant time period it was insolvent on a going concern basis the Court must conclude that ABST was solvent. Q.E.D.

### a.    Going Concern v. Liquidation Analysis

In support of AB7's argument that ABST must be valued solely on a going concern basis, AB7 cites Langberg's testimony, which was proffered at the R&S Confirmation Hearing.  There, the R&S Plaintiffs' business was touted as a "turnkey operation" with "an existing base of approximately 90 stores that are open for business stocked with inventory and with experienced employees who are operating there on a day to day basis.  And, therefore, [ABST] would be stepping in . . . with a going business that is generating a positive cash flow."[80] Plaintiffs counter by arguing that when ABST emerged it was not an operating company, but rather only a "company that had filed a bankruptcy case . . . and was then operating only because its creditors were stayed."[81] Plaintiffs contend that "promptly upon emergence," ABST suffered negative cash flow and was "propped up only by continuing insider advances."[82]

There can be no serious contention that the Strauss business that was acquired by AB7 through the R&S APA and R&S Plan was not a going concern.  But for purposes of whether a liquidation or going concern analysis is appropriate the question is whether the business was "wholly inoperative, defunct, or dead on its feet" or if liquidation in

---

[80] D.I. # 26, Ex. H, at 17.

[81] D.I. # 46, at 48.

[82] *Id.* at 49.

bankruptcy was clearly imminent on the transfer date.  That is a question in this case that cannot be answered on a motion to dismiss.

### b.    Have plaintiffs sufficiently pled that ABST was insolvent as a going concern?

As mentioned above, AB7 does not dispute that ABST was insolvent from inception under a liquidation analysis.  The Defendants do challenge, however, whether ABST has adequately pled that the company was insolvent as a going concern. Defendants correctly characterize plaintiffs' insolvency allegations as being broad and general.  Defendants argue that because the Plaintiffs seek to avoid eleven different loan obligations, incurred on eleven different days, along with six payments on six different days, over the course of 20 months, they must allege facts establishing insolvency on each date, rather than in broad stroke.

In response to AB7's argument, Plaintiffs assert that a 12(b)(6) motion is not the appropriate stage for the Court to consider these issues in detail.  Given the moving parts, lack of hard data, and the number of different times at which insolvency must be decided for Plaintiffs' various claims, Plaintiffs assert that there are admittedly broad allegations are sufficient for purposes of Rule 12(b)(6).

Moreover, while admitting that the Complaint does not contain the specificity that the Defendants argue is necessary, Plaintiffs argue that its broad assertions are not as broad as argued.  Plaintiffs claim they have alleged facts supporting insolvency under both the discounted cash flow analysis and the adjusted balance sheet analysis. But, Plaintiffs do not provide any actual discounted cash flow analysis let alone one

from each date of transfer or obligation.  Moreover, there are additional deficiencies with the plaintiffs' allegations.[83]

When it's all said and done, Plaintiffs rely on the old "where there is smoke there is fire" theory of pleading.  The Plaintiffs contend that out of the $43 million transferred to ABST, $28 million went right out the door to the R&S Plaintiffs in accordance with the R&S APA.  Thus, while $43 million was transferred to ABST, once $28 million was paid out under the plan, ABST was left with $15 million in cash.  But, since ABST owed $23 million under the long-term loan, the $15 million in remaining cash was insufficient to cover their liabilities, i.e., they were underwater by $8 million. Therefore, ABST contends it was insolvent immediately.

These allegations are sufficient to survive a motion to dismiss – barely.  One certainly cannot deny the math.  But many a balance sheet insolvent debtor may be nonetheless solvent as a going concern.  Plaintiffs have won the right to take discovery but if they expect to prevail on this point they have much work left to do.

In sum, the Plaintiffs have adequately pled that ABST was insolvent for all relevant periods.

### Count One:  Alter Ego

A subsidiary is an alter ego or instrumentality of a parent entity "when 'the separate corporate identities . . . are a fiction and . . . the subsidiary is, in fact, being

---

[83] AB7 argues further that Plaintiffs' adjusted balance sheet analysis relies inappropriately on liquidation values.  AB7 also argues that Plaintiffs fail to provide sufficient detail to make a discounted cash flow argument.  Moreover, AB7 cites case law for the proposition that proper discounted cash flow analysis focuses on projections as of the relevant valuation date, not hindsight.

operated as a department of the parent.'"[84]    Plaintiffs must demonstrate that the companies functioned as a single entity and should be treated as such.[85]    This demonstration is made through a two-part test.    Plaintiffs must show (1) that the companies operated as a single economic unit; and (2) the presence of an overall element of injustice or unfairness.[86]

### 1.  R&S Plaintiffs' Standing

Count One is asserted by all Plaintiffs.  As a preliminary matter, AB7 argues that the R&S Plaintiffs cannot pursue the alter ego claim for two reasons.  First, only ABST can pursue an alter ego claim premised on generalized harms to the debtor.  Second, the R&S Plaintiffs have failed to allege any particularized harm.  Therefore, AB7 seeks dismissal of the R&S Plaintiffs as parties to Count One.  AB7 concedes that ABST can press forward with Count One.

The R&S Plaintiffs counter by arguing that they suffered two particularized harms. First, they filed a claim against ABST's estate for $8,140,496.67. Second, they were fraudulently induced by AB7 and AB7-related ABST Directors to endorse the R&S Plan, which incorporated the R&S APA.

AB7 acknowledges the assertion of the $8 million claim against ABST's estate but asserts without further support that the claim is not a particularized harm suffered by the R&S Plaintiffs.  Similarly, AB7 asserts without support that the R&S Plaintiffs' claim

---

[84] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001).

[85] *See id.*

[86] *See Off. Comm. Of Unsecured Creditors v. Highland Capital Management, L.P. (In re Broadstripe, LLC)*, 09-50966, 2010 WL 3768003, at *39 (Bankr. D. Del. Sept. 2, 2010) (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990), aff'd, 932 F.3d 959 (3d Cir. 1991)).

for fraudulent inducement is a generalized harm.  AB7's bald assertions are insufficient. Indeed, its entire standing argument, and the R&S Plaintiffs' response, is contained in footnotes.[87] The Court has already given the argument more attention than it is worth. The R&S Plaintiffs have sufficiently pled that they have standing to pursue the alter ego claim.

### 2.  Single Economic Unit

For analyzing alter ego claims, the Third Circuit uses seven factors to determine whether companies are operating as a single economic unit:   (a) the subsidiary is undercapitalized; (b) the subsidiary was insolvent at the relevant time; (c) the companies failed to observe corporate formalities;[88] (d) the subsidiary did not pay dividends to the parent; (e) there was a siphoning of the subsidiary's funds by the dominant stockholder; (f) the absence of corporate records; and (g) whether the corporation is merely a façade for the operations of the dominant stockholder or stockholders.[89]

These factors are not exhaustive, no single factor is dispositive, and some combination is required.[90]  "Under Delaware law, the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham but just 'something

---

[87] D.I. # 25, at 66 n.26.

[88] Whether officers and directors functioned properly is to be considered along with the observation of corporate formalities.  *See In re Foxmeyer Corp,* 290 B.R. 229, 235 (Bankr. D. Del. 2003)).

[89] *Blair v. Infineon Technologies AG,* 720 F. Supp. 2d 462, 470-71 (3d Cir. 2010); *In re Broadstripe, LLC,* 444 B.R. 51, 102 (Bankr. D. Del. 2010).

[90] *Blair,* 720 F. Supp. 2d at 471 (citing *Trevino v. Merscorp, Inc.,* 583 F.Supp.2d 521, 529 (D.Del.2008)).

that is similar in nature to fraud or a sham.'"[91]   The Court will address the factors

seriatim.

### a.  Unreasonably Small Capital or Undercapitalization

As discussed above, plaintiffs' allegations regarding undercapitalization are

sufficient to survive the motion to dismiss.

### b.  Insolvency

Similarly, plaintiffs' allegations relating to insolvency are sufficient.

### c.  Failure to observe corporate formalities

This factor considers "whether corporate records were kept, officers and

directors functioned properly, and other corporate formalities were observed."[92]

Plaintiffs allege that:

- AB7 made decisions in Japan, communicated them to the Individual Defendants,

  and those decisions were implemented without observing corporate formalities

  at the ABST Directors' level.

- No loan agreements were circulated to the full board of ABST Directors, no

  meetings were called, no votes taken, no resolutions made, and no minutes kept

  with regard to the decision-making processes related to funding ABST, in

  violation of ABST by-laws and Delaware law.

- ABST's directors of accounting and finance were wholly excluded from

  numerous funding decision-making processes.

---

[91] *Id*. at 471 (citing *In re Foxmeyer Corp*, 290 B.R. at 236).

[92] *In re Foxmeyer*, 290 B.R. at 235 (internal citations omitted).

- AB7-related Directors at ABST and AB7 employees in Japan circumvented normal inventory purchasing and product line development processes, never consulting ABST's merchandising department.

- Takeda, Yamada, Kojima, and Sumino concealed material strategic, financial, and operational decisions from ABST Directors Langberg and Catalano, and also failed to provide results of the cash management budget to all ABST Directors on a monthly basis (in violation of ABST Accounting Rule 7.1).

Defendants argue that the "minimal disregard of corporate formalities alleged in the Complaint does not come close to establishing that [ABST] functioned as an alter ego of AB7." Defendants argue on the merits that neither the by-laws nor other law required ABST Director approval of AB7's loans. Finally, Defendants argue that alleged violations of ABST's accounting rules should be disregarded, since Plaintiffs did "not allege that such rules were ever formally adopted by [ABST's] board."

AB7's arguments on the merits are for another day. This is a motion to dismiss and Plaintiffs have sufficiently alleged the failure of AB7 and ABST to observe corporate formalities.

### d.    Non-payment of dividends

Plaintiffs make no allegation regarding the non-payment of dividends.

e.    **Siphoning funds**

Siphoning suggests "the improper taking of funds that the owner was not legally entitled to receive."[93]    Plaintiffs allege that the April 22, 2008 "loan prepayment" of $10.6 million, and other payments of "interest" siphoned funds from ABST. Additionally, Plaintiffs allege that Defendants "caused [ABST] to forego the $55 million dollars in equity that AB7 was required to provide under the R&S Plan and forced it to undertake more than $40 million in debt obligations instead."

Defendants argue that AB7 put "$75 million net of its own cash *into* the company" and therefore could not have siphoned money out of ABST.  They also argue that Plaintiffs ignore that the $10.6 million loan prepayment and interest payments were "bracketed by significant *infusions* of larger amounts of both equity and low-interest unsecured debt.  The accusation that [ABST] was used to *extract* value for AB7 is not just inaccurate – on the facts pleaded it is downright surreal."[94]

The defendants' argument that they could not be siphoning cash when they put cash into the company misses the point. Indeed their allegation that they put "net" cash into the company is exactly the point. The question is not what they put in the company, but when they took it out. If the infusions were, in fact, loans, then the insider was siphoning cash by requiring payments to be made under his loan at a time when

---

[93] *In re The Heritage Organization, L.L.C.*, 413 B.R. 438, 517 n.69 (Bankr. N.D. Tx. 2009).

[94] D.I. # 50, at 45 (emphasis in original).

the company was insolvent.[95] If the infusions were, in fact, capital contributions, it is worse. The controlling insider was making dividends to itself at a time when the company was insolvent.

###### f.    Absence of corporate records

Defendants argue that the "Complaint does not allege that [ABST's] board failed to maintain minutes of its meetings or other corporate records . . . ."[96] Plaintiffs allege that ABST was supposed to hold meetings and then take minutes and corporate records. Plaintiffs state multiple times in the Complaint that none of the loan agreements were circulated to the full ABST board for approval, no resolutions were passed, and no minutes of meetings exist. Whereas Defendants assume no such meetings, minutes or resolutions were necessary, Plaintiffs posit that they were required. For purposes of deciding this motion to dismiss it is certainly appropriate to assume such meetings, minutes, and resolutions were required. Thus, plaintiffs have sufficiently alleged there was an inappropriate absence of corporate records.

###### g.    Corporate façade

When a parent corporation exercises significant control over a subsidiary's operations and finances, an inference may arise that Defendants created a façade.[97]

---

[95] After the parties submitted their papers, Judge Walrath found in *Moll Industries, Inc.*, that payments from a subsidiary to its parent on a secured loan did not constitute siphoning funds. The case is distinguishable in numerous respects. Most obvious, here, the loans are unsecured.

[96] D.I. # 25, at 70.

[97] *See Blair*, 720 F.Supp.2d 462, 472 ("[Plaintiff's] other allegations also give rise to the inference that the Infineon defendants created a façade by exercising significant control over the Qimonda Subsidiaries' operations, finances, and the ultimate decision to close their plants in the United States.").

Defendants argue that ABST was a legitimate and separate corporation from AB7, recognized as such by all relevant parties.  Defendants argue that AB7 and ABST functioned in a prototypical parent-subsidiary relationship.  Moreover, they argue that Plaintiffs only allege that AB7-related ABST Directors managed the daily affairs of ABST, not that AB7 itself managed the affairs of ABST.  Defendants argue that wholly-owned subsidiaries may share officers, directors, and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and directors were not functioning properly.[98]

Plaintiffs allege that the AB7-related ABST Directors were loyal to AB7 and not acting on behalf of ABST.  Plaintiffs point to AB7-related ABST Directors' compensation and health care, showing that each AB7-related ABST Director received the majority of their compensation and their medical benefits from AB7.[99]  However, Plaintiffs do not rest their case on compensation.  Plaintiffs set forth myriad facts that allow the Court, at the 12(b)(6) stage, to infer the subsidiary is a mere instrumentality for the parent and that the overlapping or AB7-related ABST Directors did not function properly.

---

[98] D.I. # 50, at 43-44 (quoting *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings)*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009) and *Trenwick*, 906 A.2d at 201).

[99] In 2007:  Takeda received $327,000 from AB7 and $115,000 from ABST; Yamada received $105,000 from AB7 and $58,000 from ABST; Kojima received $62,000 from AB7 and $34,000 from ABST; Takenaka Partners received $6,000 per month for Takenaka's service on the boards of directors of AB7 subsidiaries (ABUSA and Autobacs France) ($72,000 per year), $3,000 per month for general advising fees ($36,000 per year), and $1.4 million for a successful asset purchase.

For example, Plaintiffs allege:

- AB7 used its financial statements, and precluded ABST from using its financial statements, when dealing with trade creditors or anyone else inquiring about ABST's credit.

- AB7 described ABST as its financial responsibility.

- Two non-AB7-related directors, Langberg and Catalano, were denied access to pertinent information and excluded from decision-making.

- ABST was prevented by AB7-related ABST Directors from negotiating outside funding using ABST's assets, forcing ABST to file bankruptcy.  This was allegedly to ABST's detriment and to AB7's benefit, as AB7 received a tax benefit under Japan's tax laws.

- An AB7 employee in Japan, Kiyo Inoue, dictated the implementation of a new product line to ABST.

- AB7-related Directors excluded ABST directors of accounting and finance from all material financial decision-making.

- AB7 used its own cash to manipulate ABST's audit, infusing ABST with cash to avoid a going-concern qualification, and then transferring the cash back to AB7 under the guise of a "loan prepayment."

Plaintiffs' allegations provide facts that suggest AB7-related ABST Directors functioned improperly and used ABST as an instrumentality.  "Although some of plaintiffs' allegations . . . are consistent with the parent/subsidiary relationship, their

other allegations also give rise to the inference that the . . . defendants created a façade by exercising significant control over the . . . operations, finances" and the ultimate decision to file bankruptcy.[100]

Under all seven elements of the Third Circuit's test, Plaintiffs have sufficiently alleged that AB7 and ABST were a single economic unit.

### 2. Injustice, Unfairness, or Something Similar

Taking Plaintiffs allegations as true, this Court could find that AB7 "misdirected funds, exercised crippling control, and purposely siphoned" money from ABST to AB7 for AB7's benefit (even if just as a risk minimization device).  As such, Plaintiffs sufficiently allege that AB7 may have perpetrated fraud or injustice, or something similar.[101]

### 3. Conclusion: Motion to Dismiss Count One Will Be Denied

Plaintiffs allege AB7 and ABST were a single economic unit and that AB7 may have perpetrated injustice or something similar.  Therefore, the Motion to Dismiss Count One will be denied.

### Count Two:  Breaches of Fiduciary Duties

ABST alleges that the Individual Defendants[102] breached the fiduciary duties of loyalty, care, and good faith to ABST and ABST's creditors.[103]  The parties agree that Delaware law applies to Count Two.

---

[100] *See Blair v. Infineon Techs. AG*, 720 F.Supp.2d 462, 472 (3d Cir. 2010).

[101] *Id*. at 473.

[102] Again, Takeda, Yamada, Kojima, and Takenaka.

The Individual Defendants argue that (a) they only owed fiduciary duties to their sole shareholder, AB7; (b) even if fiduciary duties were owed to ABST or others, the duty of care claims must be dismissed because of (b)(i) an exculpatory provision in the ABST certificate of incorporation or (b)(ii) the business judgment rule protections ("BJR"); (c) even if fiduciary duties were owed to ABST or others, the duty of loyalty claims must be dismissed because the Complaint does not allege the Individual Defendants were "interested and the Complaint fails to plead the "type of extreme conduct, such as victimizing an insolvent subsidiary for the benefit of its shareholders that has been held to support a pleading for the breach of the duty of loyalty."

### 1. The Individual Defendants Owed Fiduciary Duties to ABST and Its Creditors

The Individual Defendants argue that ABST was a solvent, wholly owned subsidiary corporation of AB7.  Therefore, ABST's Directors only owed duties to the sole shareholder, AB7.  They correctly argue that in the "zone of insolvency" Delaware directors "must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."[104]  Thus, the Individual Directors did not owe fiduciary duties to ABST's creditors when it was in the "zone of

---

[103] Defendants point out that the duty of good faith is now a subsidiary element of the fundamental duty of loyalty.

[104] D.I. # 25, at 58 (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2006)) (emphasis added).

insolvency." However, the Individual Directors did owe ABST's creditors fiduciary duties if and when ABST became insolvent.[105]

Insolvency is discussed above. ABST has sufficiently pled insolvency from the time of ABST's inception, without a termination date. Since all of the Individual Defendants' acts fall during a period of insolvency the Individual Defendants owed fiduciary duties to ABST and its creditors.

### 2. The Duty of Care

"The duty of care has been described as the duty to act on an informed basis. To prove a breach of the duty of care, a plaintiff must demonstrate gross negligence. The precise behavior constituting gross negligence varies depending on the context, but in general "a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner."[106]

ABST alleges that the Individual Directors violated their duty of care by:

- Failing to perform market research, due diligence, and engage in negotiations, leading to corporate waste.

- Recklessly expanding and overpaying for inventory.

- Failing to renew a New York State insurance policy for ABST.

---

[105] *See USDigital*, 443 B.R. at 42 ("In addition, the [*Gheewalla*] Court ruled that the directors of a solvent Delaware corporation that is operating in the zone of insolvency must continue to discharge their fiduciary duties to the corporation and its shareholders, not its creditors. Accordingly, after *Gheewalla*, the actual point of insolvency becomes integral to assessing the director's duty to creditors.") (citations omitted).

[106] *USDigital*, 443 B.R. at 41 (citations omitted).

- Failing to inform non-AB7-related ABST Directors with regard to material financial and operational issues.

Additionally, ABST alleges that the ABST Directors had a duty to act created by the by-laws and Accounting Rules and they failed to act in spite of this known duty.[107]  Thus, ABST has sufficiently alleged a *prima facie* claim for breach of the fiduciary duty of care

### a.   ABST's Exculpatory Provision Does Not Require Dismissal of the Duty of Care Claims

"Litigation involving the duty of care is uncommon since the adoption of section 102(b)(7) of the Delaware General Corporate Law . . . ."[108]  Section 102(b)(7) allows "the inclusion of a provision in the certificate of incorporation limiting or eliminating the personal monetary liability of directors in stockholder actions for breach of fiduciary duty, so long as the action did not breach the directors' duty of loyalty, give rise to statutory liability for improper dividends or stock redemptions or repurchases, or grant the director some other improper personal benefit."[109]

---

[107] ABST's by-laws require that the ABST Directors "shall act only as a Board, and the individual directors shall have no power as such."  To "act," the ABST Directors must have a quorum (a majority of the total number of directors) and a majority vote of said quorum constitutes the "act of the Board of Directors." The ABST Accounting Rules state that "[f]inancing arrangements must have BOD approvals prior to action on the financing plan" and all payments over $100,000 require final approval after a meeting of the ABST Directors.  No meeting or minutes regarding the payments over $100,000 or the financing actions took place.

[108] *Id.* at 43 (citations omitted).

[109] Corinne Ball, Marilyn Sonnie, Amanda Moore et. al., *Advising the Board of Directors in the Context of Mergers and Acquisitions*, 1528 PLI/Corp 507, 521 (Jan. 25, 2006).

The Individual Defendants argue that the exculpatory clause in ABST's certificate of incorporation[110] requires dismissal of duty of care claims as a matter of law.  ABST argues that by sufficiently alleging breach of the duty of loyalty in the Complaint, they render the exculpatory provision impotent at the 12(b)(6) stage.[111]  The Individual Defendants concede that where a duty of loyalty claim is properly alleged, courts generally refuse to dismiss residual duty of care claims.  However, the Individual Defendants argue that ABST failed to allege a duty of loyalty claim, thereby allowing the exculpatory provision to compel dismissal of the duty of care claim.  As discussed herein, ABST has sufficiently alleged a breach of the duty of loyalty.  Thus, the Court will not dismiss the duty of care claim based upon the exculpatory provision.[112]

### b.    The Business Judgment Rule Does Not Require Dismissal of the Duty of Care Claims

The business judgment rule "creates a presumption in favor of a director-approved transaction, and . . . to rebut the presumption, the shareholder challenging a

---

[110] Again, the provision provides:  "Ninth:  A Director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; *provided, however,* that the foregoing shall not eliminate or limit the liability of the director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit."  D.I. # 26, Ex. Z, at 3 (emphasis in original).

[111] D.I. # 46, at 109 (quoting *Collins & Aikman Corp. v. Stockman*, No. 07-265, 2009 WL 1530120, at *20 (D. Del. May 20, 2009)) and at 109 n.89.

[112] Even if ABST failed to allege a breach of the duty of loyalty, ABST provides an alternative reason for denying dismissal of the duty of care claims per the exculpatory provision.  The Third Circuit has long held that "affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6).  *See In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005).  The Third Circuit also has held that the duty of care protections provided by an exculpatory charter provision "appear[] to be in the nature of an affirmative defense."  *Id.*  Additionally, the District of Delaware held specifically that "Delaware state courts characterize a § 102(b)(7) charter provision as in the nature of an affirmative defense."  *Ad Hoc Comm. of Equity v. Wolford*, 554 F.Supp.2 538, 561 (D. Del. 2008).

board decision must show that the directors breached the duty of . . . loyalty, or due care."[113]   ABST must allege sufficient facts to support a reasonable inference that the directors breached their fiduciary duties, and thereby overcome that presumption and change the standard of review from business judgment to entire fairness."[114]   Denying dismissal per the exculpatory provision requires ABST to sufficiently allege a breach of the duty of loyalty; denying dismissal per the business judgment rule requires ABST sufficiently allege a breach of the duty of loyalty or the duty of care.   Because, as set forth herein, ABST sufficiently alleges breach of the duties of loyalty and care, the business judgment rule does not require dismissal under 12(b)(6) of the breach of fiduciary duty of care claims against the Individual Directors.

### 3.  The Duty of Loyalty

"The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.   To prove a breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred and that the transaction was unfair . . . ."[115]

---

[113] *USDigital*, 443 B.R. at 46 n.92 (citing and characterizing *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993)).

[114] *In re Bridgeport Holdings, Inc.*, 388 B.R. at 567 (citing *Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577, 2007 WL 4292024, *7).

[115] *USDigital*, 443 B.R. at 41 (citation omitted).   Although in general the plaintiffs must show a self-interested transaction occurred and that the transaction was unfair to the shareholders, where insolvency is alleged, it is reasonable that in such a context the transaction may also be viewed for unfairness to creditors.

Alternatively described, the duty of loyalty is "an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation."[116] "A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain. The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders."[117]

"The duty of good faith is a 'subsidiary element' of the 'fundamental duty of loyalty.' The Delaware Supreme Court has recognized three non-exclusive categories of conduct indicative of a failure to act in good faith. First, a failure to act in good faith may be established when a director 'intentionally acts with a purpose other than that of advancing the best interests of the corporation.' Second, a failure to act in good faith may be established when a director 'acts with the intent to violate applicable positive law.' Third, a failure to act in good faith may be established when a director 'intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[118]

The Individual Defendants argue that "[s]imply being employed by both the parent corporation and the subsidiary does not automatically make directors

---

[116] *Id*. at *3 (quoting *Guth v. Loft*, 5 A2d 503, 510 (Del. 1939).

[117] *Id*. (citing *In re IT Group Inc.*, 2005 WL 3050611, at *8 and *In re Walt Disney Co. Derivative Litigation*, 90 7 A.2d at 751) (further citations omitted).

[118] *USDigital*, 443 B.R. at 41 (citations omitted).

'interested' in transactions involving the parent."[119]  That is not the end of the matter, as ABST does not merely allege common employment.  ABST also alleges:

- AB7 provided funding to ABST in return for debt, despite knowledge that such funding was to be provided in return for equity.

- AB7-related ABST Directors caused ABST to purchase inventory from AB7 on unfavorable terms, to the benefit of AB7 and the detriment of ABST.

- AB7-related ABST Directors prevented ABST from seeking financing from third-parties to avoid bankruptcy, to provide AB7 with a tax benefit and to the detriment of the creditors of ABST.

- AB7-related ABST Directors systematically excluded Langberg and Catalano from decision-making, and also excluded ABST's directors of accounting and finance, considering only the interests of AB7 and not of ABST or its creditors.

- Defendant Yamada breached his duties of loyalty, good faith, and care, by failing to renew ABST's New York State insurance.

- Each AB7-related ABST Director had significantly greater financial interests in AB7 than in ABST.

Thus, ABST has pled more than simple common employment to show "interestedness" of the overlapping AB7-related ABST Directors.

The Individual Defendants then attempt to discredit ABST's allegations that the Individual Defendants purchased inventory in a manner that benefitted AB7 and

---

[119] D.I. # 25, at 61-62.

harmed ABST as not extreme enough to support a pleading for the breach of the duty of loyalty.   But the Individual Defendants have merely isolated one allegation. Considering ABST's allegations together, the cases that the Individual Defendants cite do not support discrediting ABST's allegations at this stage.

In fact, all of the cases cited by the Individual Defendants are either distinguishable on the facts or, upon inspection, support that the Court deny the Individual Defendants Motion to Dismiss Count Two.

For example, the Individual Defendants point to *FDIC v. Sea Pines Co.*, supposedly to contrast what they view as non-breaching conduct in this case with the "extreme conduct, such as victimizing an insolvent subsidiary for the benefit of its shareholders" that led the court in *Sea Pines* to deny dismissing a count that pled breach of the duty of loyalty.[120]  More importantly, the court in that case was reviewing a lower court's decision, and found the conduct so fundamentally unfair and unjust that it held the lower court's decision to the contrary was clearly erroneous.   *Sea Pines* found sufficient allegations for pleading breach of the duty of loyalty where common directors caused property of the subsidiary to be mortgaged for the benefit of the parent entity.

*Sea Pines* stated that the facts in its case were materially indistinguishable from those in the Supreme Court case *Koehler v. Black River Falls Iron Co.*[121]  *Sea Pines* quoted the following passage from *Koehler*: "Instead of honestly endeavoring to effect a loan of money, advantageously, for the benefit of the corporation, these directors, in violation

---

[120] D.I. # 25, at 63 (citing *FDIC v. Sea Pines Co.*, 692 F.2d 973, 977 (4th Cir. 1982).

[121] *Koehler v. Black River Falls Iron Co.*, 67 U.S. (2 Black) 715, 720 (1862).

of their duty, and in betrayal of their trust, secured their own debts, to the injury of the stockholders and creditors.   Directors cannot thus deal with the important interests entrusted to their management.   They hold a place of trust, and by accepting the trust are obliged to execute it with fidelity, nor for their own benefit, but for the common benefit of the stockholders of the corporation."[122]

The Individual Defendants deny that Plaintiffs sufficiently pled that AB7 was required to provide funding to ABST in return for equity rather than in return for debt. Their denial is unsupported.  And, on Plaintiffs' case theory, their claims inhabit a space quite akin to that in *Koehler* and *Sea Pines*.  According to Plaintiffs, the AB7-related ABST Directors, instead of honestly endeavoring to effect a capital contribution for the benefit of the corporation, raised the structural payout priority of their own debts, to the injury of the creditors and the corporation, in betrayal of their trust.  The similarity between the allegations in *Koehler* in 1862 and those today before this Court are uncanny.  The distinguishing conduct they cite to the Court as "extreme" actually tracks the conduct alleged before the Court today.

Thus, ABST has sufficiently pled a breach of the fiduciary duty of loyalty by the Individual Defendants.

### 4.  Takenaka's Separate Motion to Dismiss Count Two

Takenaka's Motion argues that, as an outside director, Takenaka was not involved in ABST's day-to-day management.   Therefore, he argues he owed no fiduciary duties regarding day-to-day management.

---

[122] *Id.* at 720-21.

Takenaka cites *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.* in support of his motion. [123]  Takenaka's reliance on *Merck*, however, is misplaced.  In *Merck*, the court found that an amended complaint failed to adequately plead demand futility as to disinterested outside directors where the complaint did not allege that outside directors were involved in the research, manufacturing, or sale of the drug Vioxx.  But *Merck* involved a "derivative suit based on directors' failure to prevent employee wrongdoing," and applied a standard whereby "only the 'director' disregard of 'obvious danger signs' may expose them to personal liability."[124].  The board of directors in *Merck* relied on reassurances from company executives and scientists that Vioxx was safe, which the court weighed strongly against accusations that the Board "recklessly ignored the dangers of Vioxx" and mitigated the obviousness of any danger signs.  *Merck* is inapplicable because it uses a different legal standard and is distinguishable on the facts. In this case, Takenaka is both Vice President of ABST and intricately involved in the activities relevant to the Complaint.

The Complaint alleges that Takenaka negotiated the R&S APA deal. Additionally, Takenaka was so involved that he testified through proffer in support of the R&S APA and R&S Plan.  Takenaka was not only an outside director, but ABST's vice-president as well.  He represented that the R&S APA deal would be done with equity rather than debt.  Takenaka knew about AB7's plan to finance the R&S APA with

---

[123] *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2008 U.S. Dist. LEXIS 47216, at * 23 (D.N.J. June 17, 2008).

[124] *Id.* at 22.

debt as he was personally involved in due diligence, negotiating, and developing the business plan related to the deal.

Thus, ABST has sufficiently pled a breach of the fiduciary duties of care and loyalty by Takenaka.

### 5.  Conclusion:  Both Motions to Dismiss Count Two Will Be Denied

ABST has sufficiently alleged breaches of the fiduciary duty of care and loyalty by the Individual Defendants. Thus, the Court will deny the motions with respect to Count Two.

### Count Three:  Avoidance of Fraudulent Transfer

### 1.  Actual Fraud

ABST alleges that AB7, through overlapping ABST directors and AB7's controlling power as an insider, caused ABST to incur loan obligations with the intent to defraud or hinder ABST's creditors.

"Section 548(a)(1) of the Code grants a trustee [or DIP] the power to avoid any transfer by a debtor of an interest in property [or any obligation incurred by the debtor] made within two years before the filing of a bankruptcy petition if the transfer was actually or constructively fraudulent.   Under Section 548(a)(1)(A), transfers or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay  or defraud a past or future creditor."[125]  "To avoid a transaction under Section 548(a)(1)(A), a plaintiff must show that the transaction was made 'with actual intent to

---

[125] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544-45 (Bankr. D. Del. 2009) (citations omitted); 11 U.S.C. § 548(a)(1)(A).

hinder, delay or defraud' creditors.  Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer [actual] fraudulent intent."[126]

Searching for such circumstantial evidence, courts often look to badges of fraud that include, "but are not limited to: (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits, control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction.  The presence or absence of any single badge of fraud is not conclusive.  The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.  Although the presence of a single factor . . . may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.  Additionally, a court may consider other factors relevant to the transaction."[127]

ABST argues fraud based on allegations that:

- AB7, an insider, directed ABST to incur loan obligations and make payments to AB7.

- AB7 had dominion and control over ABST's financial and operational affairs.

- ABST was insolvent from inception.

---

[126] *Id*. at 545.

[127] *Id*. at 545 (numerals in the original are here changed to roman numerals).

- The loan obligations were concealed from the New Jersey Bankruptcy Court and the R&S Plaintiffs.

- The loan obligations were never approved by ABST's full board of Directors. Thus, the loan obligations "are void, and as a result, the Debtor did not receive reasonably equivalent value for incurring the Fraudulent Obligations."

- Payments from ABST to AB7 were predicated on illegal debts, and therefore ABST did not receive reasonably equivalent value.[128]

### a.    Badge of Fraud: The Relationship Between The Debtor And The Transferee

AB7 concedes that the first badge of fraud, the relationship between the debtor and the transferee, is present, and provides circumstantial evidence of actual fraud. AB7 is admittedly an insider as the indirect 100 percent parent of ABST.[129]

### b.    Badge of Fraud: Lack of Consideration

ABST argues that loan obligations to AB7, totaling $40,250,000 in principal and $2,258,554.31 in interest, are void.[130]  Thus, ABST argues, no consideration was given in exchange for incurring the loan obligations.  Assuming, ABST is correct that the loan obligations are void, ABST is correct that no consideration was given as a loan.

---

[128] Reasonably equivalent value is typically discussed in the context of constructive, rather than actual, fraudulent transfers.

[129] D.I. # 50, at 77 ("Other than the fact that the Loan Obligations and Payments were made to an insider, plaintiffs do not plead any of the other "badges of fraud" with the requisite particularity.").

[130]The Complaint alleges that ABST made $264,074 in interest payments prior to filing the third Chapter 11 case.  Presumably, the total interests referenced includes accrued but unpaid interest that AB7 claims it due.

Although it remains to be seen whether ABST, the allegation of lack of consideration has been sufficiently pled by Plaintiffs.

### c.    Badge of Fraud: Insolvency Or Indebtedness Of The Debtors

As discussed above, Plaintiffs' allegations regarding insolvency are sufficient to survive the motion to dismiss.

### d.    Badge of Fraud: How Much Of The Debtor's Estate Was Transferred

Neither ABST nor AB7 expressly address this factor.  Moreover, the financial documents provided to this Court are insufficient to readily determine the total worth of the estate and the percent of the estate transferred with regard to each transfer.  Thus, this prong has not been sufficiently pled by Plaintiffs

### e.    Badge of Fraud: Reservation Of Benefits, Control, Or Dominion By The Debtor

Plaintiffs argue that AB7 had dominion and control over the Debtor's financial and operational affairs.  Their argument here is unclear, but they appear to be arguing that ABST, as an alter ego of AB7, was one and the same with AB7, and thereby reserved benefits and control with respect to the obligations incurred and payments made. This prong has not been sufficiently pled by Plaintiffs.

### f.    Badge of Fraud: Secrecy Or Concealment Of The Transaction(s)

AB7 argues that "there is no suggestion that the Loan Obligations or Payments were concealed when they were actually made."  AB7 also argues that "[a]t most, the Complaint alleges a failure to affirmatively disclose the $23 Million Loan prior to June 5, 2007, but AB7 was under no duty to disclose the details of its planned funding of

[ABST] beyond the $10 million in equity specified in the APA, and thus mere non-disclosure cannot give rise to an inference of fraud."

ABST asserts that the $23 Million Loan, put on the books of ABST as debt, was not disclosed or discussed prior to June 5, 2007, after AB7 had directed ABST to incur the obligation.  ABST alleges that Takenaka asserted at the R&S Confirmation Hearing that neither "he nor AB7 is aware of any other arrangement or agreement involving AB7 and ABST or any of its affiliates, employees or principals."  This assertion could possibly have created a duty to disclose the details of AB7's planned funding process, supposing ABST and AB7 had already set up a financing arrangement.  No such disclosure was made until June 5, 2007.  There are no discussions, recorded minutes, votes, or resolutions regarding the $23 Million Loan.

AB7 argues that at the very least, the $10.9 million payment and (aggregated) $17,250,000 in working capital loans were not concealed.  However, ABST contends in its Complaint that "[e]ach loan agreement was signed by Sumino on behalf of AB7 and by Yamada on behalf of [ABST] and approved by AB7 and the Individual AB7/[ABST] Defendants. . . . None of the loans [were] circulated to the full [ABST] board of directors for approval, or approved by Langberg or Catalano.  No [ABST] board resolutions or minutes of meetings exist in which any such loan was approved."  If they were not circulated for approval, they were approved in some degree of secrecy

This prong has been sufficiently pled by Plaintiffs.

**2.  Conclusion: Motion to Dismiss Count Three Will Be Denied**

Plaintiffs have sufficiently pled four badges of fraud: an insider relationship, insolvency, lack of consideration and secrecy. Therefore, the Court will deny the Motion to Dismiss this count.

## Count Four: Avoidance of Fraudulent Transfer

**1. Constructive Fraud**[131]

In the alternative to pleading that the loan obligations were the result of actual fraud, ABST alleges that the transactions were "constructively fraudulent." More specifically, ABST alleges it was insolvent from inception and it did not receive reasonably equivalent value for incurring the debt owed to AB7.

It is undisputed that the Delaware and New Jersey Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa). To establish a constructively fraudulent transfer or obligation, "the plaintiff must show that (a) the debtor made the transfer [or incurred the obligation] without receiving reasonably equivalent value, and (b) [regarding the debtor's financial condition] the debtor was either: (i) insolvent or became insolvent as a result of the transfer; (ii) engaged or [was] about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or

---

[131] AB7 argues that constructive fraudulent transfer claims are evaluated at the 12(b)(6) stage under Rule 9(b)'s heightened pleading standard. However, in *USDigital*, this Court held that Rule 8(a) governs constructive fraud cases. Therefore, "[c]omplaints alleging constructive fraudulent transfers need only set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him. All that is needed at this stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the [d]ebtors were insolvent." *USDigital*, 443 B.R. at 38 (citations omitted).

reasonably should have believed that it would incur, debts beyond its ability to pay as they became due."[132]

### a.    Reasonably Equivalent Value

"The term 'reasonably equivalent value' is not defined by the Bankruptcy Code. Congress left to the courts the task of setting forth the scope and meaning of this term, and courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence.  As the Third Circuit has noted, 'a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave.' Rather, courts look to the 'totality of the circumstances' of the transfer to determine whether 'reasonably equivalent' value was given."[133]

Generally, this Court follows a two-step approach, first looking to whether "based on the circumstances that existed at the time of the transfer [or obligation] it was 'legitimate and reasonable' to expect some value accruing to the debtor."[134]  "Second, if the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine 'whether the debtor got roughly the value it gave.' . . . To assess the reasonable equivalence of the transfer or obligation and the value received by the debtor, a court should 'look to the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an

---

[132] *Id*. at 38 (citations omitted) (numbering changed for convenience).

[133] *Id*. at 39 (citations omitted).

[134] *In re Jevic Holding Corp.*, 2011 WL 4345204, at *8 (Bankr. D. Del 2011) (BLS).

arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith."[135]

AB7 argues that ABST received reasonably equivalent value both when it incurred loan obligations (receiving cash) and when it made payments in principal and interest in favor of AB7 (paying down debt). Plaintiffs argue that the loan obligations are void; therefore, they argue that ABST did not receive reasonably equivalent value when it incurred the loan obligations.

As set forth above, there is a total $40,250,000 in incurred intercompany loan obligations. Excluding roll ups, they are comprised of: (i) $23 million on April 26, 2007; (ii) $2.5 million on October 11, 2007; (iii) $2 million on November 14, 2007; (iv) $2.1 million on December 19, 2007; (v) $4 million on January 9, 2008; (vi) $4 million on March 3, 2008; (vii) $5 million on May 2, 2008; (viii) $2.6 million on June 20, 2008; (ix) $3.65 million on July 29, 2008; and (viii) $2 million on November 6, 2008.

ABST received cash (dollar for dollar) equal to the face amount of each loan obligation ABST incurred in favor of AB7. Plaintiffs do not argue that the payment of $23 million to the R&S Plaintiffs under the R&S Plan and R&S APA nor the subsequent cash infusions were not reasonably equivalent value for the assets acquired by AB7. Rather, they argue that they *expected* to get the cash with no strings or repayment obligations attached. Therefore, the discrepancy is between the expectation (free cash) and the loan obligations (cash with repayment obligations), Plaintiffs argue that discrepancy results in ABST having not received reasonably equivalent value.

---

[135] *Id.*

There is a total of $10,952,035 in principal and interest payments made on intercompany loans from ABST to AB7.  They consist of (i) $44,065 on January 9, 2008; (ii) $128,085 on April 22, 2008; (iii) $10.6 million on April 22, 2008 (principal); (iv) $38,864 on July 8 ,2008; (v) $96,537 on November 6, 2008; (vi) $17,393 on December 3, 2008; and (vii) $27,091 on January 14, 2009.

When AB7 provided dollars for debt on a one-to-one ratio, they provided reasonably equivalent value.  Thus, regardless of whether the transactions should be characterized as capital contributions or loans, ABST received reasonably equivalent value for the cash. However, they have sufficiently pled that ABST did not receive reasonably equivalent value for costs of incurring the debt, i.e., the principal and interest payments in the amount of  $10,952,035.

### b.    Financial Condition

ABST must also allege that "(b) [regarding the debtor's financial condition] the debtor was either: (i) insolvent or became insolvent as a result of the transfer; ii) engaged or [was] about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due."[136]

### i.    Insolvency

Plaintiffs' allegations regarding insolvency are sufficient to survive the motion to dismiss.

---

[136] *USDigital*, 443 B.R. at 38 (citations omitted) (numbering changed for convenience).

### ii.    Undercapitalization/Unreasonably Small Capital

Similarly, Plaintiffs 'allegations regarding undercapitalization are sufficient.

### (iii)    Inability to pay debts as they became due

The Complaint alleges that AB7 generally did not attempt to collect principal and interest payments on loan obligations when they came due.   Rather, the obligations went unpaid and had to be rolled into new loan arrangements.   In addition, apart from the $23 Million Loan, ABST required approximately $20 million in additional cash. The clear inference is that ABST was unable to pay its debts as they came due.

## 2. Conclusion:  Motion to Dismiss Count Four Will Be Granted in Part and Denied in Part

There is no dispute that the cash was infused into ABST regardless of whether it was debt or equity. Thus, regardless of whether the transactions should be characterized as capital contributions or loans, ABST received reasonably equivalent value for the cash. However, they have sufficiently pled that ABST did not receive reasonably equivalent value for costs of incurring the debt, i.e., the principal and interest payments in the amount of  $10,952,035.  In addition, Plaintiffs have sufficiently alleged ABST was insolvent, had unreasonably small capital and was unable to pay its debts as they became due. The Motion to Dismiss Count Four will be granted in part and denied in part as the amount of the claim is limited to $10,952,035.

## **Count Five:  Preferences**

ABST alleges that six relevant preferential transfers were made to or for the benefit of AB7:  (i) $128,085 on April 22, 2008; (ii) $10.6 million on April 22, 2008; (iii) $38,864 on July 8, 2008; (iv) $96,537 on November 6, 2008; (v) $17,393 on December 3, 2008; and (vi) $27,091 on January 14, 2009.

AB7 concedes that payments (v) and (vi) must survive the Motion to Dismiss as they occurred within 90 days of ABST's bankruptcy filing, but disputes (i)-(iv) (payments (i)-(iv) collectively, the "Contested Preference Payments").  ABST seeks to avoid the alleged preferential transfers pursuant to 11 U.S.C. §547(b).

Under 11 U.S.C. §547(b), in order to avoid a prepetition preferential transfer of the debtor's interest in property, ABST must show that the transfer was:

    (1)    to or for the benefit of a creditor;

    (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)    made while the debtor was insolvent;

    (4)    made—

        (A)    on or  within 90 days before the petition date or (B) if the transfer is to an insider, between 90 days and one year before the petition date; and

    (5)    that enables such creditor to receive more than such creditor would receive if—

        (A)    the case were a case under chapter 7 of this title;

        (B)    the transfer had not been made; and

        (C)    such creditor received payment of such debt to the extent provided by the provisions of this title.[137]

---

[137] 11 U.S.C. § 547(b); *USDigital*, 443 B.R. at 36.

### 1.  Insolvency as of February 4, 2008

AB7 argues that the Complaint fails to establish a *prima facie* case for a preferential transfer because ABST failed to allege insolvency at the time the Contested Preference Payments were made.   Under §547(f) of the Bankruptcy Code, ABST is presumed insolvent for the 90-day period prior to February 4, 2009, ABST's Chapter 11 petition date. [138]   Under §547(b)(4)(B) the preferential transfer look-back period is one year before the petition was filed (February 4, 2008), since the "creditor at the time" of the transfer, AB7, was an insider. The lion's share of the alleged preferential transfers occurred within one year of the bankruptcy filing, i.e., between April 22, 2008 and July 8, 2008.  AB7 argues that ABST failed to allege insolvency between February 4, 2008 and the start of the 90-day presumed insolvency period (approximately November 5, 2008). Therefore, the $10,766,949 in transfers made between April 22 and July 8, 2008, should not be deemed preferential transfers.  This argument, however, fails as this court has already held that ABST has sufficiently pled that it was insolvent from its inception.

### Subsequent New Value Defense

AB7 argues that the face of ABST's Complaint establishes the subsequent new value defense for AB7 with respect to $10,863,486 in payments made between April 22, 2008 and November 6, 2008.   AB7 argues it provided "money" to ABST, which constitutes "new value."

Section 547(c)(4) of the Bankruptcy Code provides that "[t]he trustee may not avoid under this section a transfer . . . to or for the benefit of a creditor, to the extent

---

[138] 11 U.S.C. § 547(f).

that, after such transfer, such creditor gave new value to or for the benefit of the debtor .

. . on account of which new value the debtor did not make an otherwise unavoidable

transfer to or for the benefit of such creditor."[139]  In turn, §547(a)(2) of the Code defines

"new value" as follows:

"(a) In this section –

(2) 'new value' means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation . . . ."[140]

AB7 provides the following chart in support of its new value defense:

| New Value Defense Chart Created by AB7 | | | |
|---|---|---|---|
| Date | Payment | New Value | Net Preference |
| 4/22/2008 | $128,085 | | $128,085 |
| 4/22/2008 | $10,600,000 | | $10,778,085 |
| 5/2/2008 | | ($5,000,000) | $5,778,085 |
| 6/20/2008 | | ($2,600,000) | $3,178,000 |
| 7/8/2008 | $38,864 | | $3,216,949 |
| 7/28/2008 | | ($3,650,000) | $0 |
| 11/6/2008 | $96,537 | | $96,537 |
| 11/6/2008 | | ($2,000,000) | $0 |
| 12/3/2008 | $17,393 | | $17,393 |
| 1/14/2009 | $27,091 | | $44,484 |

ABST argues that the subsequent new value *defense* is inapplicable to a 12(b)(6)

motion to dismiss, since it is an affirmative defense that goes to the merits of the

complaint, not the sufficiency of the complaint.[141]  AB7 concedes that section 547(g) of

---

[139] 11 U.S.C. § 547(c)(4).

[140] 11 U.S.C. § 547(a)(2).

[141] *See Pardo v. Nylcare Health Plans (In re APF Co.),* 274 B.R. 408, 429 (Bankr. D. Del. 2001) (PJW).

the Code places the burden of proving a subsequent new value defense on the defendant.[142]  Additionally, AB7 recognizes that *In re APF Co.* explicitly addressed the new value defense and concluded that it does "not form a basis for dismissal under Rule 12(b)(6).[143]  Still, AB7 presses that the affirmative new value defense appears on the face of ABST's Complaint, and therefore is proper grounds to dismiss.[144]  While AB7 may ultimately succeed on the merits this is not the appropriate vehicle to argue the point.  The rule of law professed in *In re APF Co.* is correct and foregoes AB7's motion.

### 2.  Conclusion:  Motion to Dismiss Count Five Will Be Denied

ABST sufficiently alleges each element to plead a *prima facie* preference case.  The subsequent new value defense is not properly before the court on this motion to dismiss under Rule 12(b)(6). Therefore, the Court will deny the Motion to Dismiss Count Five.

### Count Six:  Recovery of Avoidable Transfers

Count Six seeks to recover transfers avoided under Counts Three, Four, and Five pursuant to section 550 of the Bankruptcy Code.  The disposition of this Court is determined by those counts.  Thus, the Motion to Dismiss will be granted in part and denied in part as set forth above.

---

[142] D.I. # 25, at 92.

[143] *In re APF Co.*, 274 B.R. at 429.

[144] AB7 cites *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) and *In re Image Masters*, 421 B.R. at 181.

## Count Seven:  Declaratory Judgment

Count Seven seeks a declaratory judgment that recharacterizes the debts owed to AB7 as equity contributions.  As this Count is derivative of Count Eight, which survive the Motion to Dismiss, the Motion will be denied as to Count Seven.

## Count Eight:  Recharacterization of Debt to Equity

Count Eight lies at the heart of the Plaintiffs' theory in this case. Through Count Eight, ABST seeks to recharacterize the loan obligations it incurred in favor of AB7 as equity or capital contributions.

"The law regarding recharacterization is well-settled in this jurisdiction.  The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution."[145]  "The focus of recharacterization in the Third Circuit is 'whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.'  The Third Circuit has rejected a 'mechanistic scorecard' in favor of a case-by-case approach."[146]

The court looks to the "intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a common sense evaluation

---

[145] *In re Fedders*, 405 B.R. at 554 (citation omitted).

[146] *In re Friedman's Inc.*, 452 B.R. 512, 518 (Bankr. D. Del. 2011) (internal citations omitted).

of the facts and circumstances surrounding a transaction.'"[147]  Thus, "recharacterization

is a question of fact.  Courts have adopted various multi-factor tests to define the

recharacterization inquiry. . . .  Nonetheless, as the Third Circuit frequently cautions,

'[n]o mechanistic scorecard suffices,' and this Court must not allow a multi-factor test to

obscure the relevant factual and legal analysis."[148]

This Court recently looked to the Sixth Circuit's eleven factor test used in *In re*

*Autostyle Plastics, Inc.*[149]  In addition to the *Autostyle* factors, this Court included other

"pertinent" factors recognized by the Third Circuit in *In re Submicron Sys. Corp.*[150]

Ultimately, this Court discussed the following as the relevant factors:  (a) names given

to the instruments, if any, evidencing the indebtedness; (b) presence or absence of a

fixed maturity date and a schedule of payments; (c) no fixed rate of interest and interest

payments; (d) whether repayment depended on success of the business; (e) inadequacy

of capitalization; (f) identity of interests between creditor and stockholder; (g) security,

if any, for the advances; (h) ability to obtain financing from outside lending institutions;

(i) extent to which the advances were subordinated to the claim of outside creditors; (j)

the extent to which the advances were used to acquire capital assets; (k) presence or

---

[147] *Id*. at 518.

[148] *Id*. at 519-20 (citations omitted).

[149] *Id*. at 519-20 (citing *Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001)).

[150] *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006) (citing *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984)).

absence of a sinking fund; (l) presence or absence of voting rights; and (m) other considerations.[151]

## 1.  The Test

### a.    Names Given to the Instruments

The first factor in *Autostyle* is the name given to the instruments.  The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans.  In *Fidelity Bond and Mortgage Company*,[152] the court recharacterized a 'promissory note' made by the debtor to old shareholders of the debtor.  After considering testimony, the Court found: that (i) the structure at issue was created in order for the debtor to maximize certain tax benefits, (ii) the debtor did not provide for payment of any principal indebtedness under the 'notes' through the first five years, and (iii) the documents referred to the amount due to the defendants as 'indebtedness.'  After balancing these facts against the title given to the instrument, the Court concluded that the 'promissory notes' were intended to be an equity investment in the debtor and not debt."[153]

AB7 argues that there is an agreement governing each "loan" that is an "instrument evidencing indebtedness."  Each such agreement is titled "Loan Agreement" and uses terms such as "Lender" and "Borrower."  AB7 also argues that ABST's Loan Prepayment Application from April 17, 2008, was incorporated by

---

[151] *Friedman's*, 452 B.R. at 518.  It is also of note that recharacterization has no relation to inequitable conduct.

[152] *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266 (Bankr. E.D. Pa. 2006).

[153] *Friedman's*, 452 B.R. at 520 (citing *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006)).

reference in the Complaint and "recounts that [ABST] received from AB7 $41.65 million in long-term and short term loans."

ABST argues first that the labels affixed to the loan agreements and prepayment applications were affixed by AB7, and therefore should be disregarded.  Instead, ABST argues, the Court should look to the actual nature of the transaction.[154]

Given the "loan agreements" between "borrower" and "lender," the first factor favors AB7 and weighs against recharacterization.[155]

### b.    Presence or Absence of Fixed Maturity Date

"The next factor is the presence or absence of a fixed maturity date and schedule of payments.  'The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[156]

 AB7 argues a fixed maturity date appears in each loan agreement.   In the Complaint, ¶ 111 provides a table with the main attributes of each "loan" provided by AB7.  Each has a "scheduled repayment date."

ABST argues that the repayment dates were illusory.  AB7 never intended to make payment demand or enforce the loans when they came due.  ABST alleges that repayment dates were ignored and that loans were rolled up each time principal payments came due.

---

[154] *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).

[155] D.I. # 26, Exs. J-W.

[156] *Friedman's*, 452 B.R. at 520.

Specifically, on January 10, 2008, rolled up $4.5 million of loans from October 11, 2007, and November 14, 2007, which had principal amounts of $2.5 an $2 million dollars respectively, and repayment dates of January 10, 2008.  Similarly, the November 6, 2008, $10.65 million loan provided a new borrowing of $2 million, and rolled up a $5 million loan from May 2, 2008 and a $3.65 million loan from July 28, 2008, both of which were due November 6, 2008.  Finally, ABST alleges that the December 6, 2008 $10.65 million loan rolled up the November 6, 2008, $10.65 million loan, which became due on December 6, 2008.

ABST concedes that one $10.6 million principal payment was made.  However, the factual circumstances alleged by ABST surrounding the transfer make the nature of the "prepayment of principal" questionable.

Accordingly, although there are numerous fixed repayment dates stated in the loan agreements, ABST was not regularly required to make principal payments as they came due.  Therefore, this factor weighs in favor of recharacterizing the Contested Obligations as equity.

### c.    No Fixed Rate of Interest and Interest Payments

"Another factor in the *Autostyle* analysis is the presence or absence of a fixed rate of interest and interest payments.  The absence of such is a strong indication that the investment was a capital contribution, rather than a loan."[157]

AB7 argues that in ABST's Complaint a table detailed the applicable interest rates for each loan, [158] and that ABST alleges it paid AB7 $350,000 in interest.  ABST

---

[157] *Id*. at 521.

argues that the interest payments were impermissible dividends.    ABST's legal conclusion that the "interest payments" were actually impermissible dividends states the legal conclusion ABST seeks to prove: recharacterization of the debt as equity would render the distributions dividends rather than interest (for lack of a better description).

Thus, the third factor favors AB7 and weighs against recharacterization.

### d.    Whether Repayment Depended on Success

"'If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.'"[159]

AB7 argues that the loan agreements did not explicitly tie repayment to ABST's business success, and therefore this factor weighs against recharacterization.    ABST argues that there was no other source for repayment available for repaying AB7's loans, aside from the earnings and success of ABST.    Therefore, ABST concludes that repayment depended solely on ABST's economic success.

AB7 replies that the proper "question is not whether loans were in danger of not being repaid absent success of the business, but whether the lender specifically agreed to tie its right to repayment to such success, indicating an intent to be treated more like an equity owner."[160]    AB7 cites numerous cases to support its argument that the lender must specifically agree to tie its right to repayment to the success of the business for this factor to weigh in favor of recharacterization.    Starting with *Autostyle*, AB7 argues that

---

[158] D.I. # 1, at ¶ 111.

[159] *Friedman's*, 452 B.R. at 521 (citations omitted).

[160] D.I. # 50, at 50.

"[i]n *In re Autostyle*, the loan agreement had a *specific provision* permitting repayment *only* out of corporate earnings.[161]"

AB7 misapprehends the holding of *Autostyle*. The court in *Autostyle* does not quote, or even cite, to a "specific provision [of the loan agreement] permitting repayment only out of corporate earnings."[162]  More importantly, *Autostyle* found *two* sources of repayment: (1) Autostyle's earnings and (2) a security interest in all of Autostyle's assets. The court held that "[t]he fact that . . . defendants were to be paid out of Autostyle's earnings indicates that they were dependent on the success of Autostyle's business, however, this is balanced to some extent by the security of the lien on all of Autostyle's assets."[163]  Thus, *Autostyle* plainly looked to the underlying economic reality and the general tie between the loan's repayment and the success of the business. The second source of repayment, the security interest, was a mitigating factor. Therefore, *Autostyle* provides AB7 no assistance.

AB7 next cites *In re Franklin Equipment* in its effort to support its creative proposition that this factor requires a specific provision in the loan agreement permitting repayment only out of corporate earnings.[164]  AB7 quotes the court as having "observed that had the [relevant] note been payable 'only from profits' it would have

---

[161] D.I. # 50, at 50.

[162] Nowhere in *Autostyle* does the court refer to, describe, or discuss the provision AB7 alleges exists in the relevant loan agreements. There is only one unrelated citation directly to the loan agreement's provisions.

[163] *Autostyle*, 269 F.3d at 751.

[164] *In re Franklin Equipment*, 418 B.R. 176, 196 (Bankr. E.D. Va. 2009).

resembled a dividend."[165]    This quote is taken wholly out of context.    In *Franklin Equipment*, the court dealt with a note secured by a lien.    Thus, there were two sources of repayment: (1) the earnings of the business and (2) the security interest that arose by lien.    With this in mind, the court said "[h]ad the … Note been payable only from profits of the Debtor, it would in that respect resemble a dividend and be an indicia of a capital contribution."[166]    The *Franklin Equipment* opinion does not stand for the proposition that the loan agreement must include a specific provision tying repayment to corporate earnings.    Rather, like *Autostyle*, *Franklin Equipment* looked to the underlying economic reality and the general tie between the loan's repayment and the success of the business.    The second source of repayment, the security interest, again mitigated against finding that repayment depended on success.

Lastly, AB7 cites *In re Exide Techs., Inc.* for support of its specific provision theory.[167]    Of the cases AB7 cites, *Exide* comes closest to supporting AB7's proposition, but again only because its citation is taken out of context.    The Court's entire discussion of this factor follows:

> "Source of repayments:  If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.    Section 3 of the Credit Agreement sets forth repayment requirements in great length, none of which are tied directly to the success of Exide's business."[168]

---

[165] D.I. # 50, at 50 (citing *Franklin Equipment*, 418 B.R. at 196.

[166] *In re Franklin Equipment*, 418 B.R. at 196.  Note the court's use of the term "capital contribution" as undoubtedly equity, and not debt.

[167] *Official Comm. of Unsecured Creditors v. Credit Suisse First Bos. (In re Exide Techs., Inc.)*, 299 B.R. 732, 741 (Bankr. D. Del. 2003) (KJC).

[168] *Id.* at 741.

Without more, AB7's theory is holding some water.  However, in *Exide*, there were yet again two sources of repayment: (1) the earnings of the business and (2) the fully secured interests of the plaintiffs.  Therefore, because more than one source of repayment existed, the credit agreement would have to specifically tie repayment to only corporate earnings; otherwise, multiple sources of repayment would exist and the expectation of repayment would not depend solely on the success of the borrower's business.[169]

Unlike in each of those cases, ABST alleges there was one and only one source of repayment available here: the earnings and success of ABST.  AB7 concedes that all loans were unsecured and has not suggested an alternative source of repayment existed.

Thus, the fourth factor favors ABST and weighs in favor of recharacterization.

### e.    Inadequacy of Capitalization

"'Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans.'"[170]    Undercapitalization "is particularly relevant when 'a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation.'"[171]  Capitalization is assessed both at the times of initial capitalization and subsequent transactions.[172]

---

[169] *Id.*

[170] *Friedman's*, 452 B.R. at 522 (quoting *Autostyle*, 269 F.3d at 750-51.).

[171] *Autostyle*, 269 F.3d at 751 (quoting *In re Cold Harbor*, 204 B.R. at 917).

[172] *Id.* at 751 (citing *Roth Steel*, 800 F.2d at 630).

AB7 first argues that ABST failed to plead inadequate capital *at the time* any particular loan was advanced.    Second, AB7 argues that this factor is not determinative.[173]  Finally, AB7 argues that insolvency or potential insolvency is "not a ground for recharacterization."[174]

The Court has already held that ABST has sufficiently pled that it was undercapitalized and insolvent from its inception.. ABST also argues that inadequate capitalization is particularly relevant where, as here, advances come from an insider to a subsidiary with a history of unprofitability, where "the substance of the relationship represented a capital contribution designed to prop up the struggling subsidiary."[175]

AB7 replies that undercapitalization is not determinative.[176]   Indeed, "courts have cautioned that this factor is not determinative, even where the advances are made by an insider."[177]   Similarly, AB7 cautions the court away from "excessive suspicion

---

[173] D.I. # 25, at 76 (citing *In re Exide*, 299 B.R. at 741).

[174] D.I. # 25, at 76 (citing *In re SubMicron*, 432 F.3d at 457).  This argument is based on the *Submicron* court's discussion, which weighed a lender's legitimate attempt to protect existing loans in distressed companies against a lender's improper infusion of capital using purported loans in the context of undercapitalization.  The court concluded that undercapitalization was found not to "greatly" support equity recharacterization, but it is still relevant in the recharacterization test.

[175] D.I. # 46, at 76 (citing *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America) Inc.* ("*Fairchild Dornier*"), 453 F.3d 225, 234-35 (4th Cir. 2006)).

[176] Neither AB7 nor ABST need to remind the Court (with numerous citations to boot) that each factor is not dispositive when that factor does not weigh in their favor.  This court consistently states that no factor is dispositive.  Thus, AB7's related argument is not addressed here.

[177] In fact, the citation AB7 supplies does not go so far.  The court only states that "a debtor's undercapitalization *alone* will *normally* be insufficient to support the recharacterization of a claim."  *See Fairchild Dornier*, 453 F.3d at 234-35 (emphasis added).

about loans made by owners and insiders of struggling enterprises" because "too heavy an emphasis on undercapitalization produces . . . an unhealthy deterrent effect."[178]

AB7's caution regarding the unhealthy deterrent effect is misplaced.  In *Hedged-Investments*, the Tenth Circuit noted that it had previously rejected "the . . . automatic subordination of insider loans [when the borrower corporation was badly undercapitalized] on the grounds that such a fixed rule would discourage owners' efforts to salvage a troubled business."[179]  That ruling explicitly addressed equitable subordination rather than recharacterization, and the mischaracterized citation provided by AB7 did not, in fact, suggest that the factor regarding inadequacy of capitalization needed to be viewed with caution.

In fact, the language comes from a footnote that described the shift from "automatic subordination of insider loans [to a badly undercapitalized borrower]," which had previously been the standard for both equitable subordination and recharacterization (under *In re Mid-Town Produce Terminal, Inc.*)[180] to a new, entirely separate inquiry.

The *Hedged-Investments* court shifted the recharacterization inquiry to a thirteen factor examination used in the Eleventh Circuit.[181]  It was the shift from using the former bright line equitable subordination rule to the new multi-factor

---

[178] D.I. # 50, at 51 (quoting *Sender v. Bronze Group, Ltd. (In re Hedged-Inv. Assocs.)*, 380 F.3d 1292, 1299 (10th Cir. 2004) (internal citations omitted)).

[179] *In re Hedged-Inv. Assocs.*, 380 F.3d at 1298.

[180] *G.J. Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)*, 599 F.2d 389, 392 (10th Cir. 1979).

[181] *Stinnett's Pontiac Serv., Inc. v. Comm'r of Internal Revenue*, 730 F.2d 634, 638 (11th Cir. 1984).

recharacterization test that the Tenth Circuit noted *served* to assuage one of their main concerns — that excessive suspicion about loans made by insiders to struggling borrowers would "discourage legitimate efforts to keep a flagging business afloat."[182] Thus, unlike AB7's characterization of the court's concern, where they argue that this factor needs to be cautiously regarded, in fact *Hedged-Investments* had moved to satisfy its cautious regard by switching from the equitable subordination bright line inquiry to the multi-factor test.

This factor favors ABST and weighs in favor of recharacterization.

### f.    Identity of Interests between Creditor and Stockholder

"Another factor in the *Autostyle* test is the identity of interest between the creditor and the stockholder. 'If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan this evidence standing alone is almost overwhelming.'"[183]

AB7 argues that this factor is probative of intent where there are numerous stockholders, but not in the context of a wholly owned subsidiary. AB7 argues that since "a sole shareholder always makes advances in proportion to its holdings, if this

---

[182] *Hedged-Investments*, 380 F.3d at 1299 n.1 (citing *Mid-Town*, 399 F.2d at 392).

[183] *Friedman's*, 452 B.R. at 522 (citing *Autostyle*, 269 F.3d at 751).

factor is given undue weight it could improperly deter a corporation's 100 percent owner from extending financing to a subsidiary in need."[184]

ABST argues that an exact correlation exists between AB7's ownership interest and its proportionate share of the alleged loan.  AB7 indirectly owned 100 percent of the equity of ABST and made 100 percent of the loans.  Additionally, ABST argues that the identity of interest factor takes on particular importance where a parent company makes a cash advance to a struggling subsidiary.[185]

AB7 replies, reiterating its argument that a sole shareholder necessarily makes advances in proportion to their equity ownership, and therefore reveals nothing about the parties' intent.[186]

In cases of wholly owned subsidiaries, there is only an exact correlation between the ownership interest of the sole equity holder and the proportionate share of the alleged loan where the equity holder is also the sole lender.  There could be numerous lenders involved together in making a single advance.  Therefore, AB7's statement is not necessarily true.

Additionally, a parent of a wholly owned subsidiary often trades away control as additional shareholders or lenders join the fray.  Where they choose to retain control (or whatever other benefits they see in sole equity ownership and sole lender status) they risk this factor weighing against them in a recharacterization claim.

---

[184] D.I. # 25, at 77.

[185] D.I. # 46, at 79 (citing *Fairchild Dornier*, 453 F.3d at 234).

[186] D.I. # 50, at 52.

Moreover, AB7's policy argument fails because it is equally applicable to situations involving numerous shareholders. For example, if this factor was applied to two equity shareholders who each own 50% of the company and contribute 50% of a $1 million loan ($500,000), they could argue that such a pro rata split made business sense, and that giving this factor undue weight in favor of recharacterization would deter a corporation's two fifty-percent owners from extending financing to a subsidiary in need.

ABST alleges an exact correlation between AB7's ownership interest and its proportionate share of the alleged loan, and further alleges that AB7's cash advances were made to a struggling subsidiary. Therefore, the sixth factor favors ABST and weighs in favor of recharacterization.

### g.    Security, If Any, for the Advances

"Another factor in the *Autostyle* test is the presence or absence of security for the advances made under the alleged debt. 'The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans.'"[187]

AB7 concedes that their loans were all completely unsecured. However, AB7 argues that "this factor should have no relevance here where ABST represented that it would not incur secured debt." AB7's argument is a non-starter. The representations referred to by AB7 were those made by proffer at the R&S Confirmation Hearing, where attorney Bruce Buechler, of Lowenstein Sandler, proffered testimony on behalf of Langberg and Takenaka. In the proffer, he stated that "Mr. Langberg would testify that

---

[187] *Friedman's*, 452 B.R. 512 (citing *Autostyle*, 269 F.3d at 752).

. . . [ABST] would have no secured debt to start with."[188]   Similarly "Mr. Takenaka would testify that . . . [AB7] and [ABST] have no current intention to incur secured debt which [sic] otherwise encumber the assets and impact the availability of its financial resources to pay operating expenses including lease payments in the future."[189]   AB7 somehow reasons that because the proffered testimony indicated that ABST would not incur secured debt, the court should only infer an upstanding intention to honor public representations, and should disregard inferences related to recharacterization.

However, the intent to honor a public representation is not mutually exclusive with the intent to make an equity contribution.  AB7 cites no legal authority and there is no apparent underlying rationale for jumping to its conclusion.

The seventh factor favors ABST and weighs in favor of recharacterization.

### h.    Ability to Obtain Financing from outside Lending Institutions

"Yet another factor in the *Autostyle* test is the debtor's ability to obtain outside financing.  'When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[190]

AB7 argues that ABST failed to allege that any third parties denied ABST requested funding.  AB7 misconstrues the inquiry factor this element requires.  The proper question is not whether a third party denied ABST funding.  As discussed in

---

[188] D.I. # 26, Ex. H at 17.

[189] D.I. # 26, Ex. H at 23.

[190] *Friedman's*, 452 B.R. at 522-23 (citing *Autostyle*, 269 F.3d at 752).

both *Cold Harbor*[191] and *Roth Steel Tube*,[192] the proper question is "whether a reasonable outside creditor would have made a loan to the debtor on similar terms."[193]

ABST argues that no outside lender would provide equivalent funding under the same or similar terms that AB7 provided.  ABST alleges that the low interest rates,[194] lack of security, negative cash flow of ABST, and financial condition of ABST together suggest that no "reasonable outside creditor" would have made similar loans.

Of the facts alleged, the most persuasive fact is that AB7 used its own financial statements and precluded ABST from using its financials when dealing with trade creditors and anyone else inquiring about *ABST's* credit.[195]  This alone creates a strong presumption that no reasonable outside creditor would have made a loan to the debtor on similar terms as AB7's; otherwise, ABST would have provided its own financials.

This eighth factor favors ABST and weighs in favor of recharacterization.

### i.    Extent to Which Advances Were Subordinated

"Another factor in the *Autostyle* test is the extent to which the payments to be made are subordinated to the claims of outside creditors.  'Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans.'"[196]

---

[191] *See In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 918 (Bankr. E.D. Va. 1997).

[192] *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986).

[193] *In re Cold Harbor Assocs., L.P.*, 204 B.R. at 918 (citing *Roth Steel Tube*, 800 F.2d at 631).

[194] D.I. # 46, at 80 ("Below the U.S. Prime Rate and in most cases near or below the prevailing 3-month LIBOR.").

[195] D.I. 1, at ¶¶ 158-160.

[196] *Friedman's*, 452 B.R. at 523 (citing *Autostyle*, 269 F.3d at 752).

AB7 argues that ABST did not allege the subordination of advances to claims of other creditors. ABST responds that the absence of AB7's demand for payment indicates the obligations to AB7 were subordinated. ABST cites cases that state "the failure to demand repayment of <u>any</u> portion of the principal advances, in conjunction with the failure to charge interest on the advances . . . effectively subordinated any existing rights . . . for repayment. . . . This de facto subordination casts additional doubt on the original intention to assert the rights of a bona fide creditor."[197]

AB7 argues that unlike in the cases cited by ABST, AB7 had documented loans, received interest payments, and eventually demanded principal repayment.[198] However where a "supposed lender subsequently fails to insist on the remittance of interest payment[s] <u>when due</u>, it suggests that, at the time of the advance, the supposed lender expected repayment from so-called dividend money."[199] ABST alleges that maturity dates were ignored. It is unclear what other creditors were paid and when.

This factor favors ABST and weighs in favor of recharacterization.

> **j.    Extent to Which Advances Were Used to Acquire Capital Assets**

"Another factor in the *Autostyle* test is whether the advances were used to acquire capital assets. 'Use of advances to meet the daily operating needs of the

---

[197] D.I. # 46, at 80 (citing *American Offshore, Inc. v. Comm'r*, 97 T.C. 579, 603 (1991), in turn citing *Inductotherm Indus., Inc. v. Comm'r*, T.C. Memo, 1984-281, *aff'd without published op.*, 770 F.2d 1071 (3d Cir. 1985) (emphasis added)).

[198] D.I. # 50, at 53.

[199] *Ramig v. C.I.R.*, No. 29149-08, T.C. Memo. 2011-147, at *8.

corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness.'"[200]

AB7 argues that "[w]hile the initial $23 million loan was advanced for purposes of acquiring the assets of the [R&S] Debtors, this factor should have little relevance where, as part of the same transaction, AB7 also infused $20 million in equity."[201] Additionally, although not discussed by AB7, the loan agreements generally state the following:  "WHEREAS: the Lender would make certain loan to the Borrower for the purpose of providing a working capital under the conditions of approval made by the Lender's Board Meeting held on 28th February, 2007."[202]

ABST emphasizes that the $23 Million Loan was used to purchase the R&S Plaintiffs' assets, which constitute capital assets.[203]  Additionally, ABST alleges that $5 million advanced on May 2, 2009, and $2 million advanced on November 6, 2008, were advanced to meet AB7's obligations to creditors under the R&S Plan, which they also argue constitute capital assets.

The $23 million, $5 million, and $2 million advances described above allegedly were advanced for purposes of acquiring capital assets.  It is of note that ABST does not allege that all advances were used to acquire capital assets.  Therefore, this factor favors ABST and weighs in favor of recharacterization.

---

[200] *Friedman's*, 452 B.R. at 523 (citing *Autostyle*, 269 F.3d at 752).

[201] D.I. # 25, at 78.

[202] D.I. #26, Exs. J-V.

[203] *See Friedman's*, 452 B.R. at 523 ("The Funding Obligation was used for the purchase of Crescent, which became a wholly owned subsidiary of Friedman's.  Therefore, this factor weighs in favor of characterizing the Notes as equity.").

### k.      Presence or Absence of a Sinking Fund

"Another factor in the *Autostyle* test is the presence or absence of a sinking fund to provide repayments."[204]  "The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans;" however, securing loans with liens can obviate the need for a sinking fund.[205]

AB7 does not dispute that no sinking fund existed.  Therefore, this factor favors ABST and weighs in favor of recharacterization.

### l.      Presence or Absence of Voting Rights

"A factor discussed by the district court in *Submicron* is the presence or absence of voting rights."[206]  The presence of voting rights would favor recharacterizing debt as equity.

ABST does not allege, nor do the loan agreements appear to grant AB7 rights to vote.[207]    Therefore, this factor weighs in AB7's favor and weighs against recharacterizing the loan agreements as equity.

### m.      Other Considerations

One additional consideration concerning to the court in *Cold Harbor* was "a troubling lack of formalities."[208]  ABST alleges that the loan agreements were never approved or discussed in any meetings by ABST's board of directors, and that no

---

[204] *Friedman's*, 452 B.R. at 523 (citing *Autostyle*, 269 F.3d at 753).

[205] *See Autostyle*, 269 F.3d at 753.

[206] *Friedman's*, 452 B.R. at 523 (citing *SubMicron*, 291 B.R. at 323).

[207] D.I. # 26, Exs. J-V.

[208] *See In re Cold Harbor Assocs., L.P.*, 204 B.R. at 916.

minutes exist regarding any such meeting.  ABST alleges that two of the directors of ABST, the two that were not AB7-related, were purposefully excluded from finance discussions, including those related to the loans.  Finally, ABST alleges that these actions violated ABST by-laws and Accounting Rules.  Thus, the additional factor of a lack of formalities favors ABST and weigh in favor of recharacterization.

### 2.  Conclusion:  Motion to Dismiss Count Eight Will Be Denied

Applying this Court's decision in *Friedman's*, the Court is not to base its decision on a mechanical count of factors for and factors against recharacterization.  "Rather, the Court is to use its evaluation of the above described factors to make its decision 'through a common sense evaluation of the facts and circumstances surrounding a transaction.'"[209]  That said, of the thirteen relevant factors, only three favor AB7 and weigh against recharacterizing the debt as equity.[210] While the Defendants' arguments may ultimately prevail, at this stage of the proceedings, taking all the allegations in the Complaint as true,[211] Plaintiff has alleged plausible facts that require a further evidentiary record for the Court to recharacterize[212] the loans as equity.  The Motion to Dismiss Count Eight will be Denied.

---

[209] *Friedman's*, 452 B.R. at 525 (citing *In re Radnor Holdings Corp.*, 353 B.R. 820, 838-39 (Bankr. D. Del. 2006)).

[210] Specifically, factors (a) names given to the instruments, if any, evidencing the indebtedness; (c) no fixed rate of interest and interest payments; and (l) presence or absence of voting rights.

[211] *Id*. at 525 (citing *Fowler*, 578 F.3d at 210-11).

[212] *Id*. at 525.

## Count Nine:  Equitable Subordination

ABST alleges that the loan obligations it incurred in favor of AB7 should be equitably subordinated to the unsecured claims against ABST

"The Bankruptcy Code provides that a court may 'under principles of equitable subordination, subordinate for the purposes of distribution all or part of an allowed claim to all or part of another allowed claim.'  Under the *Mobile Steel* framework,[213] equitable subordination requires proof of three elements: (i) the defendant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination of the claim is consistent with bankruptcy law."

Courts differentiate between insiders and outsiders when analyzing whether a claimant's conduct was inequitable.  Indeed, '[t]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act.'  An insider's conduct is 'rigorously scrutinized,' and the plaintiff 'bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor.'  The rationale behind the heightened scrutiny of insider conduct is that:

'In circumstances where the plaintiff seeks to equitably subordinate the claim of a fiduciary or insider of the debtor who is also a creditor, the line between the defendant creditor and the debtor is often blurred.  The insider creditor is typically in a

---

[213] *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)

position to exert control over the debtor. The creditor may also share common management and/or ownership with the debtor. In its efforts to collect its debt, therefore, the creditor may act directly or cause the debtor to act.'

'On the other hand, if the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary.'"[214]

### 1. AB7 Was an Insider

"A party may be found to constitute an 'insider' for purposes of equitable subordination if the party either (i) meets the statutory definition of insider, or (ii) [is] in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's-length. ABST alleges that AB7 was an insider at all relevant times. AB7 has not disputed insider status. ABST was an indirect wholly owned subsidiary of AB7. As indirect owner of 100 percent of the outstanding equity securities, it meets the definition in the Bankruptcy Code of an insider as an affiliate.[215] AB7 also was in a close relationship with ABST[216] that suggests transactions were not conducted at arm's-length. [217]

---

[214] *Off. Comm. of Unsecured Creditors  v. Highland Capital Management, L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 78-80 (Bankr. D. Del. 2010) (internal citations omitted).

[215] 11 U.S.C. § 101(31)(E); 11 U.S.C. § 101(2)(A) ("The term 'affiliate' means—(A) entity that directly or indirectly owns . . . 20 percent or more of the outstanding voting securities of the debtor . . . .").

[216] *See Count 1:  Alter ego (a) Single Economic Unit (vii) Corporate façade* for examples of relevant allegations.

[217] *See Winstar Commc'ns*, 554 F.3d at 397 ("The Bankruptcy Court's extensive findings regarding [parent's] ability to coerce [subsidiary] into transactions not in [subsidiary's] interest amply demonstrate [parent's] insider status.").

Analyzing AB7 as an insider, AB7's conduct is rigorously scrutinized, and ABST "bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor."[218]

### 2.  Applying the *Mobile Steel* Test to AB7 As an Insider

Again, under the *Mobile Steel* framework, equitable subordination requires proof of three elements: (a) the defendant engaged in some type of inequitable conduct; (b) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (c) equitable subordination of the claim is consistent with bankruptcy law.  It is also of note that courts recognize that determining whether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss.[219]

### a.    Inequitable or Unfair Misconduct

General categories of inequitable conduct include, but are not limited to, (i) fraud, illegality, and breach of fiduciary duties; (ii) undercapitalization; and (iii) claimant's use of the debtor as a mere instrumentality or alter ego.

---

[218] *In re Broadstripe, LLC*, 444 B.R. 51, 79-80 (internal citations omitted).

[219] D.I. # 46, at 92 (*citing Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("Application of the *Mobile Steel* factors is fact-intensive and so a motion to dismiss may not necessarily be granted, even where the defendants are non-insiders."); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007) ("The nature of the underlying conduct (and, at least arguably, any resulting injury) will have to be fleshed out as a factual matter—a task that is, of course, inappropriate when consideration motions under Rule 12(b)(6).")).

ABST alleges the following constituted fraud, illegality and breach of fiduciary duties:

- AB7 breached the R&S Plan by causing ABST to pay $10.9 million as a "loan prepayment" to AB7.  The R&S Plan required that "ABST shall not make any dividends or **distributions** to ABST's equity holders [AB7] on account of such equity holders' interests in ABST until such time as ABST's obligations under the R&S Plan are fully satisfied."[220]

- AB7 violated the R&S Confirmation Order and breached the R&S Plan by failing to fully fund the cash portion of the purchase price with equity rather than debt.[221]

- AB7 violated section 1125(a)(1) of the Code when it failed to provide sufficient information in the R&S Disclosure Statement and R&S Plan.

- AB7 violated section 1129(a)(4) when it failed to disclose costs attendant to carrying debt for approval.

- AB7-related ABST Directors breached fiduciary duties by failing to hold meetings, vote, formally approve, and record minutes related to approving AB7's loans and the loan prepayment.

- ABST was undercapitalized.

- ABST was the alter ego of AB7.

---

[220] D.I. # 1, at ¶¶ 127-129; D.I. 26, Ex. EE (R&S Plan) at 31.  However, this notably presumes that the distribution was based on AB7's equity interest and control, rather than AB7's lending arrangement. Thus, it *already assumes* that the debt is recharacterized as equity.

[221] D.I. # 1, at ¶¶ 73-82, 86. This is discussed below in Count Ten:  Breach of the R&S Plan of Reorganization.

The bulk of these accusations including undercapitalization and alter ego, have already been discussed and generally favor denying the motion to dismiss. ABST's allegations of illegality under Bankruptcy Code sections 1125(a)(1) and 1129(a)(4), however, have not.

ABST argues that AB7 violated section 1125(a)(1) of the Code when it failed to provide sufficient information in the R&S Disclosure Statement and R&S Plan. AB7 responds that section 1125(a)(1) of the Bankruptcy Code requires sufficient information in the disclosure statement be provided *by a plan proponent*. AB7 argues that it was not a plan proponent and it neither drafted nor signed the disclosure statement.

Neither AB7 nor ABST cite legal authority regarding obligations under 1125(a)(1). That section of the Bankruptcy Code provides: (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable . . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ."[222]

The Bankruptcy Code generally prohibits solicitation of an acceptance or rejection from the holder of a claim or interest prior to transmission of the "adequate information" described by §1125(a)(1).[223] ABST does not allege that AB7 was a plan proponent. Also, the New Jersey Bankruptcy Court approved the R&S Disclosure Statement as containing adequate information. Though the information may ultimately turn out to have been incorrect, alleging a violation of §1125(a)(1) is an improper

---

[222] 11 U.S.C. § 1125(a)(1).

[223] 11 U.S.C. § 1125(b).

collateral attack on the disclosure statement, especially when the "misinformation" was caused by a non-proponent. Therefore, ABST fails to plead misconduct under §1125(a)(1).

Plaintiffs also assert that AB7 violated section 1129(a)(4) of the Bankruptcy Code as the $23 Million Loan was not approved by the court. AB7 cites to the statute, the legislative history and court decisions in correctly arguing that section 1129(a)(4) only requires approval of payments made for *professional services performed* before plan confirmation.

Section 1129(a)(4) provides "(a) The court shall confirm a plan only if all of the following requirements are met: (4)  Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, **for services or for costs and expenses in or in connection with the case**, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[224]

The legislative history to section 1129 indicates that (a)(4) "requires that any payment made or promised by the proponent, the debtor, or person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, be disclosed to the court. In addition, any payment made before confirmation must have been reasonable, and any payment to be fixed after confirmation must be subject to the approval of the court as reasonable."

---

[224] 11 U.S.C. § 1129(a)(4).

In *In re Dallas Stars, L.P.*, an order was issued that addressed section 1129(a)(4), stating: "U.  Payment for services or costs and expenses (11 U.S.C. §1129(a)(4)).  Any payment made or to be made by the Debtors for services or for costs and expenses <u>of the Debtors' professionals</u> in connection with their Chapter 11 Cases, or in connection with the Prepackaged Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code."[225]

Similarly, in *In re Stations Holding Co.*,[226] the requirements of 11 U.S.C. §1129(a)(4) were described as follows: "Pursuant to section 1129(a)(4) of the Bankruptcy Code, any payment made or promised by the Debtor or by any person acquiring property under the Plan, <u>for services or for costs and expenses in, or in connection with</u>, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case to the extent of services provided before the Confirmation Date, has been, or will be before payment, disclosed to the Bankruptcy Court."[227]

Thus, AB7 correctly concludes that ABST "misapplied Section 1129(a)(4), which requires approval of payments made for *professional services performed* before plan confirmation, where such payments are made or promised by the debtor, plan proponent, or persons acquiring property or issuing securities under the plan." As a result, ABST has failed to plead any misconduct under section 1129(a)(4).

---

[225] *In re Dallas Stars, L.P., et al.*, No. 11-12935, 2011 WL 5829885 at *9 (Bankr. D. Del. Nov. 18, 2011) (slip copy).

[226] *In re Stations Holding Co.*, No. 02-10882 (MFW), 2002 WL 31947022, at *3 (Bankr. D. Del. Sept. 30, 2002).

[227] *In re Stations Holding Co.*, 2002 WL 31947022, at *3.

Nonetheless, the remaining relevant factors support ABST and sufficiently plead that AB7 was engaged in inequitable misconduct..

### b.    Conduct Caused Injury or Conferred an Unfair Advantage

AB7 argues that the loans it provided permitted ABST to continue functioning, make payments to Class 4 Creditors from the R&S Plan, and pay trade vendors who supplied ABST with inventory. Indeed AB7 argues that every dollar it advanced benefitted ABST at AB7's expense.

ABST alleges that:

- Current general unsecured creditors went unpaid when they otherwise would have been paid, absent AB7's misconduct.

- Creditors from the R&S Plan went unpaid because of AB7's misconduct.

- The R&S Plaintiffs and the New Jersey Bankruptcy Court relied on AB7's false statements in agreeing to support and approve the R&S Plan and the R&S APA.

- ABST was harmed by AB7's decisions to purchase unneeded equipment and to work with suppliers to benefit AB7's business relations, even to the detriment of ABST.[228]

These allegations are sufficient to allege harm and unfair advantage.

### c.    Equitable Subordination Is Consistent with Bankruptcy Law

AB7 argues that as a general unsecured creditor, it should be treated as other general unsecured creditors, especially since all of the general unsecured creditors benefitted from AB7's overall course of conduct.  ABST cites section 510(c) of the

---

[228] The underlying unfair conduct is more fully described in Count Two: Breach of Fiduciary Duties.

bankruptcy code for the principle that distribution of assets among similarly situated creditors should be equal.  ABST alleges, however, that AB7 is not similarly situated with other general unsecured creditors, however, because it engaged in inequitable unfair conduct that caused harm.

ABST is correct and it has sufficiently pled that equitable subordination would be consistent with the bankruptcy law.

### 3.  Conclusion: Motion to Dismiss Count Nine Will Be Denied

ABST satisfies all three parts of the *Mobile Steel* test.  Therefore, the claim for equitable subordination should not be dismissed.  However, sections 1129(a)(4) and 1125(a)(1) are not grounds that support ABST's claim for equitable subordination.  The Court will deny the Motion to Dismiss Count Nine (but notes that sections 1129(a)(4) and 1125(a)(1) allegations are unfounded).

### Count Ten:  Breach of the R&S Joint Plan of Reorganization

### 1.  Plaintiffs Sufficiently Allege That AB7 Is Bound by the R&S Plan

The Plaintiffs allege that AB7 was bound by and breached the R&S Plan and R&S Confirmation Order.  AB7 argues that it is not bound and, therefore, could not be in breach.

Specifically, AB7 argues it was "*not* a party to the R&S Plan, did *not* sign the R&S Disclosure Statement, and is *not* alleged to have drafted or actively negotiated either document – only to have reviewed them, through counsel, and not objected. . . . [I]t is

not enough to make them 'parties' to the documents for contract purposes."[229] Plaintiffs argue that AB7 was a party to the documents, and is bound by the terms of the R&S Plan or 11 U.S.C. §1141(a).[230]

AB7, through its attorney Antonoff, was an active participant in developing the R&S Confirmation Order.[231]  Moreover, the R&S Confirmation Order states that "the provisions of the [R&S] Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, their respective successors and assigns, and any entity acquiring property under the [R&S] Plan, whether or not . . . such holder accepted the [R&S] Plan.[232]  AB7 was a Holder of an Interest in (and arguably itself was) an entity [ABST] acquiring property under the R&S Plan.  ABST also alleges that all parties understood ABST was a mere shell incapable of funding the purchase price without funding from AB7.  Moreover, as AB7 was the indirect 100 percent owner of ABST it was in substance the entity receiving property under the R&S Plan.  Finally, Plaintiffs allege that as a third-party investor agreeing to provide an affiliate with funding necessary to enable the affiliate to meet obligations under the R&S Plan, AB7 is bound to provide such funding under general contract principles.[233]

---

[229] D.I. # 50, at 11.

[230] Plaintiffs have alleged that ABST was AB7's alter ego.  Assuming that is true, AB7 clearly is a "party" to the R&S Plan and related documents.  Because Count One was not dismissed, the Count Ten inquiry must assume AB7 was bound as a party via its alter ego, ABST.

[231] *See* D.I. # 51, Ex. HH, where Antonoff rejects changes to the R&S Confirmation Order via email.

[232] D.I. # 26, Ex. I, ¶ 28.

[233] ABST cites *Paul v. Monts*, 906 F.2d 1468 (10th Cir. 1990) and *In re Air Center, Inc.*, 48 B.R. 693, 695 for support.  This Court need not address the third party contract principle dispute, as Plaintiffs sufficiently allege other grounds for binding AB7 to the R&S Plan and Confirmation Order.

Plaintiffs have sufficiently pled that AB7 was bound to the R&S Plan and R&S Confirmation Order.

### 2. The R&S Plan Plausibly Required AB7 to Use Equity, Not Debt

In ¶ 20 of the R&S Confirmation Order, Judge Winfield ordered that "[o]n or prior to the Effective Date, Autobacs [AB7] *will make a capital contribution* to Autobacs/Strauss [ABST] in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital."[234]

Tracking the language of the R&S Confirmation Order, Plaintiffs equate the term "capital contribution" to equity-based financing and assert that a capital contribution cannot be made using debt-based financing.  They contend that the "cash portion of the purchase price" due was $27,878,470.  Adding together the $27,878,470 cash portion of the purchase price and the $10,000,000 in working capital, the Plaintiffs conclude that, under the express terms of the Confirmation Order, AB7 was required to make a capital contribution to ABST, on or before the Effective Date, in the amount of $37,878,470.  Instead, AB7 only provided $20 million in equity-based financing on or before the Effective Date.  Therefore, the Plaintiffs conclude that AB7 breached the R&S Plan when it failed to timely provide the difference of $17,878,470 in equity-based financing.

AB7 disputes the meaning of the term "capital contribution."  Specifically, AB7 argues that the required "capital contribution" could be made using equity or debt.  AB7 concedes that it contributed $20 million in equity and $23 million in debt on or

---

[234] D.I. # 26, Ex. I, ¶ 20 (emphasis added).

before the effective date, but argues that it thereby provided its required "capital contribution" in full.

In support of this interpretation of "capital contribution," AB7 cites the definition of "capital contribution" found in Black's Law Dictionary: "Funds made available by a shareholder, usu. without an increase in stock holdings."[235]   AB7 argues that the definition does not specify nor imply an equity requirement and therefore allows debt financing.   Further, AB7 argues that the term "working capital" is a "closely related term" that embraces debt or equity, so, similarly, the term "capital contribution" should embrace both debt and equity as well.

The Plaintiffs respond by arguing that the definition of the term "contributed capital," as set out in the financial world and case law, clearly dictates that a capital contribution cannot be a loan.   The Plaintiffs argue that even if AB7 was unaware of the term's alleged universal meaning (equity), AB7's attorneys surely knew (or at least are bound through the R&S Confirmation Order) that the universally accepted meaning of the term "capital contribution" meant equity, not debt.[236]

Turning first to the usage of the term in finance and accounting, the Plaintiffs cite the *Dictionary of Finance and Investment Terms,* which defines "contributed capital" as "payments made in cash or property to a corporation by its stockholders either to buy

---

[235] *Black's Law Dictionary (9th ed. 2009).*

[236] *See Restatement (Third) of the Law Governing Lawyers,* § 28(1) (2000) ("Information imparted to a lawyer during and relating to the representation of a client is attributed to the client for the purpose of determining the client's rights and liabilities in matters in which the lawyer represents the client . . . .").

capital stock, to pay an assessment on the capital stock, or as a gift."[237]   Additionally,

the Plaintiffs cite *Wiley GAAP 2010, Interpretation and Application of Generally Accepted*

*Accounting Principles*, which defines "contributed capital" as ". . . the amount of **equity**

invested in a corporation by its owners. . . ."[238]   Both of these definitions provide greater

specificity than the definition found in Black's Law Dictionary.   At the least, they show

it is plausible that financial and accounting textbook definitions require capital

contributions be made in the form of equity rather than debt.

The Plaintiffs next turn to extensive case law to show that loans and debt are

distinct from equity and capital contributions.   Numerous cases set up a disjunctive

either/or test to determine whether certain financial advances constitute capital

contributions on the one hand, or, alternatively, loans.   For example, one Supreme

Court case held, "[a] corporation must derive its funds from three sources: capital

contributions, loans, and profits from operations. . . . We need not decide whether the

funds supplied to petitions . . . were capital contributions rather than loans."[239]

The Plaintiffs also cite many binding cases from the Third Circuit that

categorically treat financing as a loan (debt) or a capital contribution (equity) in a

mutually exclusive way.   In *In re SubMicron Sys. Corp.*,[240] the Third Circuit stated that

"[r]esearch has uncovered only one bankruptcy case discussing whether the **capital**

---

[237] John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms*, 143 (8th ed. 2010).

[238] Barry J. Epstein *et al.*, *Wiley GAAP 2010, Interpretation and Application of Generally Accepted Accounting Principles*, 59, 1008 (2009) (emphasis added).

[239] *Nat'l Carbide Corp. v. Comm'r,* 336 U.S. 422, 434-35 (1949).

[240] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456-57 (3d Cir. 2006).

**contribution versus loan determination question** is primarily one of law or fact."[241] Later in the same opinion, the Third Circuit stated, "[a]s discussed above, the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."[242]

Based on the foregoing case law and definitional usage of the term "capital contribution," it is at least plausible that use of the term "capital contribution" may have excluded debt. Furthermore, the Plaintiffs assert that, to clear any ambiguity, they will offer evidence at trial that AB7's representatives agreed during negotiations to provide the entire cash purchase price, plus $10 million in working capital, in equity and not debt.

AB7 argues that the "unexplained reference to a 'capital contribution' [in the R&S Confirmation Order] cannot be deemed to change a fundamental term of the [R&S APA] absent any allegation of a new agreement."[243]  AB7 points out that the R&S Confirmation Order states that "[t]he [R&S APA] between [ABST] and the [R&S Plaintiffs] dated as of March 29, 2007 . . . and the transactions contemplated thereby are hereby approved in all respects."  AB7 argues that the Plaintiffs need to allege facts that establish the parties' intent to change the terms of the R&S APA.

---

[241] *Id.* (emphasis added).

[242] *Id.* at 457.

[243] D.I. # 50, at 14.

AB7's position assumes that the R&S APA is not informed by the other R&S Plan-related documents (or otherwise) in a way that would require AB7 to use equity rather than debt.[244]  That assumption cannot be made at the 12(b)(6) stage.

AB7 also argues that the R&S APA controls AB7's obligations.  This is distinct from AB7's argument that it is not bound by the R&S Plan-related arguments.  Here, AB7 argues that even if it were so bound, it only participated in negotiating and signing the R&S APA, so primacy should be given to that document (the R&S APA) over the R&S Plan and the R&S Disclosure Statement.  They must also mean to argue that R&S APA should be given primacy over the R&S Confirmation Order, because of the language in ¶ 20 of the R&S Confirmation Order.  AB7 points out that the R&S Confirmation Order provides that the R&S APA " . . . and the transactions contemplated thereby are hereby approved in all respects."[245]  It is also of note that the R&S Confirmation Order does not include a provision establishing that the terms of the Confirmation Order shall control in case of conflict.[246]

### 3.  Conclusion:  Motion to Dismiss Count Ten Will Be Denied.

AB7 is incorrect that the R&S Confirmation Order needs to "explain" its reference to the term "capital contribution," especially merely to survive the Motion to

---

[244] This is articulated in more detail in Count Eleven:  Breach of the Asset Purchase Agreement.

[245] D.I. # 26, Ex. I, ¶ 7.

[246] This addition was attempted, but rejected by AB7's attorney during the R&S Confirmation Order negotiations.

Dismiss.[247]  Plaintiffs sufficiently alleged that the term "capital contribution" means equity, not debt; the R&S Confirmation Order required AB7 provide a certain amount of funds using equity, not debt; and AB7 did not perform that responsibility.  The Court will deny the Motion to Dismiss Count Ten.

### Count Eleven:  Breach of the R&S Asset Purchase Agreement (APA)

The R&S APA provides that "[AB7] specifically agrees, for the benefit of Seller and its creditors, to provide Buyer with the funds up to the total amount set forth on Schedule 4, provided, however, that the aggregate amount provided by [AB7] to Buyer pursuant to this ARTICLE IV shall not exceed $39,000,000."[248]

### 1.  Breach of the R&S Asset Purchase Agreement (APA)

The Plaintiffs argue that AB7 breached the R&S APA by failing to fund the total amount listed in Schedule 4 has equity.  AB7 concedes that the R&S APA required the use of equity to fund a $10 million investment for working capital.  Beyond that $10 million, AB7 argues that the R&S APA was silent as to how AB7 would fund the closing payments enumerated in Schedule 4.  Therefore, AB7 concludes, the silence permitted AB7 to fund the Schedule 4 payments with equity or debt, or a combination of both.

The Plaintiffs concede that the R&S APA does not explicitly state on its face, taken alone, that AB7 must provide the entire total amount in Schedule 4 in the form of equity.  However, the Plaintiffs contend that in the context of the R&S Plan-related

---

[247] It is noteworthy that numerous cases require that "where the plain terms of a court order unambiguously apply . . . they are entitled to their effect."  *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2197 (2009).

[248] D.I. # 26, Ex. B, at 13.

documents, it becomes clear that the R&S APA required the use of equity to fund the total amount from Schedule 4.

AB7 argues that while extrinsic evidence can be used to interpret an ambiguous contract, even New Jersey's "expansive" view of the parol evidence rule bars a party from relying on extrinsic evidence to alter the terms of the contract.[249]  As the R&S APA was "silent" altogether as to the form of funding required, AB7 argues that extrinsic evidence would alter, and not just interpret, the R&S APA.  Additionally, AB7 argues that the R&S APA's integration clause precludes reliance on prior agreements not embodied in the R&S APA.

AB7 cites *Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*[250] for the "hornbook principle of contract interpretation" that "contracts should be construed together with other documents executed by the same parties, for the same purpose, and in the course of the same transaction."  Namely, AB7 states that *Crystal Palace* interpreted various writings, including an asset purchase agreement, plan of reorganization, and confirmation order, to resolve apparent conflict between documents.[251]

In *Crystal Palace*, three out of four of the documents were consistent with one another, but the fourth was inconsistent.  The court in *Crystal Palace* stated that "[a]lthough there is a conflict in the terms of several of the documents . . . three of the

---

[249] *See Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006).

[250] *Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*, 817 F.2d 1361, 1365 n.3 (9th Cir. 1987) (hereinafter "*Crystal Palace*").

[251] *Crystal Palace,* 817 F.2d at 1365 n.3.

four documents that discuss this matter . . . the purchase agreement, the confirmation order . . . and . . . the plan of reorganization, all indicate that the transaction was supposed to [occur in a particular time frame]."[252]

While the R&S Plan-related documents explicitly require a "capital contribution," the R&S APA does not. Similar to *Crystal Palace*, the case before this Court involves a potential conflict between documents that may give rise to a potential ambiguity in the parties' intent. Alternatively, this could be a case where one document, the R&S APA, provides broadly for a transaction and surrounding documents (including the R&S Confirmation Order, R&S Plan, and R&S Disclosure Statement) explain the specifics of performance under the R&S APA.

Regardless, whereas *Crystal Palace* found "strong support" of intent by comparing multiple documents against each other and searching for consistency, this court need only find it plausible that the R&S APA required a "capital contribution," in light of the surrounding documents. Although the analysis is not purely numerical, three of the four relevant documents in this case explicitly require a capital contribution.[253]

---

[252] *Id.* at n.3. It is of note that *Crystal Palace* went on to hold that, absent a stay, all orders and judgments of courts must be complied with promptly and that no "good faith" exception to obeying a court order exists. However, this court does not need to determine whether AB7 complied with the R&S Confirmation Order at this stage of the proceedings.

[253] Although AB7 denies it is bound by or that it agreed to any document besides the R&S APA, Plaintiffs sufficiently allege that AB7 is *bound* at the least by the R&S Confirmation Order. Under the analysis from *Crystal Palace*, Plaintiffs still sufficiently allege that AB7 breached the R&S APA.

### 2. Conclusion: Motion to Dismiss Count Eleven Will Be Dismissed

Therefore, the Plaintiffs sufficiently plead a breach of the R&S APA in light of the surrounding documents.  Moreover, because the inconsistency gives rise to ambiguity, extrinsic evidence should be allowed to interpret the R&S APA.[254]  the Court will deny the Motion to Dismiss Count Eleven

### Count Thirteen:  Fraudulent Inducement

R&S Plaintiffs allege that the Defendants fraudulently induced: (i) the R&S Plaintiffs to vote in favor of the plan in the second Chapter 11 case; and (ii) the New Jersey Bankruptcy Court to approve confirmation of that plan.

Plaintiffs' allegations in support of its claim of fraudulent inducement must meet the Rule 9(b) heightened pleading requirements, stating "with particularity the circumstances constituting fraud . . . ."[255]  Plaintiffs can meet this requirement by alleging "who made a material misrepresentation to whom and the general content of the misrepresentation."

Under New Jersey law, Plaintiffs must allege five elements to plead common law fraud: (i) a material misrepresentation of a presently existing or past fact; (ii) knowledge or belief by the defendant of the fact's falsity; (iii) an intention that the other

---

[254] *See Landmark Am. Ins. Co. v. Rider Univ.*, No. 08-1250, 2009 WL 1905107, at *11 (D.N.J. June 30, 2009).

[255] Fed. R. Civ. P. 9(b), applicable to this adversary proceeding pursuant to Rule 7009 of the Federal Rules of Bankruptcy Procedure.

person rely on the material misrepresentation; (iv) reasonable reliance thereon; and (v) resulting damages.[256]

### 1.  Material Misrepresentations of Present or Past Fact

#### a.  Equity Versus Debt Misrepresentations

The R&S Plaintiffs allege there were five separate material misrepresentations made by AB7.

First, the R&S Plaintiffs allege (wait for it) that AB7 repeatedly represented that it would fund the majority of the cash portion of the purchase price of the R&S Plaintiffs' assets through capital contributions (equity).   Nonetheless on February 26, 2007, AB7 held a board of directors' meeting, where the directors acted in direct contradiction by approving a funding plan for the R&S APA limited to $20 million in capital contribution.   The board-approved funding plan provided for the difference between the Schedule 4 total ($38,919,235) and $20 million to be funded with debt.[257]

Plaintiffs identify a number of specific occasions where AB7 misrepresented that the funding will be by capital contribution.   For example, ABST alleges that:  "(a) During negotiations on the proposed R&S Plan, in or about January 2007, AB7 and Takenaka Partners, through Kim and Takenaka, represented to the principals of R&S Parts and Service, who, acting as the conduit for AB7's information, stated to counsel to the R&S Creditors Committee that the Strauss Discount Auto Purchase would be a full

---

[256] *Roll v. Singh*, No. 07-04136, 2008 WL 3413863, at *18 (D.N.J. June 26, 2008); AB7 cites *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (2005) for a virtually identical test.

[257] D.I. # 1, at ¶ 78.

equity deal with the purchase price being funded by capital contributions rather than debt."[258]

This representation was made to the "R&S Principals," which is not the defined term in the Complaint [259]  In the Plaintiff's Opposition to Defendant's Motion to Dismiss, Plaintiffs circularly define "R&S Principals" as "the principals of the R&S Debtors."[260]  But no definition gives meaning to "the principals of the R&S Debtors" in the Complaint or the Opposition to Defendant's Motion to Dismiss.  The only related reference discovered in a hunt through the pleadings mentions that Glenn Langberg was <u>a principal</u> of R&S Parts and Service.[261]  It would require a leap to conclude that "R&S Principals," in the plural, in fact refers solely to Langberg.

It is unclear who the relevant principals in or about January 2007 were.  Therefore, who made the misrepresentation and the general content of the misrepresentation are properly plead, but "to whom" is not properly plead with the particularity required by Rule 9(b). [262]  The R&S Plaintiffs requested leave to amend its Complaint should the court determine that the allegations fail to meet Rule 9(b).  This insufficiency in the pleading could be easily corrected with a definition of the relevant R&S Principals.

---

[258] D.I. # 1, ¶ 86 (a).

[259] Also in the Complaint, Plaintiffs allege that the R&S Disclosure Statement represented that management of ABST would be largely the same as for the R&S Plaintiffs.  Plaintiffs allege that this was a fraudulent misrepresentation because Langberg and Catalano did not retain similar stature on the board of ABST Directors and were excluded.  This was a non-actionable issue.

[260] D.I. # 46, at 8.

[261] D.I. # 1, ¶ 7.

[262] D.I. # 25, at 38 (citing *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).

Regarding the fact that this was an oral misrepresentations, AB7 argues that the R&S Plaintiffs could not have reasonably relied on it (or any other oral statements) because the R&S APA had an integration clause. For this proposition, AB7 cites two cases, *Winoka Vill., Inc. v. Tate*[263] and *Braunstein v. Benjamin Berman, Inc.*[264] Neither case, however, as applied to the facts in this case, is persuasive. Here, as in *Crystal Palace*, multiple documents can be read together to determine the basis of the agreement, and extrinsic evidence should be allowed to resolve potential ambiguity (did AB7 agree to pay with equity) if necessary.

AB7 quotes *Winoka Vill.* for the proposition that "alleged oral misrepresentations, being contradictory of the undertakings expressly dealt with [in] writing[], are not effectual."[265] *Winoka Vill.* involved a lease agreement that specified the lease's start and end dates. Tenant vacated numerous months prior to the lease's end date. Tenant argued that the landlord orally represented that vacating early would cost one month's worth of rent with no other penalties. The court held that "[t]he rule that a specific undertaking in a written agreement is not to be varied or contradicted by parol is a rule of substantive law and not of evidence merely." [266] Again, unlike in *Winoka Vill.*, in this case there are numerous relevant documents, and the R&S APA, unlike the lease in *Winoka Vill.*, is not necessarily controlling.

---

[263] *Winoka Vill., Inc. v. Tate*, 84 A.2d 626, 628 (N.J. Super. Ct. App. Div. 1951).

[264] *Braunstein v. Benjamin Berman, Inc.*, No. 89-5344, 1990 WL 192547, at *8-9 (D.N.J. Sept. 12, 1990).

[265] *Winoka Vill.*, 84 A.2d 626 at 628.

[266] *Id.*

Second, the R&S Plaintiffs identify the Disclosure Statement and R&S Plan as containing misrepresentations effected by AB7. For example, "(b) Exhibit A to the R&S Disclosure Statement that was circulated to all the participants in the R&S Bankruptcy Case was the form of the proposed R&S Plan." The proposed R&S Plan contained the language that "[o]n or prior to the Effective Date, [AB7] will make a capital contribution to Autobacs/Strauss in an amount sufficient to pay the foregoing cash portion of the purchase price plus $10 million of working capital." The R&S Plaintiffs allege that "[b]y agreeing to that language in connection with the R&S Plan, Defendants falsely represented that their intention was to fund the acquisition solely through equity, when, in fact, the AB7 board of directors had already approved" a $23 million loan and other loans "as the mechanism for funding most of the purchase price."[267]

AB7 argues that the R&S Plaintiffs failed to allege that **AB7** made an affirmative misrepresentation with respect to the R&S Plaintiffs' disclosure statement. AB7 essentially says that the R&S Disclosure Statement, and misinformation therein, is simply not AB7's problem. AB7 argues that it did not sign and did not draft the R&S Disclosure Statement. Additionally, AB7 argues that it did not adopt and did not endorse the R&S Disclosure Statement.[268]    Thus, AB7 did not make any misrepresentations because it did not *make* any representations through the disclosure statement. It is certainly possible that a person or entity that does not actually sign a disclosure statement might be responsible for misrepresentations contained in it.

---

[267] D.I. # 1, ¶ 86(b).

[268] D.I. # 25, at 41 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997)).

Whether that is the case, however, is a question of fact that cannot be determined on a motion to dismiss.

Third, ABST alleges that "(c)  For the same reasons, Defendants falsely represented their intent by agreeing to language at page 38 of the R&S Disclosure Statement that AB7 'will make a capital contribution . . . in an amount sufficient to pay the foregoing cash portion of the purchase price. . . .'"[269]  The same analysis that applied to ¶ 86(b) above applies to ¶ 86(c), as this stems from a document drafted and signed by the R&S Plaintiffs, not AB7.

Fourth, ABST alleges "(d)  On behalf of AB7, Kim drafted a Three-Year Projection that was attached to the R&S Disclosure Statement and circulated to all the parties receiving that Disclosure Statement.  All Defendants reviewed and approved the Three-Year Projection before it was disseminated as an exhibit to the R&S Disclosure Statement.  The Three-Year Projection disclosed no interest being paid or accrued and thus falsely represented that Defendants had no current intent to fund the purchase price through a loan rather than a capital contribution, and had no intent to impose additional interest bearing debt on [ABST] after confirmation.  As alleged above, Defendants had previously approved at the AB7 board level the plan to impose substantial interest bearing debt on [ABST]."[270]

---

[269] D.I. # 1, ¶ 86(c).

[270] D.I. # 1, ¶ 86(d).

AB7 argues that the Three-Year Projection prepared by Kim was not a representation that ABST would have no debt.[271]   AB7 contends that Three-Year Projection documents of that nature do not need to include debt.  However, the R&S Plaintiffs argue that the "bottom line net income projection" needed to include debt and interest payments in order to not be misleading.[272]   AB7 replies that no creditor reasonably could have read the projections as representing that ABST would have no debt.[273]  Nonetheless, the nature of the document, its use in the industry, and reasonable interpretations require evidence and is not a proper 12(b)(6) issue.

Fifth, ABST alleges "(e)   Takenaka falsely testified on behalf of AB7 and Takenaka Partners at the R&S Confirmation Hearing on April 25, 2007, that 'AB7 and ABST' had 'no current intention . . . to encumber [sic] the assets' and that neither 'he nor AB7 is aware of any other **arrangement or agreement** involving AB7 and ABST or any of its affiliates, employees or principals.'"[274]

AB7 argues that the "general statement to the New Jersey Bankruptcy Court that he and AB7 were not aware of 'any other arrangement involving AB7 and ABST' was not rendered inaccurate (much less fraudulent) simply because AB7 had *internally* authorized eventual loans to ABST . . . .  The funding approval was merely a ministerial detail of a fully disclosed transaction, not a separate 'agreement' requiring disclosure.

---

[271] D.I. # 25, at 40.

[272] D.I. # 46, at 36.

[273] D.I. # 50, at 26.

[274] D.I. # 1, ¶ 86(e).

The AB7 board's February 26, 2007, internal authorization does not evidence an 'agreement' with ABST, which was not even created until March 8, 2007."[275]

AB7 said it was unaware of "any other arrangement."  "Arrangement" clearly includes preparation.  The R&S Plaintiffs alleged that AB7 represented that it was unaware of any other arrangements, besides those disclosed to the New Jersey Court. The New Jersey Court had not been told of the arrangement made by the board of directors, in preparation for lending $23 million to ABST.   This clearly constitutes a misrepresentation of a presently existing fact.

### b.  Omissions

ABST also argues that the above representatives were false and misleading in failing to disclose that, by virtue of the $23 Million loan obligation, ABST would be insolvent under the Bankruptcy Code from its inception."[276]   ABST argues that insolvency is a consequence that allegedly arises from the fraudulent misrepresentations.  Therefore, it need not be a ground for fraudulent inducement itself. The R&S Plaintiffs are seemingly arguing for fraudulent inducement by omission. Similarly, the R&S Plaintiffs argue that AB7 fraudulently **omitted** to disclose that the R&S Plan confirmation "would likely be followed by the 'liquidation or the need for further financial reorganization."[277]   They also argue that AB7 fraudulently **omitted** to disclose that "there were to be payments to AB7 within the meaning of 11 U.S.C.

---

[275] D.I. # 25, at 41.

[276] D.I. # 1, ¶ 86(f).

[277] D.I. # 1, ¶ 318(g).

§1129(a)(4)."[278]   The Plaintiffs have failed to plead sufficiently the existence of any fraudulent omission.

### c.   Rapid Expansion and Stability Representations Are "Puffery"

The R&S Plaintiffs also allege that AB7 represented that it would stabilize and strengthen ABST.   Specifically, Takenaka proffered that AB7's "business plan for [ABST] is to stabilize the business during the next several months for upwards of 12 months . . . ."[279]   The R&S Plaintiffs allege that AB7 intended to engage in a reckless high risk rapid expansion program that could not be adequately funded without substantial additional working capital not contemplated by the New Jersey Bankruptcy Court, when the representation was made.[280]   They further allege that AB7 stated it "would financially back [ABST], that AB7 was putting its formidable wealth behind [ABST], and that 'the money would be there' for [ABST]."   AB7 argues these were "prototypical examples of **puffery** that cannot support a fraud claim."   In the Court's mind, however, the difference between "puffery" and lying is immaterial.

### 2.   Knowledge or Belief by the Defendant of the Fact's Falsity and an Intention That the Other Relies on the Misrepresentation

As described above, on February 26, 2007, AB7 held a board of directors' meeting, where the directors approved a funding plan for the R&S APA limited to $20 million in equity.   The board-approved funding plan provided for the difference

---

[278] D.I. # 1, ¶ 318(h).

[279] D.I. # 1, ¶ 318(f).

[280] D.I. # 1, ¶ 75.

between the Schedule 4 total ($38,919,235) and $20 million to be funded with debt.[281] This occurred approximately one month after the alleged January 2007 statements made during negotiations. Though the evidence of intent arises after the alleged misrepresentation, in *Roll v. Singh*, the court held that a "[d]efendant's lack of intention may be shown circumstantially by his subsequent acts and by subsequent events . . . ."[282] It similarly shows knowledge of the fact's falsity, sufficient to overcome the Motion to Dismiss.

### 3. Reasonable Reliance Thereon

AB7 argues that Plaintiffs could not reasonably have relied on any oral representations made during R&S APA negotiations because of the R&S APA's integration clause. AB7 finds the R&S APA clear and unambiguous. However, in light of the other relevant documents, the R&S APA is not clearly and unambiguously written to allow the use of debt in paying the cash portion of the purchase price under the R&S APA or other R&S Plan-related documents. The method of funding requires interpretation, and therefore the parol evidence rule should not bar evidence of prior oral statements.

---

[281] D.I. # 1, at ¶ 78.

[282] *Roll v. Signh*, No. 06-CV-04136, 2008 WL 3413863, at *18 (D.N.J. June 26, 2008. AB7 argues that it may have made a reasonable but mistaken interpretation of the R&S Confirmation Order and Plan. However, they contend, a reasonable but mistaken interpretation cannot give rise to an inference of fraudulent intent. Whether their interpretation was reasonable or not is clearly not properly determined on their Motion to Dismiss.

### 4.  Resulting Damages

Plaintiffs allege that as a result of the misrepresentations, creditors (whose interests are now represented by the R&S Plaintiffs) agreed to the R&S Plan, voting for its confirmation.  Plaintiffs also allege that the R&S Plaintiffs are owed $8,140,496.67, which is the amount still due under the R&S Plan.  Furthermore, Plaintiffs seek compensatory as well as punitive damages.  These allegations are sufficient to survive the Motion to Dismiss.

### 5.  Yamada, Takeda, and Kojima

Yamada, Takeda, and Kojima argue correctly that no specific statements, i.e., misrepresentations, are attributed to them. Therefore, the Motion to Dismiss Count Thirteen against Yamada, Takeda, and Kojima in their individual capacity will be dismissed.

### 6.  Leave to Replead

Leave to replead is "freely given when justice so requires" and denied when futile.[283] the definition of "R&S Principals" is not specific enough to allege fraud under Rule 9(b), leave to replead.  Nonetheless, the court grant the plaintiffs leave solely to replead the definition of R&S Principals, as repleading with more specificity may establish a claim upon which relief could be granted.

---

[283] *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

### 7. Conclusion: Motion to Dismiss Count Thirteen Will Be Granted in Part and Denied in Part

The Motion to Dismiss the claims against Yamada, Takeda, and Kojima will be granted. The Motion to Dismiss the remaining claims under Count Thirteen will be denied, provided, however, that the motion to dismiss the alleged misrepresentations made to "R&S Principals" will be granted provided however, that the R&S plaintiffs have leave to replead the definition of "R&S Principals."

### Count Fourteen:  Disallowance of AB7 Proof of Claim

In Count Fourteen, ABST seeks to disallow AB7's general unsecured claim against ABST because the loans which provide the basis for the claim should be recharacterized as an equity investment.[284]

Count Fourteen is tied to Count Eight: Recharacterization of Debt to Equity. As this Court is not dismissing Count Eight, the Motion to Dismiss Count Fourteen will be denied.

### Count Fifteen:  Disallowance of AB7 Proof of Claim

In Count Fifteen ABST seeks to disallow AB7's Proof of Claim to pursuant to Bankruptcy Code §502(d) based on underlying avoidable transfer claims.  Those claims are addressed in Counts Three, Four, and Five.  The Court has denied the Motion to Dismiss Counts Three and Five and granted the Motion to Dismiss Count Four However, because Count Three and Count Four overlap somewhat the Court will deny the Motion to Dismiss with respect to Count Fifteen in whole.

---

[284] AB7's Proof of Claim against ABST included $42,575,218.47 in unpaid principal and interest on unsecured loans.

## Punitive Damages

"In order for a defendant to be subject to liability for punitive damages, his conduct must be 'willful and wantonly reckless or malicious.'"[285]  Given the survival of numerous relevant claims and the nature of the facts and allegations, it would be premature to make a decision on punitive damages at the 12(b)(6) stage.[286]  AB7's arguments to the contrary are unavailing.[287]

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss and Takenaka's Motion. More specifically:

1. The Motion to Dismiss Counts 1-3, 5, 7-11 and 14-15 will be denied.

2. The Motion to Dismiss Count 4 will be granted in part and denied in part as the amount of the claim is limited to $10,952,035.

3. The Motion to Dismiss Count 6 will be denied, provided, however, that the portion relating to Count 4 will be granted in part and denied in part as the amount of the claim is limited to $10,952,035.

4. The Motion to Dismiss the claims against Yamada, Takeda, and Kojima in Count 13 will be granted.

---

[285] *Boyes v. Greenwich Boat Works, Inc.*, 27 F.Supp.2d 543, 548 (D.N.J. 1998).

[286] *See Sheris v. Nissan N. Am. Inc.*, No. 07-2516, 2008 WL 2354908, at *9 (D.N.J. June 3, 2008).

[287] AB7 argues that fraud standing alone without an aggravating element will not sustain a claim for punitive damages.  However, an "aggravating" element includes willful, wantonly reckless, or malicious conduct.  As Plaintiffs have alleged a basic foundation for this sort of conduct in the Complaint, dismissal is premature.

5.  The Motion to Dismiss that portion of Count 13 relating to misrepresentations made to the R&S Principals will be granted, provided, however, that the R&S Plaintiffs have leave solely to replead the definition of "R&S Principals."

6.   The Motion to Dismiss the balance of Count 13 will be denied.

7.  Finally, the Motion to Dismiss claim for punitive damages will be denied.


The Court will enter an order.